```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3
    MARK N. WAYSON,
 4
             Plaintiff,
 5
       vs.                        NO.  F03-0035 (JWS) Civil
 6
    ROBERT SCHNEIDER and the
 7  UNITED STATES OF AMERICA,
 8           Defendants.
 9
10     VIDEOTAPED TELEPHONIC DEPOSITION OF LINDA S.C. RUNDELL
11                     September 27, 2004
12                         9:14 a.m.
                        4010 Rodeo Road
13                    Santa Fe, New Mexico
14
15
16      The deposition of LINDA S.C. RUNDELL was taken on
17  behalf of the Plaintiff on September 27, 2004, at 9:14 a.m.
18  at the offices of Hunnicutt, Costello Reporting, Santa Fe,
19  New Mexico, before Maureen R. Costello, Certified Court
20  Reporter #220 and Notary Public in and for the County of
21  Santa Fe, State of New Mexico.
22
23
24
25                         COPY
```

HUNNICUTT, COSTELLO REPORTING, INC.
(505) 474-9770 - (800) 304-9770 FAX (505) 474-9771
MAUREEN R. COSTELLO, RPR, CCR 220

Exhibit B

Case 4:06-cv-00001-JWS   Document 48-3   Filed 05/16/2007   Page 2 of 11

WAYSON vs. SCHNEIDER                     LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

2 (Pages 2 to 5)

### Page 2

```
                    APPEARANCES
 1
 2  FOR PLAINTIFF:  MARK N. WAYSON
                    Pro Se
 3  VIA TELEPHONIC  Post Office Box 84570
    COMMUNICATION   Fairbanks, Alaska 99708-4570
 4                  (407) 746-4570
                    markonwayson@yahoo.com
 5
    FOR DEFENDANTS: DANIEL COOPER, Jr., ESQ.
 6                  Assistant U.S. Attorney
    VIA TELEPHONIC  222 W. 7th Ave. #9, Rm. 253
 7  COMMUNICATION   Anchorage, Alaska 99513
                    (907) 271-1408
 8
    VIDEOGRAPHER:   WILL MOIR
 9                  WILL VIDEO MOIR PRODUCTIONS
                    12 Monticello
10                  Albuquerque, New Mexico 87123
                    (505) 292-7659 FAX (505) 298-4137
11                  canyongods@comcast.net
12                  I N D E X
13                                          PAGE
14  EXAMINATION OF LINDA S.C. RUNDELL
15     BY MR. WAYSON               5
                                  30
16                                 36
17     BY MR. COOPER              27
                                  34
18
    Objections By Mr. Cooper  16, 17, 20, 22, 24, 25, 37
19
    No Requests for Production of Documents
20
    No Instructions Not to Answer
21
    SIGNATURE/CORRECTION PAGE           40
22
    REPORTER'S CERTIFICATE              41
23
24
25
```

### Page 3

```
 1              E X H I B I T S
 2                    Initial Reference
 3
    Deposition Exhibit
 4
    1  09/19/02 Memorandum               23
 5     To: Chief, Nat'l Law Enforcement Office
       From: State Director, Linda Rundell
 6     Subj: DOI-OIG Case File No. 2002-I-R-612-WCA
 7  2  10/02/02 Memorandum
       To:  Special Agent-In-Charge      26
 8     From: Chief Nat'l Law Enforcement Office
              Walter I. Johnson
 9     Subj: Investigative Referral
10  3  09/15/01 U.S. Dept of the Interior  26
       Bureau of Land Management
11     Contract Diary by Carol Hammond
12  4  09/15/01 Incident/Investigation Report  27
       Officer Eddie R. Lee
13
    5  04/05/02 Letter to Earl E. Devaney     27
14     Re: 18 U.S.C. 1001 violation by Fairbanks
       From Mark N. Wayson
15
16
17           * * *
18
19
20
21
22
23
24
25
```

### Page 4

1   VIDEOGRAPHER: Good morning. Today is Monday, the
2   27th of September, 2004. The time is 9:14 a.m. I am Will
3   Moir, owner of Will Moir Video Productions located in
4   Albuquerque, New Mexico. We're here for the deposition of
5   Linda Rundell in the case of Mark N. Wayson versus Robert
6   Schneider and the United States of America, filed in the
7   United District Court for the District of Alaska, Case
8   No. F03-0035.
9           This deposition is being videotaped in the
10  presence Maureen Costello with the court reporting firm of
11  Hunnicutt, Costello. This deposition is being held at
12  4010 Rodeo Road in Santa Fe, New Mexico.
13          Counsel will now please state their appearance.
14          MR. WAYSON: Mark Wayson representing myself.
15          MR. COOPER: Daniel R. Cooper, Jr., Assistant
16  United States Attorney, counsel for Mr. Schneider and the
17  United States.
18          VIDEOGRAPHER: Thank you very much. The court
19  reporter will now, please, swear the witness in.
20          (The witness was first duly sworn.)
21          VIDEOGRAPHER: Thank you. We're all set. Thank
22  you.
23
24
25

### Page 5

1               LINDA S.C. RUNDELL,
2   the Witness herein, having been first duly sworn by the
3   Notary Public, was examined and testified as follows:
4                   EXAMINATION
5   BY MR. WAYSON:
6       Q  Ms. Rundell, I will begin the questioning. I'm
7   Mark Wayson. I would first like to ask you how long you've
8   been with BLM.
9       A  A little over 25 years.
10      Q  And in what capacity are you working now?
11      A  I am currently the BLM State Director for the
12  states of New Mexico, Oklahoma, Texas and Kansas.
13      Q  And how many -- how many state directors are
14  there?
15      A  Oh, about eleven, ten or eleven, something like
16  that.
17      Q  Okay. And were you a state director in Alaska?
18      A  I was the associate state director in Alaska.
19      Q  And for how long?
20      A  For three years.
21      Q  Can you tell me from when to when, please?
22      A  December 1999 through December of 2002.
23      Q  And as an associate director, whom did you -- who
24  was the director then?
25      A  Fran Cherry.

