

ATTACHMENT LIST FOR MEMORANDUM IN SUPPORT OF MOTION &

AFFIDAVIT TO EXTEND FINAL WITNESS DEADLINE

1. Rundell's Rule 26 Witness list 02-09-07

2. Linda Rundell Deposition  09-27-04

3. Pamela Stuart 2004 BLM Law Enforcement Biography

4. Schematic of BLM Law Enforcement chain of command

5. Plaintiff's 04-27-07 Affidavit in Support of Motion to Compel

6. E-mail BLM FOIA Coordinator Watkins to Wayson & AUSA Cooper

7. Chronology of Efforts to Obtain Discovery, 02-04-05

Wayson v. Rundell, 4:06 Cv 1 (JWS)
Motion to Extend Wit. List Deadline  07-24-07

NELSON P. COHEN
Acting United States Attorney

SUSAN J. LINDQUIST
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West 7th Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
susan.lindquist@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MARK N. WAYSON, | ) Case No. 4:06-cv-1-JWS <br> ) <br> ) **RUNDELL'S RULE 26 WITNESS** <br> ) **LIST** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Plaintiff, | |
| v. | |
| LINDA RUNDELL and UNITED STATES OF AMERICA, | |
| Defendants. | |

The Defendant, Linda Rundell, in her personal capacity, through counsel, presents its Rule 26 witness list that it does not file in court.

1.  Mark Wayson
    Plaintiff, pro se
    c/o Thomas R. Wickwire
    Law Offices of Thomas R. Wickwire

*Attachment # 1*

   2775 Hanson Road, Suite 1
   Fairbanks, AK 99709
   (907) 474-0068

2. Linda Rundell
   1474 Rodeo Rd.
   Santa Fe, New Mexico 87505
   (505) 438-7501

She was the acting state director. She signed the memorandum drafted by Ms. Stewart.

3. Pam Stewart- retired
   Senior Agent-in-Charge
   P.O Box 6271
   Phoenix, Az 65005
   (602) 391-8616

She worked for Ms. Rundell and was assigned the task of investigating Mr. Wayson's complaint. She drafted the memorandum for Ms. Rundell. She knows she spoke with Mr. Schneider and Ranger Ed Lee.

4. Walter Johnson
   Chief Law Enforcement Officer
   Retired - formerly in
   BLM Headquarters
   Washington D.C.

The memorandum was addressed to him. The government is still seeking his current contact information.

5. Greg Assmus
   Chief of Internal Affairs
   BLM National
   3833 S. Development Ave.
   Boise, ID 83075
   (208) 387-5129

