1

LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3
    MARK N. WAYSON,
 4
              Plaintiff,
 5
       vs.                        NO.  F03-0035 (JWS) Civil
 6
    ROBERT SCHNEIDER and the
 7  UNITED STATES OF AMERICA,
 8            Defendants.
 9
10      VIDEOTAPED TELEPHONIC DEPOSITION OF LINDA S.C. RUNDELL
11                      September 27, 2004
12                         9:14 a.m.
                        4010 Rodeo Road
13                    Santa Fe, New Mexico
14
15
16      The deposition of LINDA S.C. RUNDELL was taken on
17  behalf of the Plaintiff on September 27, 2004, at 9:14 a.m.
18  at the offices of Hunnicutt, Costello Reporting, Santa Fe,
19  New Mexico, before Maureen R. Costello, Certified Court
20  Reporter #220 and Notary Public in and for the County of
21  Santa Fe, State of New Mexico.
22
23
24
25                         COPY
```

HUNNICUTT, COSTELLO REPORTING, INC.
(505) 474-9770 - (800) 304-9770 FAX (505) 474-9771
MAUREEN R. COSTELLO, RPR, CCR 220

*Attachment 1*

Case 4:06-cv-00001-JWS   Document 62-2   Filed 08/15/2007   Page 2 of 2
Case 4:06-cv-00001-JWS   Document 48   Filed 05/16/2007   Page 4 of 11

WAYSON vs. SCHNEIDER                          LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

4 (Pages 10 to 13)

Page 10

1  Q. Did you contact any witnesses?
2  A. I did not.
3  Q. Did you contact Ranger Lee with the law
4  enforcement in Fairbanks with BLM?
5  A. I may have, but I don't recall.
6  Q. Do you know if Henri Bisson was in any capacity at
7  -- in the Alaska administration of BLM at that time?
8  A. Henri Bisson was in the Washington office. At
9  that time he was not in the Alaska BLM organization.
10  Q. Did you talk to Michael Baffrey with the Secretary
11  of Interior's Office?
12  A. I cannot recall.
13  Q. In the second paragraph of this memorandum dated
14  September 19th, you referred to: "Upon careful review of
15  the incident in question, we have determined," and can you
16  tell me who the "we" you're referring to is?
17  A. My guess would be that I was referring to myself,
18  the State Director, and whoever from the National Law
19  Enforcement Office looked into the incident for me.
20  Q. Do you know who the chief in the National Law
21  Enforcement Office was at that time?
22  A. I'm fairly certain it was Walter Johnson.
23  Q. Okay. Did Pamela Stuart have any role in this, in
24  the inquiry?
25  A. I don't know that she was on board at that time.

Page 11

1  I can't remember the exact date that we hired her.
2  Q. Was she the chief of the law enforcement here in
3  Alaska?
4  A. She was the special agent-in-charge in Alaska.
5  Q. So she was the top-ranking law enforcement officer
6  in Alaska.
7  A. Yes.
8  Q. Okay. And where is she now?
9  A. She is now in Santa Fe.
10  Q. And when did she transfer down there, do you know?
11  A. To Santa Fe?
12  Q. Correct.
13  A. I believe it was around April of 2003. That's
14  just a guess, though.
15  Q. And I understand that you went down there in
16  December of --
17  A. 1999.
18  Q. That's correct, but I mean: You transferred from
19  Alaska in December of 2002?
20  A. Yes.
21  Q. Okay. Do you think that the finding that you made
22  may have been different had you interviewed the individuals
23  who were involved and reviewed evidence?
24  A. I don't believe so.
25  Q. Would you follow the same procedures if the

Page 12

1  complainant had been a federal employee?
2  A. Yes.
3  Q. Would you contact that employee?
4  A. Probably not. I would have asked whoever was
5  handling the inquiry for me to look at the facts and
6  contact whoever that individual felt needed to be
7  contacted.
8  Q. Did you do so in this case?
9  A. I turned it over to the National Law Enforcement
10  Office, and they conducted their investigation into the
11  matter.
12  Q. But you don't know who you assigned to do this
13  inquiry?
14  A. I don't recall.
15  Q. Would there be a record of it anyplace?
16  A. I'm -- Most likely if there is, it would be in
17  the Boise office of the National Law Enforcement Office.
18  Q. Okay. What information did you have when you
19  began this inquiry?
20  A. I had the memo from Walter Johnson, and I had
21  spoken with Mr. Schneider about the incident. At some
22  point I reviewed the statements written by Ms. Hammond,
23  Officer Lee.
24  Q. I'm sorry. I didn't hear that, ma'am.
25  A. I said: At some point I review the statements

Page 13

1  that were written by Ms. Hammond and Officer Lee.
2  Q. Okay. On the Ms. Hammond statements, you're
3  talking about the contract diary, which is, I believe,
4  Exhibit No. 2.
5  A. Yes.
6  Q. Okay. And with the -- and that Ranger Lee report,
7  you're referring to the report that's listed as No. 3; is
8  that correct?
9  A. Yes.
10  Q. Okay. And just so I keep it straight: You had a
11  memo from Walter Johnson requesting or directing you to
12  this inquiry; but you don't have that memo, right?
13  A. The memo, again, is from Walter Johnson to the IG
14  that I'm referring to.
15  Q. Yes. And do you have that memo?
16  A. I do. We've already spoken about it. It's No. 7.
17  Q. Well, I would ask if you have another one because
18  that's dated October 2nd, and your memorandum is dated
19  September 19, 2002.
20  A. Yes.
21  Q. Well, did you have a memo accompanying this report
22  from Ms. Hammond and the report from Ranger Lee?
23  A. Oh, I don't know. It's not part of the materials,
24  I don't believe, that were sent to me.
25  Q. No, I think that's correct. But did you have one?