```
 1              IN THE UNITED STATES DISTRICT COURT
 2                    FOR THE DISTRICT OF ALASKA
 3
   MARK N. WAYSON,                    )
 4                                    )
                                      )
 5              Plaintiff,            )
                                      )
 6   vs.                              )
                                      )
 7   ROBERT SCHNEIDER and the         )
     UNITED STATES OF AMERICA,        )
 8                                    )
                Defendants.           )
 9   _____)
     Case No. F03-0035 CV (JWS)
10
            TELEPHONIC DEPOSITION OF JUTTA FROEHLICH-TUMBRINK
11                       October 22, 2004

12   APPEARANCES:

13        FOR THE PLAINTIFF:    MR. MARK N. WAYSON
                                In Propria Persona
14                              2775 Hanson Road
                                  Suite 1
15                              Fairbanks, Alaska 99709
                                (907)  474-0068
16
          FOR THE DEFENDANT:    MR. DANIEL R. COOPER, JR.
17                              Assistant U. S. Attorney
                                U. S. Department of Justice
18                              U. S. Attorney's Office
                                222 West Seventh Avenue, #9
19                                Room 253
                                Anchorage, Alaska  99513
20                              (907)  271-5071

21                           *  *  *  *
```

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

Exhibit B

```
 1  A       Yes, I did.
 2  Q       Now, you said that this case began in -- your
 3          involvement began in 1997, so we're approximately seven
 4          years.  During this seven years, has this case moved
 5          along as you would expect a German family case to move
 6          along?
 7  A       No, definitely not.  This is a very confusing case, and
 8          it is -- in the beginning I was very optimistic and I
 9          thought, being brought up and educated in this system,
10          I felt that you had all the chances in the world to get
11          a fair and decent regulation to see your daughter on a
12          regular basis the way it is described in German family
13          law.  But then began a very unusual procedure, and
14          still nowadays, and it even -- something you even do
15          not know.  We have a very strange decision which came
16          in yesterday.  And also this ties in with all these
17          unusual, unexplainable decisions and procedures, which
18          I cannot relate to.  There is no German rule which
19          is -- which is set up to allow a process like this.  It
20          is very, very strange, and very -- makes me very
21          suspicious, and I even had discussed it with your
22          lawyer, Ms. Chrosciel, and, well, we came to a
23          conclusion that something must be going on.  And we
24          actually thought first it was because Ms. Sug, the
25          mother of the child, was holding -- being a foreign --
```

|   |   |   |
|---|---|---|
| 1 |   | a teacher in the foreign service, was holding a |
| 2 |   | diplomatic passport. But after having done some |
| 3 |   | research, we found out that this does not cause any |
| 4 |   | privileges. So this couldn't have been the reason. |
| 5 |   | And so therefore we thought, well, something else |
| 6 |   | must -- must be going on. We -- we couldn't -- we |
| 7 |   | couldn't figure out what it was, but as if somebody |
| 8 |   | would pull the strings behind the scene. That's how we |
| 9 |   | felt about it, your lawyer and as well as I. |
| 10 | Q | And can I say that -- can I summarize by saying that |
| 11 |   | you feel that there's some outside influence involved |
| 12 |   | in this case? |
| 13 | A | Yes, very strongly I feel about that, because it -- it |
| 14 |   | couldn't -- it couldn't happen that, for instance, when |
| 15 |   | you applied under the Hague Treaty, which is law in |
| 16 |   | Germany, that the Central Authority, which is in charge |
| 17 |   | according to the Hague Treaty, that they told me over |
| 18 |   | the phone, and the reason I called them was always the |
| 19 |   | language problem, just to remind of that, and to fill |
| 20 |   | you in with -- with what was going on here on this end, |
| 21 |   | and that they told me, and Mr. Weitzel told me that he |
| 22 |   | spoke to the judge. The judge was -- said there's |
| 23 |   | absolutely no problem, she will grant visitation. And |
| 24 |   | this actually was -- well, that's what I thought, okay, |
| 25 |   | this is a decent decision now we are going to -- to |