Case 4:06-cv-00001-JWS   Document 48-3   Filed 05/16/2007   Page 3 of 11

WAYSON vs. SCHNEIDER                    LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

3 (Pages 6 to 9)

Page 6

1  Q. Did you say Kerry?
2  A. Cherry, C-h-e-r-r-y.
3  Q. Okay. As an associate director, were you at times
4  the acting director?
5  A. Yes, I was.
6  Q. Okay. Well, I want to draw your attention to this
7  -- a letter that we have here which is -- it's
8  Exhibit No. 5 --
9  A. Yes.
10 Q. -- in that packet. It's the September 19th
11 memorandum, excuse me, from the State Director to the
12 Chief, National Law Enforcement Office.
13 A. (Witness perused document.)
14 Q. Did you find it?
15 A. Yes, I have it.
16 Q. Okay. And did you write this letter, write this
17 memorandum?
18 A. I signed it. It may have been drafted by one of
19 my employees.
20 Q. Do you know who would be drafting something like
21 that?
22 A. I do not recall.
23 Q. Did you read it, review it?
24 A. Yes, I did.
25 Q. Did you sign it, agreeing with it?

Page 7

1  A. Yes, I did.
2  Q. Okay. Now, this in your first paragraph, you
3  refer to an inquiry. I understand this was an
4  administrative inquiry.
5  A. I believe so.
6  Q. Okay. And who assigned it to you?
7  A. As I recall, from going through this packet of
8  information because my memory is vague on this, it was
9  someone from the National Law Enforcement Office of BLM.
10 Q. In other words, they would have the authority to
11 assign you an inquiry like this?
12 A. Most likely I received a call; and I have a copy
13 of a written memo signed by Walter Johnson, who was the
14 acting agent-in-charge at that time, about the incident and
15 asking that I look into it.
16 Q. What's the date of this memo, please?
17 A. Oh, let's see. (Witness perused documents.) I
18 believe I'm referring to the memo signed by -- well, Dennis
19 McLane. It's actually from Walter Johnson to the IG's
20 office.
21 Q. I'm sorry. I didn't understand.
22 A. The October 2, 2002, memo from Walter Johnson to
23 the special agent-in-charge, Office of Inspector General.
24 You have it marked as No. 7.
25 Q. That's correct, but my inquiry is: Who assigned

Page 8

1  you the administrative inquiry?
2  A. I do not recall. As I mentioned, it was probably
3  as a result of a phone call from the national office, law
4  enforcement.
5  Q. But you don't know who called you?
6  A. I do not recall.
7  Q. Okay. Did you -- Do you know when you were
8  assigned this inquiry?
9  A. I do not.
10 Q. Okay. What -- Is there a procedure for an
11 administrative inquiry?
12 A. The procedures vary according to what the inquiry
13 is about. In this case I would have made some calls
14 myself, particularly to the manager in question,
15 Mr. Schneider; and most likely I asked that someone from
16 the National Office of Law Enforcement look into it as well
17 since it involved a law enforcement activity.
18 Q. Did you contact Mr. Schneider then?
19 A. I did.
20 Q. Did you talk to him before you wrote this or
21 signed this memorandum?
22 A. I did.
23 Q. Okay. Do you recall who was the national law
24 enforcement officer you spoke with?
25 A. I do not.

Page 9

1  Q. Okay. Do you remember if you talked to anybody
2  else in conducting this administrative inquiry?
3  A. I do not recall. It's likely that I may have.
4  Q. But would you have followed a procedure for an
5  inquiry such as this?
6  A. As I mentioned already, the procedures varied,
7  depending on the type of inquiry you're looking at.
8  Q. What kind of inquiry was this?
9  A. Well, this one involved law enforcement. So
10 typically we would ask someone from the National Law
11 Enforcement Office to help with the review.
12 Q. Did you make any notes when you were preparing,
13 doing this administrative inquiry?
14 A. I don't know that I did. I don't have them if I
15 did.
16 Q. Okay. Can you recall anyone else that you spoke
17 with making various inquiries?
18 A. As I mentioned already, I'm sure that I talked to
19 someone from the National Office of Law Enforcement; but
20 who that was, I cannot recall.
21 Q. Did you talk to Carol Hammond?
22 A. I don't know that I did talk to Carol.
23 Q. Do you know her?
24 A. I probably met her in Fairbanks at an
25 all-employees meeting or some other meeting.

Case 4:06-cv-00001-JWS   Document 48-3   Filed 05/16/2007   Page 4 of 11

WAYSON vs. SCHNEIDER                    LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

4 (Pages 10 to 13)

Page 10

1  Q. Did you contact any witnesses?
2  A. I did not.
3  Q. Did you contact Ranger Lee with the law
4  enforcement in Fairbanks with BLM?
5  A. I may have, but I don't recall.
6  Q. Do you know if Henri Bisson was in any capacity at
7  -- in the Alaska administration of BLM at that time?
8  A. Henri Bisson was in the Washington office. At
9  that time he was not in the Alaska BLM organization.
10 Q. Did you talk to Michael Baffrey with the Secretary
11 of Interior's Office?
12 A. I cannot recall.
13 Q. In the second paragraph of this memorandum dated
14 September 19th, you referred to: "Upon careful review of
15 the incident in question, we have determined," and can you
16 tell me who the "we" you're referring to is?
17 A. My guess would be that I was referring to myself,
18 the State Director, and whoever from the National Law
19 Enforcement Office looked into the incident for me.
20 Q. Do you know who the chief in the National Law
21 Enforcement Office was at that time?
22 A. I'm fairly certain it was Walter Johnson.
23 Q. Okay. Did Pamela Stuart have any role in this, in
24 the inquiry?
25 A. I don't know that she was on board at that time.