1

LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF ALASKA
 3
   MARK N. WAYSON,
 4
              Plaintiff,
 5
     vs.                      NO. F03-0035 (JWS) Civil
 6
   ROBERT SCHNEIDER and the
 7 UNITED STATES OF AMERICA,
 8            Defendants.
 9
10    VIDEOTAPED TELEPHONIC DEPOSITION OF LINDA S.C. RUNDELL
11                  September 27, 2004
12                     9:14 a.m.
                    4010 Rodeo Road
13                Santa Fe, New Mexico
14
15
16   The deposition of LINDA S.C. RUNDELL was taken on
17 behalf of the Plaintiff on September 27, 2004, at 9:14 a.m.
18 at the offices of Hunnicutt, Costello Reporting, Santa Fe,
19 New Mexico, before Maureen R. Costello, Certified Court
20 Reporter #220 and Notary Public in and for the County of
21 Santa Fe, State of New Mexico.
22
23
24
25              **COPY**
```

HUNNICUTT, COSTELLO REPORTING, INC.
(505) 474-9770 - (800) 304-9770 FAX (505) 474-9771
MAUREEN R. COSTELLO, RPR, CCR 220

*Attachment # 2*

WAYSON vs. SCHNEIDER                              LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

3 (Pages 6 to 9)

Page 6

1   Q. Did you say Kerry?
2   A. Cherry, C-h-e-r-r-y.
3   Q. Okay. As an associate director, were you at times
4   the acting director?
5   A. Yes, I was.
6   Q. Okay. Well, I want to draw your attention to this
7   -- a letter that we have here which is -- it's
8   Exhibit No. 5 --
9   A. Yes.
10  Q. -- in that packet. It's the September 19th
11  memorandum, excuse me, from the State Director to the
12  Chief, National Law Enforcement Office.
13  A. (Witness perused document.)
14  Q. Did you find it?
15  A. Yes, I have it.
16  Q. Okay. And did you write this letter, write this
17  memorandum?
18  A. I signed it. It may have been drafted by one of
19  my employees.
20  Q. Do you know who would be drafting something like
21  that?
22  A. I do not recall.
23  Q. Did you read it, review it?
24  A. Yes, I did.
25  Q. Did you sign it, agreeing with it?

Page 7

1   A. Yes, I did.
2   Q. Okay. Now, this in your first paragraph, you
3   refer to an inquiry. I understand this was an
4   administrative inquiry.
5   A. I believe so.
6   Q. Okay. And who assigned it to you?
7   A. As I recall, from going through this packet of
8   information because my memory is vague on this, it was
9   someone from the National Law Enforcement Office of BLM.
10  Q. In other words, they would have the authority to
11  assign you an inquiry like this?
12  A. Most likely I received a call; and I have a copy
13  of a written memo signed by Walter Johnson, who was the
14  acting agent-in-charge at that time, about the incident and
15  asking that I look into it.
16  Q. What's the date of this memo, please?
17  A. Oh, let's see. (Witness perused documents.) I
18  believe I'm referring to the memo signed by -- well, Dennis
19  McLane. It's actually from Walter Johnson to the IG's
20  office.
21  Q. I'm sorry. I didn't understand.
22  A. The October 2, 2002, memo from Walter Johnson to
23  the special agent-in-charge, Office of Inspector General.
24  You have it marked as No. 7.
25  Q. That's correct, but my inquiry is: Who assigned

Page 8

1   you the administrative inquiry?
2   A. I do not recall. As I mentioned, it was probably
3   as a result of a phone call from the national office, law
4   enforcement.
5   Q. But you don't know who called you?
6   A. I do not recall.
7   Q. Okay. Did you -- Do you know when you were
8   assigned this inquiry?
9   A. I do not.
10  Q. Okay. What -- Is there a procedure for an
11  administrative inquiry?
12  A. The procedures vary according to what the inquiry
13  is about. In this case I would have made some calls
14  myself, particularly to the manager in question,
15  Mr. Schneider; and most likely I asked that someone from
16  the National Office of Law Enforcement look into it as well
17  since it involved a law enforcement activity.
18  Q. Did you contact Mr. Schneider then?
19  A. I did.
20  Q. Did you talk to him before you wrote this or
21  signed this memorandum?
22  A. I did.
23  Q. Okay. Do you recall who was the national law
24  enforcement officer you spoke with?