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

Exhibit B 

|   |   |   |
|---|---|---|
| 1 |   | face here.  And then unexpectedly she turned around, |
| 2 |   | and even though your daughter had told her she wanted |
| 3 |   | to see her dad, she wanted to travel to Alaska and |
| 4 |   | Brazil, nevertheless, she banned you from visitation |
| 5 |   | for four full years, and this was something I -- still |
| 6 |   | nowadays I cannot relate to that.  Actually, it's the |
| 7 |   | same judge who issued the very strange decision which |
| 8 |   | came in this week. |
| 9 | Q | Which came this week? |
| 10 | A | Yes.  You don't know about it.  I have to translate it |
| 11 |   | for you over the weekend. |
| 12 | Q | Okay.  Well, to go back to what you just spoke about, |
| 13 |   | you spoke about the Central Authority contacting you. |
| 14 | A | Yes. |
| 15 | Q | What is the role of the Central Authority in Germany? |
| 16 | A | The Central Authority is, under the Hague Treaty, is, |
| 17 |   | how to put that in English, the Hague Treaty wants to |
| 18 |   | make sure that no parent has an advantage from -- |
| 19 |   | because of violating local law.  So the Central |
| 20 |   | Authority is acting on the behalf of -- in every state, |
| 21 |   | not only Germany, in every state, is acting on the |
| 22 |   | behalf of the government to restore rights which have |
| 23 |   | been violated by the -- by one parent. |
| 24 | Q | When you refer to the government, are you referring to |
| 25 |   | governments which are signatories to that international |

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

Exhibit B

13

1         treaty?
2 A    Yes. Yes.
3 Q    Is Germany a signatory to the Hague Treaty?
4 A    Germany is a signatory, yes, as well as the United
5         States, and in the meantime also Brazil.
6 Q    Now, you said that the Central Authority contacted you,
7         or you contacted him, and he told you that the Hague
8         judge had told him that the -- she would implement the
9         petition which the Central Authority had filed; is that
10        correct?
11 A    Exactly. So the procedure is that you apply with the
12        Central Authority to act -- to file a petition on your
13        behalf, and that's what they did. They did that in the
14        summer, what was it, 2001, and based -- and then came
15        this decision, and it came in German, so I had to
16        translate it for you into English, and then I -- I
17        talked to this Mr. Weitzel, the person in charge at the
18        Central Authority, and he said, well, that he -- that
19        he had contacted -- he himself had contacted the judge,
20        the Hague judge, and she said that she wouldn't see any
21        problem, she would grant it, the way it was applied
22        for.
23 Q    Can you remember when this conversation with
24        Mr. Weitzel took place?
25 A    This took place shortly before there was the hearing,


Exhibit B

```
 1            maybe four weeks before there was the hearing in
 2            October.  My -- I would say in September, early
 3            September.
 4                 MR. COOPER:  Of which year?
 5   Q        Which year are you referring to?
 6   A        I think 2001.
 7   Q        2001?
 8   A        Yeah.
 9   Q        Okay.  And this hearing with the judge took place when?
10   A        This hearing in October, 20 -- 20 something, 26 or so.
11   Q        And at this hearing, the judge reversed her decision;
12            is that correct?
13   A        Yeah.
14   Q        Now, is there anything else that has happened that
15            would lead you to believe that the outside influence
16            you feel is occurring is coming from the United States
17            of America or some agent thereof?
18                 MR. COOPER:  Well, I'm going to object.  She
19   hasn't stated yet that she believes that the influence is
20   coming from the United States of America.
21                 MR. WAYSON:  My question, Mr. Cooper, was is
22   there anything which has occurred which would lead you to
23   believe that the outside influence in this case is coming from
24   the United States of America?
25   A        Well, I think at least -- my feeling is I don't know if
```

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678


Exhibit B

```
 1            it is -- from which agency it was initiated, but at
 2            least the behavior of your Consulate in Dusseldorf I
 3            found a little, well, strange.  It was last January,
 4            this year, this year, when you had -- there was the --
 5            the decision had been issued by the Appeals Court of
 6            Cologne, and there was a difficulty that you were
 7            supposed to drop off your passport, which was
 8            unfeasible, because it was Christmas time, and so the
 9            Consulate was not open, and back and forth.  And I had
10            learned from the Appeals Court that Ms. Ram -- Rem or
11            Ram, that she had talked to -- to the judges of the
12            Appeals Court.  And that she had -- that she couldn't
13            really help to resolve the problem.  At that time, and
14            in my recollection, but I'm not quite sure about that,
15            you were not here in Germany at that time.  And so I
16            called Ms. Ram and asked her what the problem was.  And
17            she said that she didn't want you to come to the
18            Consulate.  And I said, well, but why?  Well, he's --
19            he's supposed to, or he should have the opportunity, or
20            whatever.  And then she said, well, I don't want him
21            to -- to be here, because everybody here feels
22            threatened.
23  Q         Feels threatened by whom?
24  A         By you, by Mr. Wayson.  And since I didn't know -- I
25            wasn't familiar with the name Ram, because all the
```