Page 11

1  I can't remember the exact date that we hired her.
2  Q. Was she the chief of the law enforcement here in
3  Alaska?
4  A. She was the special agent-in-charge in Alaska.
5  Q. So she was the top-ranking law enforcement officer
6  in Alaska.
7  A. Yes.
8  Q. Okay. And where is she now?
9  A. She is now in Santa Fe.
10 Q. And when did she transfer down there, do you know?
11 A. To Santa Fe?
12 Q. Correct.
13 A. I believe it was around April of 2003. That's
14 just a guess, though.
15 Q. And I understand that you went down there in
16 December of --
17 A. 1999.
18 Q. That's correct, but I mean: You transferred from
19 Alaska in December of 2002?
20 A. Yes.
21 Q. Okay. Do you think that the finding that you made
22 may have been different had you interviewed the individuals
23 who were involved and reviewed evidence?
24 A. I don't believe so.
25 Q. Would you follow the same procedures if the

Page 12

1  complainant had been a federal employee?
2  A. Yes.
3  Q. Would you contact that employee?
4  A. Probably not. I would have asked whoever was
5  handling the inquiry for me to look at the facts and
6  contact whoever that individual felt needed to be
7  contacted.
8  Q. Did you do so in this case?
9  A. I turned it over to the National Law Enforcement
10 Office, and they conducted their investigation into the
11 matter.
12 Q. But you don't know who you assigned to do this
13 inquiry?
14 A. I don't recall.
15 Q. Would there be a record of it anyplace?
16 A. I'm -- Most likely if there is, it would be in
17 the Boise office of the National Law Enforcement Office.
18 Q. Okay. What information did you have when you
19 began this inquiry?
20 A. I had the memo from Walter Johnson, and I had
21 spoken with Mr. Schneider about the incident. At some
22 point I reviewed the statements written by Ms. Hammond,
23 Officer Lee.
24 Q. I'm sorry. I didn't hear that, ma'am.
25 A. I said: At some point I review the statements

Page 13

1  that were written by Ms. Hammond and Officer Lee.
2  Q. Okay. On the Ms. Hammond statements, you're
3  talking about the contract diary, which is, I believe,
4  Exhibit No. 2.
5  A. Yes.
6  Q. Okay. And with the -- and that Ranger Lee report,
7  you're referring to the report that's listed as No. 3; is
8  that correct?
9  A. Yes.
10 Q. Okay. And just so I keep it straight: You had a
11 memo from Walter Johnson requesting or directing you to
12 this inquiry; but you don't have that memo, right?
13 A. The memo, again, is from Walter Johnson to the IG
14 that I'm referring to.
15 Q. Yes. And do you have that memo?
16 A. I do. We've already spoken about it. It's No. 7.
17 Q. Well, I would ask if you have another one because
18 that's dated October 2nd, and your memorandum is dated
19 September 19, 2002.
20 A. Yes.
21 Q. Well, did you have a memo accompanying this report
22 from Ms. Hammond and the report from Ranger Lee?
23 A. Oh, I don't know. It's not part of the materials,
24 I don't believe, that were sent to me.
25 Q. No, I think that's correct. But did you have one?

Case 4:06-cv-00001-JWS   Document 48-3   Filed 05/16/2007   Page 5 of 11

WAYSON vs. SCHNEIDER   LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

5 (Pages 14 to 17)

Page 14

1  A. I do not recall.
2  Q. Okay. Did you also have the complaint, April 5,
3  2002, complaint, to Earl E. Devaney from me?
4  A. If it's in this packet, I have it. If not, I do
5  not have it.
6  Q. No. I'm asking if you had it. It's No. 1, if
7  that can be of help.
8  A. I have this in front of me that was sent to me.
9  If you're asking whether I had it at the time, I do not
10 know.
11 Q. But you do recall having the report from Ranger
12 Lee and the report from Ms. Hammond?
13 A. Yes.
14 Q. Did you have the e-mail from Mr. Schneider, which
15 is No. 4?
16 A. (Witness perused document.) Probably. I don't
17 recall.
18 Q. When you say that there are different procedures
19 for different administrative inquiries, did you follow the
20 procedure for this administrative inquiry involving a law
21 enforcement matter?
22 A. Yes. I contacted the National Office of Law
23 Enforcement.
24 Q. But didn't they actually contact you?
25 A. I asked them to assist with this.

Page 15

1  Q. So I understand that they assigned it to you, and
2  then you asked them to assist with it.
3  A. Yes.
4  Q. So you're unaware of -- If there was an
5  investigative report in addition to this by National Law
6  Enforcement Office, you're not aware of it?
7  A. I am not.
8  Q. Would they have talked to you about it before you
9  wrote the September 19th letter --
10 A. Yes.
11 Q. -- memorandum?
12 A. Yes.
13 Q. Do you know if they did talk to you about it?
14 A. I believe so.
15 Q. Can you tell me what they told you?
16 A. I don't recall. My guess would be that they
17 looked into it and found no basis.
18 Q. But you have no idea whom you spoke with there?
19 A. I do not.
20 Q. Okay. Are you sure you talked to Robert Schneider
21 about this?
22 A. Yes, I did.
23 Q. And are you sure you talked to him about this
24 before you issued the memorandum?
25 A. I believe Mr. Schneider contacted me about this

Page 16

1  incident after it happened. He gave me a briefing on the
2  phone.
3  Q. Did he report to you that there was a videotape?
4  A. No. I don't know. He may have. I don't recall.
5  Q. If there were videotape, you would have included
6  it in your inquiry?
7  A. My guess is whoever investigated it would have, if
8  they were aware of it, would have wanted to see it.
9  Q. Okay. Now, you wrote here that there was a
10 perceived threat from Mr. Wayson. Do you know what that
11 threat was?
12 A. My understanding is that Ms. Hammond felt
13 intimidated and threatened by Mr. Wayson's behavior.
14 Q. Okay. Now, how did you decide that it was a Title
15 18 violation?
16 A. Whoever I assigned to work on this memo for me
17 would have looked that up.
18 Q. But you cannot recall whom you assigned to work on
19 this memo?
20 A. I do not.
21    MR. COOPER: Objection; asked and answered. I
22 mean, she's told you at least twice if not three times,
23 Mr. Wayson, that she can't recall; and you're not going to
24 get a different answer. So let's use our time wisely.
25 Q. (BY MR. WAYSON) Did you consult with the U.S.