25  A. I do not.

Page 9

1   Q. Okay. Do you remember if you talked to anybody
2   else in conducting this administrative inquiry?
3   A. I do not recall. It's likely that I may have.
4   Q. But would you have followed a procedure for an
5   inquiry such as this?
6   A. As I mentioned already, the procedures varied,
7   depending on the type of inquiry you're looking at.
8   Q. What kind of inquiry was this?
9   A. Well, this one involved law enforcement. So
10  typically we would ask someone from the National Law
11  Enforcement Office to help with the review.
12  Q. Did you make any notes when you were preparing,
13  doing this administrative inquiry?
14  A. I don't know that I did. I don't have them if I
15  did.
16  Q. Okay. Can you recall anyone else that you spoke
17  with making various inquiries?
18  A. As I mentioned already, I'm sure that I talked to
19  someone from the National Office of Law Enforcement; but
20  who that was, I cannot recall.
21  Q. Did you talk to Carol Hammond?
22  A. I don't know that I did talk to Carol.
23  Q. Do you know her?
24  A. I probably met her in Fairbanks at an
25  all-employees meeting or some other meeting.

Case 4:06-cv-00001-JWS   Document 57-2   Filed 07/25/2007   Page 6 of 19
Case 4:06-cv-00001-JWS   Document 48   Filed 05/16/2007   Page 4 of 11

WAYSON vs. SCHNEIDER                           LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

4 (Pages 10 to 13)

Page 10

1   Q. Did you contact any witnesses?
2   A. I did not.
3   Q. Did you contact Ranger Lee with the law
4   enforcement in Fairbanks with BLM?
5   A. I may have, but I don't recall.
6   Q. Do you know if Henri Bisson was in any capacity at
7   -- in the Alaska administration of BLM at that time?
8   A. Henri Bisson was in the Washington office. At
9   that time he was not in the Alaska BLM organization.
10  Q. Did you talk to Michael Baffrey with the Secretary
11  of Interior's Office?
12  A. I cannot recall.
13  Q. In the second paragraph of this memorandum dated
14  September 19th, you referred to: "Upon careful review of
15  the incident in question, we have determined," and can you
16  tell me who the "we" you're referring to is?
17  A. My guess would be that I was referring to myself,
18  the State Director, and whoever from the National Law
19  Enforcement Office looked into the incident for me.
20  Q. Do you know who the chief in the National Law
21  Enforcement Office was at that time?
22  A. I'm fairly certain it was Walter Johnson.
23  Q. Okay. Did Pamela Stuart have any role in this, in
24  the inquiry?
25  A. I don't know that she was on board at that time.

Page 11

1   I can't remember the exact date that we hired her.
2   Q. Was she the chief of the law enforcement here in
3   Alaska?
4   A. She was the special agent-in-charge in Alaska.
5   Q. So she was the top-ranking law enforcement officer
6   in Alaska.
7   A. Yes.
8   Q. Okay. And where is she now?
9   A. She is now in Santa Fe.
10  Q. And when did she transfer down there, do you know?
11  A. To Santa Fe?
12  Q. Correct.
13  A. I believe it was around April of 2003. That's
14  just a guess, though.
15  Q. And I understand that you went down there in
16  December of --
17  A. 1999.
18  Q. That's correct, but I mean: You transferred from
19  Alaska in December of 2002?
20  A. Yes.
21  Q. Okay. Do you think that the finding that you made
22  may have been different had you interviewed the individuals
23  who were involved and reviewed evidence?
24  A. I don't believe so.
25  Q. Would you follow the same procedures if the

Page 12

1   complainant had been a federal employee?
2   A. Yes.
3   Q. Would you contact that employee?
4   A. Probably not. I would have asked whoever was
5   handling the inquiry for me to look at the facts and
6   contact whoever that individual felt needed to be
7   contacted.
8   Q. Did you do so in this case?
9   A. I turned it over to the National Law Enforcement
10  Office, and they conducted their investigation into the
11  matter.
12  Q. But you don't know who you assigned to do this
13  inquiry?
14  A. I don't recall.
15  Q. Would there be a record of it anyplace?