|     |   |                                                                  |
| --- | - | ---------------------------------------------------------------- |
| 1   |   | communication which I knew was with Mr. Flora before,            |
| 2   |   | and so I instantly asked her whether she knew                    |
| 3   |   | Mr. Wayson or not. And she said no, I don't know him.            |
| 4   |   | But everybody here is scared, and everybody else                 |
| 5   |   | does -- does feel threatened. And that's why she                 |
| 6   |   | didn't want him here. And I thought this was very                |
| 7   |   | strange behavior for a U.S. Consulate towards a U.S.             |
| 8   |   | citizen. So in my understanding it was all -- I always           |
| 9   |   | admired the American citizens for having such a good             |
| 10  |   | protection from their Consulates when being abroad. So           |
| 11  |   | this was very confusing to me, and it really -- well,            |
| 12  |   | made me somewhat suspicious, along with all the other            |
| 13  |   | problems which had occurred over the years, where we             |
| 14  |   | always thought somebody must really do something,                |
| 15  |   | which -- which doesn't become obvious. So it was                 |
| 16  |   | like -- like somebody working a little bit secretly.             |
| 17  | Q | You mentioned that you had learned the Consulate, the            |
| 18  |   | U.S. Consulate from Dusseldorf, Ms. Ram, had called the          |
| 19  |   | Appeals Court judges. Do you know specifically which             |
| 20  |   | judge she called?                                                |
| 21  | A | Ms. Goehler-Schlicht, the head of the Appeals Court of           |
| 22  |   | the 21st Senate.                                                 |
| 23  | Q | Can you tell me how you learned this?                            |
| 24  | A | Well, I had several phone calls with                             |
| 25  |   | Ms. Goehler-Schlicht, because we had discussed how to            |

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678



|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | resolve the procedure which was just not feasible, the               |
| 2  |   | way it was issued by the Appeals Court.  They had --                 |
| 3  |   | they had not paid attention to the fact that the U.S.                |
| 4  |   | Consulates are not open always, that they have certain               |
| 5  |   | opening times, that they aren't open over the weekend,               |
| 6  |   | that you used to travel over the weekend, and so we                  |
| 7  |   | were talking back and forth how to resolve that                      |
| 8  |   | problem, how we really could find a solution which                   |
| 9  |   | would be acceptable for all parts.                                   |
| 10 | Q | Did you talk to anyone else at the appeals court who                 |
| 11 |   | was contacted by Ms. Ram?                                            |
| 12 | A | I think the secretary told me that she had spoken to                 |
| 13 |   | her, but I really can't tell what she -- what the                    |
| 14 |   | context of this conversation was.                                    |
| 15 | Q | But was this -- okay.                                                |
| 16 | A | She -- she and her boss -- it's actually not her boss,               |
| 17 |   | it's the boss of the other secretary, so the secretary               |
| 18 |   | of Ms. Goehler-Schlicht, she never mentioned having                  |
| 19 |   | spoken to the Consulate.  It was the secretary of the                |
| 20 |   | other Civil Court -- Civil Senate in the Appeals Court               |
| 21 |   | who said that she had contacted Mrs. -- know that                    |
| 22 |   | Mrs. Ram had contacted the OLG, and this was way -- and              |
| 23 |   | so that she had spoken to her, and well, she also found              |
| 24 |   | very strange, in ways she was -- the notification, but               |
| 25 |   | probably the most essential part was talk to the judge,              |

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678



|    |   |                                                                          |
|----|---|--------------------------------------------------------------------------|
| 1  |   | again from the same judge who banned you for four                        |
| 2  |   | years, who was allegedly not biased, according to -- to                  |
| 3  |   | her colleagues' opinion, and I really cannot -- I                        |
| 4  |   | cannot relate to that anymore. I -- I'm already lost                     |
| 5  |   | in my comprehension how this can happen. I -- I just                     |
| 6  |   | cannot follow anymore.                                                   |
| 7  | Q | Okay. Just to keep -- you mentioned a number of judges                   |
| 8  |   | in your last response, but the judge who made this                       |
| 9  |   | decision most recently and who has the case at this                      |
| 10 |   | time, what is -- who is this judge?                                      |
| 11 | A | Ms. Niepmann.                                                            |
| 12 | Q | And is Ms. Niepmann also the judge who ruled in 2001 or                  |
| 13 |   | decided in 2001 that I would not be able to see my                       |
| 14 |   | daughter?                                                                |
| 15 | A | Yes. Yes. This is the same person, yes.                                  |
| 16 | Q | That was in October?                                                     |
| 17 | A | It is, yes.                                                              |
| 18 | Q | And is Judge Niepmann also the judge who the Central                     |
| 19 |   | Authority quoted as saying she would grant the decision                  |
| 20 |   | in August?                                                               |
| 21 | A | Yes, and then within -- within three weeks changed her                   |
| 22 |   | mind 100 percent.                                                        |
| 23 | Q | Now, you also referred to a judge who had made a                         |
| 24 |   | decision stating that the mother of the child had                        |
| 25 |   | broken the -- violated the Appeals Court?                                |