Page 17

1  Attorney at all on this?
2  A. I cannot recall.
3  Q. Could you have?
4  A. I beg your pardon?
5  Q. Could you have?
6     MR. COOPER: Objection; calls for speculation.
7     Go ahead and answer.
8  A. I still didn't hear you. Did you say: Could I
9  have?
10 Q. Could you have called the U.S. Attorney for advice
11 about what statute was being violated?
12 A. I probably would have spoken to the Solicitor's
13 Office.
14 Q. Do you recall who was the solicitor at that time?
15 A. I don't recall that I spoke to the Solicitor's
16 Office. We had a number of solicitors that we worked with
17 on a regular basis.
18 Q. Where does your -- where does this record go, your
19 memorandum?
20 A. We have a filing system, central filing system,
21 and my -- I would suppose that the law enforcement office
22 would have kept a copy. There is a file code at -- on the
23 top, right-hand side of the memorandums which show where
24 they are filed.
25 Q. Is this the number you're referring to, 9260?

Case 4:06-cv-00001-JWS   Document 48-3   Filed 05/16/2007   Page 6 of 11

WAYSON vs. SCHNEIDER                          LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

6 (Pages 18 to 21)

Page 18

1  A. Yes.
2  Q. And then in parentheses 910?
3  A. Yes.
4  Q. What does that -- Does that tell you anything?
5  A. The 910 is the organizational code of the state
6  office. It means it comes from the State Director's
7  office. The 9260 would be the central filing code,
8  perhaps, for law enforcement.
9  Q. Do you know anything about this project that was
10 being conducted up there at 98 Mile Steese Highway?
11 A. I do not, other than it had something to do with
12 enhancing fisheries habitat, I believe.
13 Q. As the associate state director or the acting
14 state director, how would you find out about a project like
15 this?
16 A. I would not find out about a project like that
17 unless someone made a point of telling me about it for a
18 particular reason. Projects like that are generated and
19 carried out at the field office level.
20 Q. What about the cost of it? Would you be involved
21 in the cost of a project such as this?
22 A. Not unless there was a dispute over funding in
23 that there wasn't enough funding to go around for all our
24 projects and I needed to engage in priority setting.
25 Q. Would you be reviewing a budget at any time as a

Page 19

1  state director or associate director?
2  A. From a high level, and that more to ensuring that
3  the offices were adequately funded for operations and
4  personnel costs. Very unusual that I would look at
5  specific project work.
6  Q. But if you, as the associate director of the state
7  -- acting state director, wanted to find out what the cost
8  was of this project, how would you do that?
9  A. I would probably ask the budget officer;
10 alternatively, I might ask the program leader for wild life
11 or engineering; or I could ask the field office manager.
12 Q. That would be the field office manager in
13 Fairbanks?
14 A. Yes.
15    (Discussion off the record with the reporter.)
16    THE WITNESS: Field office manager.
17    THE REPORTER: In Fairbanks?
18    THE WITNESS: Fairbanks.
19 Q. Again, where would the budget officer be located?
20 A. In the state office in Anchorage.
21 Q. Do you remember who the budget officer was when
22 you were the acting director?
23 A. Carol Moore.
24 Q. Carol. Do you know if she still holds that
25 position?

Page 20

1  A. I believe so.
2  Q. If I can just ask again: Did you say you couldn't
3  recall if you had the April 2002 complaint or not when you
4  received the direction for the inquiry?
5  A. I don't recall.
6  Q. Okay. Have you seen it before, again, today?
7  A. I believe I have.
8  Q. Does BLM take any action about environmental
9  violations?
10 A. Yes, we do.
11 Q. And is BLM required to follow the same rules and
12 regulations as a private citizen?
13    MR. COOPER: Objection with respect to -- well,
14 with respect to --
15    MR. WAYSON: Environmental.
16    MR. COOPER: -- environmental, correct.
17    With that correction or clarification, you may
18 answer.
19 A. Well, I don't know what rules and regulations the
20 private citizen would follow. If we are made aware of an
21 environmental issue, we go out and take a look at what has
22 happened and try to determine what the problem is and what
23 needs to be done about it.
24 Q. (BY MR. WAYSON) And if you determine there was a
25 violation, what action would you take?

Page 21

1  A. Well, again, it would depend on what the issue
2  was. If there was a company that had done unauthorized
3  work or had created a hazard or an environmental issue, we
4  would contact the company and attempt to get them to
5  remediate it on an administrative level. If it appeared
6  that there were possible criminal violations, we would
7  certainly ask law enforcement to get involved and take a
8  look at that.
9  Q. Okay. Jumping back over to your letter or the
10 memorandum of September 19, 2002, it directs me to the
11 finding that it was justified for Mr. Schneider to send out
12 rangers in this case; is that correct?
13 A. Yes.
14 Q. Do you think it was also justified for him to
15 notify the state agency that I was a potential serious
16 threat to BLM employees?
17 A. I don't know that he did that.
18 Q. Okay. Can you tell me what you were assigned to
19 inquire into with your administrative inquiry then?
20 A. To the best of my recollection, which is vague, I
21 was asked to look into Mr. Schneider's actions insofar as
22 having called out a ranger to be on the site where
23 Ms. Hammond was conducting her BLM activities.
24 Q. (BY MR. WAYSON) Do you think that this probably
25 was assigned, though, in writing? Am I correct?