16  A. I'm -- Most likely if there is, it would be in
17  the Boise office of the National Law Enforcement Office.
18  Q. Okay. What information did you have when you
19  began this inquiry?
20  A. I had the memo from Walter Johnson, and I had
21  spoken with Mr. Schneider about the incident. At some
22  point I reviewed the statements written by Ms. Hammond,
23  Officer Lee.
24  Q. I'm sorry. I didn't hear that, ma'am.
25  A. I said: At some point I review the statements

Page 13

1   that were written by Ms. Hammond and Officer Lee.
2   Q. Okay. On the Ms. Hammond statements, you're
3   talking about the contract diary, which is, I believe,
4   Exhibit No. 2.
5   A. Yes.
6   Q. Okay. And with the -- and that Ranger Lee report,
7   you're referring to the report that's listed as No. 3; is
8   that correct?
9   A. Yes.
10  Q. Okay. And just so I keep it straight: You had a
11  memo from Walter Johnson requesting or directing you to
12  this inquiry; but you don't have that memo, right?
13  A. The memo, again, is from Walter Johnson to the IG
14  that I'm referring to.
15  Q. Yes. And do you have that memo?
16  A. I do. We've already spoken about it. It's No. 7.
17  Q. Well, I would ask if you have another one because
18  that's dated October 2nd, and your memorandum is dated
19  September 19, 2002.
20  A. Yes.
21  Q. Well, did you have a memo accompanying this report
22  from Ms. Hammond and the report from Ranger Lee?
23  A. Oh, I don't know. It's not part of the materials,
24  I don't believe, that were sent to me.
25  Q. No, I think that's correct. But did you have one?

**NEW MEXICO STATE OFFICE**
1474 Rodeo Road
Santa Fe, NM 87505
Phone: 505-438-7483
Fax: 505-438-7693

**Pamela A. Stuart (Biography)**

Pamela Stuart began her Federal career in 1977 with the U.S. Forest Service as a seasonal firefighter in Idaho. She subsequently worked for the National Park Service in North Carolina, Montana, Nevada, and Michigan. She began her career with the Bureau of Land Management (BLM) in Moab, Utah, in 1989, as the first District Ranger in the Moab Office, as well as the District Hazmat Coordinator. Ms. Stuart transferred to Phoenix in 1992 to become a Special Agent, and then transferred to Montana. In 2001, she was selected as the Special Agent-in-Charge for Alaska. In 2003, she became the Special Agent-in-Charge of the New Mexico program. Ms. Stuart holds a B.S. degree in Geography from Northern Illinois University.

Attachment # 3



Attachment # 4

RECEIVED APR 2 7 2007 CLERK, U.S. DISTRICT COURT FAIRBANKS, ALASKA

Mark N. Wayson
C/o Wickwire
2775 Hanson Road
Fairbanks, AK 99709
markonwayson@yahoo.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MARK N, WAYSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| Vs. ) | |
| ) | |
| LINDA RUNDELL and the ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| Defendants. ) | |
| _____ ) | 4:06-Cv 1 (JWS) |

**AFFIDAVIT IN SUPPORT OF MOTION TO COMPEL DISCOVERY**

I, Mark N. Wayson state as follows:

1. I am involved in ongoing litigation in Germany, Brazil, and the United States to include this case, in order to restore the legal access to my daughter which we are both entitled to by law and international treaties, and to restore other basic rights which have been stripped from my child since her abduction to Germany December 17, 1997.

Wayson v. Rundell, 4:06 Cv 1 (JWS)
Affidavit for Mot. To compel 4-27-07

1

*Attachment # 5*

2.   Since the Defendant made the finding on September 19, 2002, that I had forcibly committed a crime against a federal employee in 2001, I have detected a sharp reduction in my progress in Germany to restore my daughter's rights, and I believe, based upon the timing of legal actions by German courts and authorities, following Ms. Rundell's finding which itself flows in part from other previous BLM false accusations against me, that the reduction of my legal progress in Germany is caused all or in part by the dissemination of Ms. Rundell's finding by BLM, and/or other federal agencies and authorities with access to the information in her September 19, 2002 document.