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*



```
 1  A      Yes.
 2  Q      I apologize.  Sometimes my question are not artful.
 3  A      Oh, it could be my misunderstanding.
 4  Q      What information, if any, do you have that could
 5         ascribe the unusual events which you've noted to
 6         Mr. Schneider or his words or conduct?
 7  A      Well, it has -- to Mr. Schneider, I can't prove
 8         anything, because I don't know him.  I know the
 9         communication with Mr. Flora.  I don't know
10         Mr. Schneider.  I don't know Mr. Flora, of course,
11         personally, but I know the communication, but I don't
12         know Mr. Schneider.
13  Q      Right.  So what we're trying to do is make a connection
14         between Mr. Schneider as an individual and the unusual
15         events in Germany which go back several years to 2001,
16         anyway.
17  A      Uh-huh.  Well, they are ongoing actually.  Yes, but
18         whoever, let's put -- how to put that, so if my -- my
19         anticipation, my impression is that some influence has
20         been taken place, has -- had been carried out.
21  Q      Uh-huh.
22  A      Had been carried out by whom, I do not know, but by
23         somebody who was in charge.  So whoever that was,
24         probably Mr. Epsilon (ph) was -- or why, or if that was
25         the person who -- who was, according to my judgment,
```



|   |   |   |
|---|---|---|
| 1 |   | influencing things over here. |
| 2 | Q | Now, you have talked about when you contacted, or somebody contacted you from the Central Authority to talk about the case, is that fairly common for lawyers and litigants in Germany to contact members of the court staff? |
| 7 | A | In international cases, yes, it is. It happens quite often because the intention of courts, and the intention in family cases in general, is to find a peaceful mediative solution, which takes, of course, people to -- to help to negotiate a good solution. So if you have the opposite parties only and without anybody in between you won't get them to agree, because if they would agree they wouldn't be at court. |
| 15 | Q | In your experience as an advocate, as a guardian ad litem in the system, have there ever been other cases when a member of any consulate, whether U.S. or any other nation, contacted one of the court agencies to discuss their citizen's case? |
| 20 | A | Maybe. Not -- not in my experience, not in my cases, let's put it that way. |
| 22 | Q | But is it something that happens from time to time? |
| 23 | A | It might, if they were -- if there are administrative problems which have to be resolved, I think it's just -- it has to happen. |

```
 1   Q      In fact, wasn't that what you were urging the U.S.
 2          Ambassador to do, was to take some role in Mr. Wayson's
 3          case?
 4   A      Yes.  I just thought that he would perhaps have the
 5          means to -- to clarify a little, but this was before --
 6          before I contacted Ms. Ram.  So this was not the same
 7          time.
 8   Q      But you have no knowledge about where Ms. Ram got this
 9          belief or information that Mr. Wayson might be a person
10          that caused her consular employees to be frightened?
11   A      No.  She just said everybody here.
12   Q      Uh-huh.  Yeah, she said everybody here, and this is
13          when you spoke with Ms. Ram personally?
14   A      Yes.  Yes.  And that's when I asked her do you know him
15          personally, and she said no, I don't know him
16          personally, but everybody else here, so not everybody,
17          because not her.  She had -- well, she paid attention
18          that all her employees or clerks were apparently
19          frightened.  That's what she expressed.
20   Q      But she didn't tell you.....
21   A      Where she had it from, no.
22   Q      No.  Okay.  Now, you've testified earlier that you've
23          acted as a translator and counselor for Mr. Wayson?
24   A      Uh-huh.
25   Q      Does he pay you money for any of these services?
```

**LIZ D'AMOUR & ASSOCIATES, INC.**
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