Case 4:06-cv-00001-JWS   Document 48-3   Filed 05/16/2007   Page 7 of 11

WAYSON vs. SCHNEIDER                LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

7 (Pages 22 to 25)

Page 22

1    (Discussion off the record with the reporter.)
2    Q. Was this assigned in writing, to the best of your
3  recollection, Ms. Rundell?
4    A. I cannot recall.
5    Q. Do you think that a finding such as this would
6  have a detrimental effect to a BLM employee if it was in
7  their file?
8    A. What finding is that?
9    Q. The finding that you noted here in the September
10 19th memorandum.
11   A. I don't know -- I can't conceive that it would
12 have a detrimental effect, no.
13   Q. But if it was the -- if you made a finding that a
14 BLM employee had committed a Title 18 violation, do you
15 think that would be detrimental to their career?
16   A. I can't speculate on that.
17   Q. Do you think your inquiry was fair?
18   A. I do.
19   Q. Do you think it was fair in that you did not speak
20 with me, the accused?
21      MR. COOPER: Well, objection; vague. You're
22 referring to yourself as "the accused," and your
23 Exhibit No. 1 makes you the accuser, so ...
24      MR. WAYSON: I'm speaking in reference to the
25 accusation here -- or the finding, rather, that I committed

Page 23

1  a crime against Ms. Hammond. That's my question.
2       MR. COOPER: There's no finding that you committed
3  a crime against Mrs. Hammond -- or Ms. Hammond. If you
4  want me to submit it to the grand jury, I will, Mr. Wayson;
5  but I don't think that's what you want.
6       MR. WAYSON: Oh, I would be very pleased if you do
7  that, Mr. Cooper.
8    Q. (BY MR. WAYSON) My question is the -- has to do
9  with the finding that you made in the fifth paragraph.
10      MR. COOPER: Well, first of all, I really think
11 you really need to mark this as an exhibit if you're going
12 to keep on referring to it. Your No. 5, is that what
13 you're referring to?
14      MR. WAYSON: That's what I'm referring to, No. 5,
15 which is the -- I don't know the order we started off in.
16 If you want to make that Exhibit No. 1, that's fine with
17 me.
18      MR. COOPER: Let's make it Exhibit No. 1 and
19 attach it to the deposition, Madam Court Reporter.
20      (Discussion off the record with the reporter.)
21          (Deposition Exhibit No. 1)
22              Was marked for identification)
23      MR. COOPER: Thank you.
24   Q. (BY MR. WAYSON) Ms. Rundell, referring to
25 Exhibit No. 1, I'm referring to specifically to the fifth

Page 24

1  paragraph wherein it states:
2          "Title 18 United States Code 111
3       states in pertinent part, 'whoever forcibly
4       assaults, resists, opposes, impedes,
5       intimidates, or interferes with any person
6       designated in section 1114 of this title
7       (the BLM falls within this statue) while
8       engaged in or on account of the performance
9       of official duties shall be fined under this
10      title or imprisoned not more than one year,
11      or both."
12 Next sentence:
13         "Ms. Hammond, while performing her
14      official duties, was intimidated by
15      Mr. Wayson."
16      MR. COOPER: Now what's your question?
17   Q. (BY MR. WAYSON) My question is: Can we
18 reasonably assume that's a finding that a criminal act
19 occurred?
20      THE REPORTER: That what?
21      MR. WAYSON: Is that a reasonable -- a person -- a
22 reasonable person reading this could assume that a criminal
23 act had occurred.
24      MR. COOPER: Well, I just object to the form of
25 the question.

Page 25

1    Q. (BY MR. WAYSON) Did you make a finding that I
2  committed a crime -- this crime against Ms. Hammond?
3       MR. COOPER: Well, once again, I'm going to
4  object, Mr. Wayson. It's not a crime against Ms. Hammond.
5  It would be a crime against the peace and dignity of the
6  United States of America.
7       (Discussion off the record with the reporter.)
8       MR. COOPER: Okay. It would be a crime against
9  the peace and dignity of the United States of America.
10   Q. (BY MR. WAYSON) Okay. Ms. Rundell, did you make
11 this finding?
12      MR. COOPER: Objection to the characterization of
13 the statement as a "finding."
14      Go ahead and answer, if you can, Ms. Rundell.
15   A. Yes, I did.
16   Q. (BY MR. WAYSON) You did make this finding?
17   A. Yes.
18   Q. And are you saying it was based upon the people
19 you spoke with and who you can't recall?
20   A. I'm sorry. I'm not getting what you're saying.
21   Q. Well, I mean, other than what you've noted here
22 today of the persons you spoke with, is there any other
23 evidence that led you to the finding?
24   A. I don't recall.
25   Q. Ms. Rundell, you stated you can't recall who you

Case 4:06-cv-00001-JWS    Document 48-3    Filed 05/16/2007    Page 8 of 11

WAYSON vs. SCHNEIDER                                LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

8 (Pages 26 to 29)

Page 26

1  assigned to help you on this law enforcement, but did you
2  give specific instructions?
3       A. I'm certain I asked someone to look into it for
4  me.
5       Q. Did you ask them to make a report to you?
6       A. I don't know that I asked for a written report.
7  It may have just been verbal.
8           MR. WAYSON: You can talk to her.
9           MR. COOPER: Okay. Madam Court Reporter, first of
10 all, for the purpose of this deposition, I would like to
11 have Ms. Rundell hand you what's been marked -- she has a
12 document marked the number 7 with a circle around it. I
13 would like that marked as No. 2.
14          The one that she has circled with --
15          (Discussion off the record with the reporter.)
16                 (Deposition Exhibit No. 2
17                 Was marked for identification)
18          MR. COOPER: Okay. She also has a document with a
19 circled No. 2 at the top. If she would mark that, please.
20 That's the Carol Hammond report as No. 3.
21                 (Deposition Exhibit No. 3
22                 Was marked for identification.)
23          MR. COOPER: Okay. And the Ranger Lee report,
24 which has the circled No. 3 at the top would be Deposition
25 Exhibit No. 4.