3.   In discovery in the now dismissed Wayson v. Schneider case, I received a copy of a handwritten note from the U.S. Attorney's office from an "Ed Lee" (BLM Ranger Eddie Lee) to "Bob" (Robert Schneider) indicating that a note from "Carol H" (Carol Hammond) had been removed by Ranger Lee from correspondence which he was sending to Robert Schneider, because he did not want it available to Robert Schneider's (civil) counsel.
(Attachment 9, The 10-? -03 Ed Lee to Bob note)

4.   On 9-15-04, and on 9-21-04, AUSA Daniel Cooper acknowledged that he would obtain and provide the Plaintiff with the note referred to, which Ranger Lee had removed from what he was forwarding to Robert Schneider, but AUSA Cooper never did so.

5.   On some unknown date following 9-21-04, AUSA Daniel Cooper revealed the

Wayson v. Rundell, 4:06 Cv 1 (JWS)
Affidavit for Mot. To compel 4-27-07

2

existence of two "letters" by Chief BLM Law Enforcement Agent in Alaska, Pamela Stewart, dealing with the investigation of Robert Schneider, and said he would provide these to the Plaintiff, but he never did.

6. During discovery in the <u>Wayson v. Schneider</u> case, AUSA Daniel Cooper provided hundreds of pages of discovery which were not related to, or only very marginally related to the case, but continued a pattern of promising and then successfully stalling production of documents requested in discovery, until the dismissal of the <u>Wayson v. Schneider</u> case, including, but not limited to the Pamela Stewart 'letters,' and the note which was concealed or destroyed by Ranger Lee, and these documents are among documents which could reveal damages relevant in this case, <u>Wayson v. Rundell.</u>

7. Upon AUSA Susan Lindquist refusal to provide virtually all of the documents which I have requested in my Production Requests, I have nevertheless attempted to resolve her refusals without involving the court, including contacting U.S. Attorney Nelson Cohen, since his appointment as the U.S. Attorney in Anchorage's came after Ms. Lindquist began work on her case, and there is a record of e-mails and letters from 3-29 to 4-27 chronicling my efforts to obtain the documents without involving the court. (Attachment 10, A series of e-mails & letters between Wayson, AUSA Lindquist and U.S. Attorney Cohen beginning 3-29-07 until 4-27-07.)

Wayson v. Rundell, 4:06 Cv 1 (JWS)
Affidavit for Mot. To compel 4-27-07

3

Dated: 4·27-07

_____
Mark N. Wayson

Subscribed and sworn before me, a notary in the State of Alaska.

_____
Thomas R. Wickwire

My commission expires: 4-18-10

**CERTIFICATE OF SERVICE**
The undersigned hereby certifies that on this 27 day of April, 2007, a copy of the foregoing was served by mail on: AUSA Susan Lindquist

Office of U.S. Attorney
222 W. 7th Ave., #9, Rm. 253
Anchorage, Alaska 99513

_____
Mark N. Wayson

Wayson v. Rundell, 4:06 Cv 1 (JWS)
Affidavit for Mot. To compel 4-27-07

4

| | |
|---|---|
| FOIA Request: FA2005-07 | |
| To: | "mark wayson" <markonwayson@yahoo.com> |
| CC: | "Daniel Cooper" <daniel.cooper@usdoj.gov> |
| From: | Dennis_Watkins@nifc.blm.gov |
| Date: | Mon, 25 Oct 2004 09:41:20 -0600 |

As I did for your previous request, I stood with the law enforcement
officers as they conducted their search this morning.  Searching both
 the
electronic files and the paper files, they turned up one folder in
 regard
to your FOIA request.  In that folder were 4 documents totaling 11
 pages.
All 11 pages of these documents are contained in the documents that the
your received from the IG's office.  I can duplicate these and provide
 them
to you again, through the AUSA in Anchorage, if you desire.

Dennis Watkins
NIFC Records Administrator & FOIA Coordinator
Work:   (208) 387-5483
Fax :   (208) 387-5797

Attachment # 6

04-16-03  Mailed my FOIA request to FOIA Act Coordinator SANDRA EVANS.

05-08-03  SANDRA EVANS acknowledged receipt of FOIA request. She cited "complexities"

4

Attachment # 7

involved in processing, but promised I would be kept 'updated.' (No updates followed)

04-12-04   TIA BARNER, FOIA specialist, e-mailed me. She asked if I am still interested in the information, (a few days short of a year after my request). She also mentioned a 'note in the file' re: forwarding my request to BLM