Page 27

1                  (Deposition Exhibit No. 4
2                  Was marked for identification)
3                        EXAMINATION
4  BY MR. COOPER:
5       Q. And, Ms. Rundell, do you have this letter from the
6  Mark Wayson dated April 5, 2002? That's No. 1. I'd like
7  to mark that as Deposition Exhibit No. 5.
8       A. With the attachments?
9       Q. Yes, go ahead and mark it the way it was submitted
10 with all those attachments.
11      A. Okay.
12                 (Deposition Exhibit No. 5
13                 Was marked for identification)
14          MR. COOPER: Okay. Thank you.
15      Q. (BY MR. COOPER) Starting now back with Deposition
16 Exhibit No. 1, which is your memo dated September 19, 2002,
17 Ms. Rundell, at the bottom of the first page, do you have
18 what has been referred to by Mr. Wayson as a finding where
19 you make a conclusion that there was an intimidation in the
20 performance of official duties? Do you find that?
21      A. Yes, I do, huh-huh.
22      Q. Okay. Now, the finding -- and I'm going to use
23 that word because that's how Mr. Wayson has used it -- is
24 not the same as a conviction, is it?
25      A. A conviction, no.

Page 28

1       Q. Okay. In fact, in order for this case to proceed
2  even criminally, would you have had to present the factual
3  issues to the United States Attorney's Office so that they
4  could proceed criminally?
5       A. Yes.
6       Q. Did you ever do so?
7       A. I do not believe that occurred.
8       Q. Okay. With respect to the incident back in
9  September of 2001 which, prior to Mr. Wayson's complaint on
10 Exhibit No. 5 that Mr. Schneider did something wrong, do
11 you have any firm recollection of either the incident in
12 September 2001 or the subsequent investigation called for
13 by Mr. Wayson?
14      A. Very, very vague. It was not of sufficient
15 standing, I guess. That's not quite the right word, but it
16 just didn't stay with me because it didn't seem to be that
17 big of an incident.
18      Q. Okay. When you where conducting this
19 investigation or supervising this investigation, did you
20 maintain a file at any time, do you recall?
21      A. I do not recall, but I don't believe I did.
22      Q. Okay. If you had retained a file, where would it
23 be located now if it still exists?
24      A. It would have been put together with the
25 investigative materials.

Page 29

1       Q. Would it have been somewhere in the state
2  director's office?
3       A. It would have been, I would assume, filed under
4  the Law Enforcement Code. I may have -- if I had kept
5  written notes of anything, would have given them to the
6  investigator.
7       Q. Okay. And you would have worked with the
8  Solicitor General's Office on this, if at all, in terms of
9  legal advice?
10      A. Right.
11      Q. Was Joe Darnell at the solicitor's office at that
12 time?
13      A. Yes, he was.
14      Q. Okay. Now, turning your attention to Exhibits
15 No. 3 and No. 4, do you believe as you sit here today that
16 you did review those two, those two items?
17      A. I believe so.
18      Q. Okay. But you don't know if you ever saw this the
19 letter from Mr. Wayson to Mr. Devaney marked Exhibit No. 5?
20      A. I don't recall it. I may have seen it. I just
21 don't really recall.
22          MR. COOPER: Okay. Thank you. I don't have
23 anything further.
24
25

Case 4:06-cv-00001-JWS    Document 48-3    Filed 05/16/2007    Page 9 of 11

WAYSON vs. SCHNEIDER                          LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

9 (Pages 30 to 33)

Page 30

1    FURTHER EXAMINATION
2   BY MR. WAYSON:
3       Q. Ms. Rundell, I would like to continue just a
4   minute. Would it be -- would you be concerned personally
5   if there was an official finding that you'd committed a
6   criminal act?
7       A. I beg your pardon? That I committed a criminal
8   at?
9       Q. Exactly.
10      A. Would I be concerned personally?
11      Q. Yes.
12      A. I would assume so.
13      Q. If it was made part of the official record?
14      A. You know, you're asking for speculation, but I
15  would assume I'd be concerned.
16      Q. And if you were -- had been accused by an employee
17  of something, would you expect to be contacted before such
18  a finding was made?
19      A. Perhaps. It would depend on what the -- what the
20  allegation was.
21      Q. Well, let's say it's the allegation that's in
22  paragraph 5 of your memorandum.
23      A. That I don't believe is an allegation. It seems
24  to be a conclusion from the review.
25      Q. And if this conclusion had been made about you and

Page 31

1   placed in the official record, would you find this
2   troubling?
3       A. Well, again, you're asking for speculation, and I
4   just -- I don't know.
5       Q. And there are a number -- in Exhibit No. 3, which
6   is the Carol Hammond report, there are a number of other
7   allegations in there. Do you remember those?
8       A. My recollection is that Ms. Hammond was not
9   pleased that a video camera had been thrust in her face.
10  She felt intimidated. She felt threatened.
11      Q. Did Ms. Hammond indicate that the video camera was
12  thrust in her face?
13      A. I believe that is in her report, but I'd have to
14  go over it again.
15      Q. Could it have been in Mr. Schneider's report
16  instead?
17      A. It could have been. It could have been.
18      Q. Do you recall an allegation from Ms. Hammond that
19  there had been some comment made by me that it was just
20  like a woman to call someone for help?
21      A. I don't recall that.
22      Q. Do you recall an allegation in there -- or a
23  suggestion or allegation by Ms. Hammond in her report that
24  I had intended that the 9/11 attackers target federal
25  buildings?