04-12-04   I e-mailed TIA BARNER, requesting information again, and a copy of the 'note' which she referred to. (No answer)

04-30-04   I e-mailed TIA BARNER, repeating request. (No answer)

05-09-04   I again e-mailed TIA BARNER, repeating request, and confirmation of my response. (No answer)

Sometime between 05-14-04 &05-16-04 Attorney Wickwire contacted TIA BARNER, and threatened legal action if information was not sent.

05-18-04   ELIZABETH M. KELLY, Associate General Counsel for DOI, sent 30 heavily redacted pages, some of which are only partial copies.

06-02-04   Pursuant to Ms.KELLY's 5-18-04 instructions, I mailed BLM FOIA officer AMY GBENOU requests for BLM records under BLM case numbers.

06-02-04   Pursuant to procedures outlined by Assoc General Counsel ELIZABETH M. KELLY, I FAX'ed and mailed "FOIA APPEALS OFFICER" timely appeal of information denied me.

06-03-04   Post Card is mailed from the DOI, MS-5312-MIB, acknowledging receipt of my appeal, (2004-179) 06-02-04.   Card states law requires that a "final determination" on any appeal "shall" be made within 20 working days of receipt of appeal. (Attachment 5)

06-03-04   MARIAN LAM, FOIA appeals officer, called Attorney Wickwire's secretary to report my appeal package was not complete.

06-04-04   MARIAN LAM was mailed and Faxed the materials she requested 06-03-04.

06-22-04   Letter mailed to AMY GBENOU, BLM FOIA officer, 06-02-04, was returned to Fairbanks unopened. Postal code, and GBENOU's address has been "redacted" in heavy black ink. (Post office states someone in Washington crossed out address and code and dropped the letter into mailbox, causing it to be returned to Fairbanks.)

07-09-04   I called SANDRA EVANS IN Washington D.C. She confirmed that MARIAN LAM is the correct FOIA appeals officer. Ms. EVANS also confirms that AMY GBENOU is the BLM FOIA officer.

5

07-09-04   I called MARIAN LAM, and left call-back message.

07-10-04   I called MARIAN LAM and left contact request, leaving phone and FAX numbers.

07-13-04   I called AMY GBENOU. She advised she is a DOI Appeals officer, and not authorized to process FOIA appeals. She referred me to FOIA information officer, VINCE CHAPMAN

07-13-04   I called VINCE CHAPMAN and left contact request, leaving phone and FAX numbers.

07-14-04   JOHN LIVORNESE called attorney Tom Wickwire. Left call-back number.

07-14-04   I called JOHN LIVORNESE. He advised me to FAX him, #(1) Original 2003 FOIA request. #(2) 05-18-04 ELIZABETH M.KELLY letter. #(3) Handwritten FOIA request for BLM records which he would forward to FOIA coordinator in Idaho, DENNIS WATKINS. I did this that same day.

07-15-04   ALEX MALLUS of the FOIA Appeals Office called. She reported that GINNY MORGAN is now 'acting' FOIA Appeals officer because MARIAN LAM is vacationing. She also states there are "...eleven or twelve..." FOIA offices in the Dept of the Interior, but is not sure exactly how many, or what coordination there is between them. ALEX MALLUS does confirm that my complete 06-04-04 packet, sent to MARIAN LAM, is on the desk. ALEX MALLUS promises to "follow-up" on my FOIA appeal, and to coordinate with JOHN LIVORNESE 07-19-04 regarding the BLM FOIA request he had promised to send to Idaho. ALEX MALLUS promised an update FAX on 07-19-04

07-16-04   JOHN LIVORNESE sent a letter confirming he had forwarded my 07-14-04 BLM FOIA request to Idaho. He refers me to AMY GBENOU or VINCE CHAPMAN if I have questions.

07-19-04   Promised update FAX from ALEX MALLUS doesn't comes.

07-20-04   ALEX MALLUS called Attorney Wickwire to say she is still trying to get the information discussed with me 07-15-04, but the 'people with the information' are on vacation until "Monday." (07-26-04)   ALEX MALLUS promised to call 07-26-04 with update.

07-21-04   GINNY MORGAN called Attorney Wickwire to report that AMY GBENOU had received my request. (Apparently the request from 06-02-04)

07-22-04   I called AMY GBENOU and left call-back message. (No response)