Page 32

1       A. I don't recall that either. It may be in the
2   report, but I'd have to read it to refresh my memory.
3       Q. Do you recall, from your memory today or back then
4   when you were reviewing it, an allegation that I had
5   improperly touched another BLM employee?
6       A. I don't recall.
7       Q. Did you arrive at a conclusion what was done or
8   what I did to threaten, intimidate, or interfere with
9   Ms. Hammond?
10      A. I'm sorry. Can you repeat that?
11      Q. Yes. Did you arrive at a conclusion at any time
12  what it was I did which was threatening to Ms. Hammond?
13      A. Ms. Hammond's report and what was reported to me
14  by Mr. Schneider is that your verbal language and your
15  presence was intimidating to her, and she felt threatened.
16      Q. Okay. Was there any suggestion of force?
17      A. Not that I can recall.
18      Q. Okay. Is it possible that you spoke with
19  Mr. Schneider after your inquiry was completed?
20      A. Well, certainly. He worked for me.
21      Q. Right, but what I'm asking is that: Do you recall
22  for sure that you spoke to him before you wrote the
23  memorandum?
24      A. Yes, I'm sure I did.
25      Q. About this matter?

Page 33

1       A. Yes.
2       Q. Okay.
3       A. I'm fairly certain he called me after the incident
4   occurred on the -- probably the next business day.
5       Q. Did you -- That was long before the inquiry was
6   assigned to you, correct?
7       A. Yes.
8       Q. So did you talk to him after the inquiry was
9   assigned to you?
10      A. I don't recall, but I may have called him just to
11  refresh my memory on what he had said.
12      Q. Well, you're not certain when, but was it -- can
13  you tell me approximately how long before you wrote the
14  September 19, 2002, memorandum that the inquiry was
15  assigned to you?
16      A. I do not recall.
17      Q. Is there something procedurally that would require
18  you answer within a certain period of time?
19      A. I don't know.
20      Q. Well, you referred to that, indeed, there are some
21  procedures. Is there any place I can obtain these
22  procedures?
23      A. I would suggest that you put your request to the
24  National Law Enforcement Office.
25         MR. WAYSON: Mr. Cooper, anything further?

Case 4:06-cv-00001-JWS   Document 48-3   Filed 05/16/2007   Page 10 of 11

WAYSON vs. SCHNEIDER                                    LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

10 (Pages 34 to 37)

Page 34

1    MR. COOPER: Yes, just to follow up briefly.
2            FURTHER EXAMINATION
3  BY MR. COOPER:
4    Q. Ms. Rundell, I want to get the chronology of your
5  contacts with Mr. Schneider down as best I can. First of
6  all, Mr. Schneider worked for the director's office, did he
7  not?
8    A. He was a field office manager who reported
9  directly to the state director.
10   Q. Okay. So in the normal course of the performance
11 of your duties, you would have lots of contact with
12 Mr. Schneider?
13   A. Many, yes.
14   Q. Okay. Now, focusing just on the events that took
15 place up at 98 Mile Steese and the --
16        (Discussion off the record with the reporter.)
17      MR. COOPER: Steese, S-t-e-e-s-e. That's a term
18 of art for those who live in Alaska.
19   Q. (BY MR. COOPER) Okay. So with respect to the
20 events that occurred up at 98 Mile Steese Highway and the
21 subsequent complaint and investigation -- complaint by
22 Mr. Schneider -- excuse me. Let me start over.
23      What I'm interested in is any conversations you
24 had that you can recall with Mr. Schneider about the events
25 of September 15, 2001, at 98 Mile Steese Highway concerning

Page 35

1  Mr. Wayson and Ms. Hammond.
2    A. I am reasonably certain that Mr. Schneider called
3  me to tell me about what had occurred and the fact that he
4  had asked a ranger to go out on the location because his
5  employee, Ms. Hammond, had felt intimidated and threatened
6  by Mr. Wayson.
7    Q. Okay. And after that, do you recall talking to
8  Mr. Schneider about these events and the investigation
9  until after your conclusions were reached?
10   A. It would have been a normal course of business to
11 have talked to him again as a followup.
12   Q. Okay. But not to go into -- Well, strike that.
13       Would it have been part of your investigative
14 process to talk to Mr. Schneider about what he did and why
15 he did it prior to issuing your report?
16   A. I would have been part of the process. Whether as
17 part of that inquiry, I spoke to him about it or the person
18 who was investigating spoke to him about it, I don't
19 recall.
20   Q. As you sit here today, looking back, now having
21 had your memory refreshed by all of these documents that
22 have been attached to your deposition, do you still believe
23 that Mr. Schneider did the right thing by sending a ranger
24 out there to help control the situation?
25   A. I certainly do. I think he would have been

Page 36

1  negligent in his duties if he did not respond appropriately
2  when an employee told him that he or she felt like they
3  were being threatened by a member of the public.
4    Q. Regardless of whether or not that employee's
5  perceptions accurately reflected reality?
6    A. A person's feelings are what they are. They're
7  very personal; and in a situation that one employee might
8  take as being threatening behavior, another might not; but
9  you have to pay attention to what that employee is telling
10 you and take action based on that employee's feelings.
11   Q. In other words, you have to provide a safe work
12 place for and a safe work environment for an employee based
13 upon their perception?
14   A. Yes.
15   Q. Okay.
16      MR. COOPER: Thank you. I don't have anything
17 further.
18            FURTHER EXAMINATION
19 BY MR. WAYSON:
20   Q. Ms. Rundell, to try and track down who may have
21 taken part of this inquiry for you here in Alaska, do you
22 remember if it was an -- the person you requested was an
23 Alaskan officer or if it was somebody from the national
24 bureau?
25   A. The typical policy is if we are conducting an