07-22-04   I called VINCE CHAPMAN and left call-back request to confirm that the BLM Fire Center, also handles FOIA law enforcement matters. (No response)

07-26-04  No promised call from ALEX MALLUS.

07-27-04  AMY GBENOU faxed me a copy of JOHN LIVORNESE's 07-16-04 letter.

08-17-04  Since I was leaving the USA ( re:German litigation) with still no response from the Idaho BLM enforcement center, I Faxed BLM FOIA coordinator DENNIS WATKINS, inquiring whether the FOIA request forwarded by JOHN LIVORNESE had been received.

08-17-04  I copied JOHN LIVORNESE with the same FAX sent to DENNIS WATKINS, adding that some other contact than AMY GBENOU was needed, since she had said she does not handle BLM FOIA requests.

08-18-04  A letter from LARRY HAMILTON, Director, Office of Fire and Aviation, arrived at Attorney Wickwire's office.  Fire Director HAMILTON reported that FOIA coordinator DENNIS WATKINS had a conversation with TIA BARNER 08-10-04.

08-24-04  JOHN LIVORNESE wrote that as I was previously informed, 'the Washington Office does not maintain records' I seek.  JOHN LIVORNESE also said to contact VINCE CHAPMAN or JOHN LIVORNESE if I had additional questions.

09-15-04  Asst. U.S. Attorney, DAN COOPER instructed me during a deposition that I must direct all future contacts with BLM officials through him.

09-15-04  Upon questioning defendant SCHNEIDER about a note from BLM enforcement ranger, EDDIE LEE, about a "note" which Ranger Lee's note he had removed in order to provide a copy which Ddefendant Schneider could provide 'counsel' AUSA COOPER immediately interrupted, stating he did not know about the missing 'note' and that he would make immediate efforts to seek and provide it to me.

09-17-04  AUSA DAN COOPER was e-mailed a request to obtain the information requested through FOIA, since his instruction 9-15-04 essentially made all BLM employees a 'party' in this case, requiring me to go through their counsel.

9-20-04  In a discussion before I was deposed I repeated my request for the FOIA information to AUSA DAN COOPER.  COOPER said he would not do it.  He said I would have to file a separate lawsuit to obtain the information I had requested from BLM through FOIA.  Further he said that he himself could not get the information which he requested from agencies.  He also indicated he was presently involved in defending a suit filed by a citizen against a federal agency (possibly the Air national Guard) and that any agency sued for FOIA violations would in fact be defended by the U.S. Attorney.

9-21-04   Near the close of a deposition of federal employee BEN KENNEDY, I requested copies of documents which he had brought to the deposition.  At that point AUSA COOPER produced a packet of documents to me, which had been faxed to him by BEN KENNEDY on 4-

7

27-04. COOPER advised that the 'documents' had mistakenly been placed in a "correspondence" rather than a "discovery" file. He also said that he had two paralegals assigned to help him, and he believed there may have been a communication breakdown because of illnesses by one or both. COOPER had communicated with Mr. KENNEDY both by e-mail and phone.

9-21-04 AUSA COOPER went off the record, and chronicled documents which BEN KENNEDY had brought to the deposition, but failed to send 4-27-04. (It is unknown but possible that these documents revealed 9-21-04 are related to information requested in my FOIA requests. Copies are not yet available for inspection.) Mr. COOPER promised that copies with BAIT numbers would be 'waiting for me when I got back.' (They weren't.)

9-22-04 A Request for Production for the 'information' in the 07-14-04 BLM FOIA request was mailed to AUSA COOPER.

9-27-04 I requested to see the original copies of the 'Carol Hammond' notes sent 8-3-04, following my 5-24-04 request. Paralegal Nan Farrell wrote that the originals did not copy well, and invited inquiries about them be made to either she or Dan Cooper, at my convenience. After the Linda Rundell deposition, Mr. Cooper advised that the originals could not be found. He promised to locate them, and I advised him I would return to his office 10-13-04 to review the originals.