Page 37

1  inquiry or investigation about someone within our state, is
2  that someone from out of state would conduct that inquiry
3  or investigation.
4    Q. Okay. Do you remember how many rangers you had at
5  that time in Alaska?
6    A. I believe there were three or four.
7    Q. And would that be in addition to Special Agent
8  Stuart?
9    A. Yes. She's not considered a ranger.
10   Q. Was there a Special Agent Pete Johnson involved in
11 this also who was an Alaskan agent?
12   A. Pete Johnson was the special agent-in-charge prior
13 to when Ms. Stuart was hired. He retired. I can't recall
14 the date he retired or the date Ms. Stuart came on board.
15   Q. Is it normal in the course of BLM business not to
16 maintain records of an inquiry like this?
17       (Discussion off the record with the reporter.)
18      MR. WAYSON: Of an inquiry like this,
19 administrative inquiry.
20      MR. COOPER: I'm going to object. It misstates
21 the record. There's been no evidence that there hasn't
22 been records kept.
23       (Discussion off the record with the reporter.)
24      MR. COOPER: Never mind. Withdraw my objection.
25 Go ahead. Let's get this over with.

Case 4:06-cv-00001-JWS   Document 48-3   Filed 05/16/2007   Page 11 of 11

WAYSON vs. SCHNEIDER                LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

11 (Pages 38 to 41)

Page 38

1  A. Can you repeat the question, please?
2  Q. (BY MR. WAYSON) I would like to know what the
3  policy is on maintaining records in an administrative
4  inquiry.
5  A. Well, there are records before me that were
6  certainly maintained.
7  Q. But are there any records -- Is there any policy
8  requiring you to keep records of your efforts during an
9  administrative inquiry?
10 A. The -- I am not aware that there are any other
11 records other than what is in front of me.
12    MR. WAYSON: Okay.
13    MR. COOPER: Are you through, Mr. Wayson?
14    MR. WAYSON: I am through.
15    MR. COOPER: So am I.
16    Ms. Rundell, I'm not sure what the procedure is
17 down there, but in the District of Alaska, you have the
18 opportunity to review the transcript of your deposition,
19 make any corrections in accordance with the rules that the
20 court reporter will follow -- excuse me -- will provide
21 you.
22    Madam Court Reporter, is that the way you guys do
23 it in New Mexico?
24    THE REPORTER: Yes. Are you going to be getting a
25 copy, Mr. Cooper?

Page 39

1     MR. COOPER: Yes.
2     THE REPORTER: Okay. Now, do you want me to send
3  the signature letter to you, or do you want me to send the
4  witness copy directly to the witness?
5     MR. COOPER: Send it directly to the witness,
6  please.
7     We will not waive signature because I'd you to
8  read it, Ms. Rundell.
9     THE WITNESS: Okay.
10    THE REPORTER: Then I'll send her a signature
11 copy. She has in this state 30 days to read and sign.
12    MR. COOPER: Yes.
13    THE REPORTER: Okay.
14    MR. COOPER: And how long will it take for the
15 transcript to be prepared?
16    VIDEOGRAPHER: Let me go off the video record
17 really quick. Okay? Is that okay?
18    MR. COOPER: Yeah, sure.
19    VIDEOGRAPHER: Thank you. That concludes the
20 deposition. We are going off the record. The time is
21 10:08. Thank you.
22    (The deposition concluded at 10:08 a.m.)
23         * * *
24
25

Page 40

1  WAYSON vs. SCHNEIDER
2         DEPONENT SIGNATURE/CORRECTION PAGE
3     If there are any typographical errors to your
   Deposition, please indicate them below.
4
5  PAGE   LINE
6  _____  Change to _____
7  _____  Change to _____
8  _____  Change to _____
9  _____  Change to _____
10 _____  Change to _____
11 Any other changes to your deposition are to be
   listed below with a statement as to the reason for
   such change.
12
   PAGE   LINE   CORRECTION         REASON FOR CORRECTION
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
    I, LINDA S.C. RUNDELL, do hereby certify that I have
20 read the foregoing pages of my testimony as transcribed,
   and that the same is a true and correct transcript of the
21 testimony given by me in this deposition, except for the
   changes made.
22
23
   Date Signed        LINDA S.C. RUNDELL
24
25

Page 41

1  STATE OF NEW MEXICO  )
                        ) ss.
2  COUNTY OF SANTA FE   )
3           REPORTER'S CERTIFICATE
4     BE IT KNOWN that the foregoing transcript of
5  proceedings was taken by me; that I was then and there a
6  Certified Court Reporter and Notary Public in and for the
7  County of Santa Fe, State of New Mexico, and by virtue
8  thereof, authorized to administer an oath under penalty of
9  perjury; that the witness before testifying was duly sworn
10 by me; that the foregoing 40 pages contain a true and
11 accurate transcript of the proceedings, all to the best of
12 my skill and ability.
13    BE IT FURTHER KNOWN THAT examination of this
14 transcript and signature of the witness was requested by
15 the witness and all parties present. On October 8, 2004, a
16 letter was mailed or delivered to the witness regarding
17 obtaining signature of the witness.
18    I FURTHER CERTIFY that I am not related to nor
19 employed by any of the parties hereto, and have no interest
20 in the outcome hereof.
21    DATED at Santa Fe, New Mexico, October 8, 2004.
22
23            MAUREEN R. COSTELLO, RPR
              NM Certified Court Reporter 220
24 My Commission Expires:   Notary Public
   May 10, 2005
25

Exhibit B