10-13-04 I returned to Anchorage from Germany and called Mr. Cooper twice, but he was not available either time. I called Ms. Farrell and was told she was 'out for the day'.

10-14-04 I got an e-mail from Mr. Cooper, stating simply that the originals of the notes I sought, were on his desk.

10-15-04 I reviewed the deposition of Ben Kennedy. A 9-24-04 document from Carol Hammond to Ben Kennedy was among the exhibits turned over to Daniel Cooper. Carol Hammond refers to 'as-built' diagrams to be sent for the un-permitted project.

10-21-04 Daniel Cooper referred to a conversation he had with former chief law enforcement officer in Alaska, Pamela Stuart. He said she had mentioned two 'letters' she had written. He suggested I would want to depose her.

10-21-04 Dan Cooper gave me copies of Carol Hammond's field notes which he had indicated were available in a 10-13-04 e-mail. He gave me his file.

10-21-04 Daniel Cooper produced 291 pages of discovery documents which he said he had located in Anchorage.

10-21-04 Daniel cooper mentioned that he intended to produce the materials which he had unsuccessfully attempted to not produce with his motion for a protective order.

10-21-04  There was a discussion about an e-mail exchange regarding discovery. I mentioned specifically that I still had not received, for example, the 'note' which an Ed Lee handwritten note referred to, as one he had removed in order to provide Robert Schneider with a copy of a Carol Hammond e-mail, appropriate for Schneider to give to counsel. I reminded Daniel Cooper that he had promised 9-15-04 to find the note and get me a copy.

10-21-04  Dan Cooper suggested I had misunderstood his instructions regarding BLM FOIA information. He said it was my responsibility to file a separate lawsuit if I could not obtain the information under FOIA. He said such a suit would be defended by the U.S. attorney. He said he was currently engaged in defending such a suit for the United States Air Force.

10-22-04  Daniel Cooper produced three files, the numbers for which he read into the record of the Nicolle Jacobson deposition. Mr. Cooper promised to produce copies of these files as soon as possible.

10-22-04  Daniel Cooper produced two typewritten pages of notes. Nicolle Jacobsen testified that she had made notes on her laptop computer 'shortly', or a 'few days after' the incident at 98 mile Steese. She said she had dropped her laptop on the floor of her truck, and the notes had disappeared. She said that on 10-21-04, she had figured out another way to locate the notes and had done so on 10-21-04. She then 'typed' up a synopsis of her notes.

10-22-04  I returned to Dan Cooper the Carol Hammond field notes which he had given me 10-21-04. I advised him the copies were the same quality as I had. I advised him there was one entry I would like to see in the original form. He suggested an 'interrogatory.'

10-24-04  I mailed an appeal of my unanswered appeal to JULIA LAWS, and SANDRA EVANS. No response as of 2-4-05.

10-24-04  I included within the appeal of the appeal, the information that the alleged conversation between TIA BARNER and me, which DENNIS WATKINS alleged in his 8-13-04 letter is false. I requested that JULIA LAWS and/or SANDRA EVANS determine if such a BARNER-WATKINS conversation took place. No response as of 2-4-05.

10-24-04  I filed another FOIA with BLM. and appealed the 8-13-04 response from LARRY HAMILTON, through John Livornese.

10-24-04  Mr. Cooper was copied with all, including a letter expressing my confusion as to which BLM employees were/are off limits to me. Mr. COOPER had originally declared 'all' BLM employees would have to be contacted through him. He later modified this somewhat to suggest that only the ones in Alaska were on this list. (No clarification was ever received.)

10-25-04 I received an e-mail from John Livornese. He said my FOIA request had been sent to Dennis WATKINS. My appeal of my unanswered appeal had been forwarded to the appeal officers, and he advised that, "...unfortunately, I am not aware of any legal entity which acts on behalf of citizens denied information requested under the FOIA.

9