IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

MARK N. WAYSON,

Plaintiff,

vs. NO. F03-0035 (JWS) Civil

ROBERT SCHNEIDER and the
UNITED STATES OF AMERICA,

Defendants.

VIDEOTAPED TELEPHONIC DEPOSITION OF LINDA S.C. RUNDELL

September 27, 2004

9:14 a.m.
4010 Rodeo Road
Santa Fe, New Mexico

The deposition of LINDA S.C. RUNDELL was taken on behalf of the Plaintiff on September 27, 2004, at 9:14 a.m. at the offices of Hunnicutt, Costello Reporting, Santa Fe, New Mexico, before Maureen R. Costello, Certified Court Reporter #220 and Notary Public in and for the County of Santa Fe, State of New Mexico.

COPY

Exhibit C



Exhibit B

A. I have this in front of me that was sent to me. If you're asking whether I had it at the time, I do not know.

Q. But you do recall having the report from Ranger Lee and the report from Ms. Hammond?

A. Yes.

Q. Did you have the e-mail from Mr. Schneider, which is No. 4?

A. (Witness perused document.) Probably. I don't recall.

Q. When you say that there are different procedures for different administrative inquiries, did you follow the procedure for this administrative inquiry involving a law enforcement matter?

A. Yes. I contacted the National Office of Law Enforcement.

Q. But didn't they actually contact you?

A. I asked them to assist with this.



Q. So I understand that they assigned it to you, and then you asked them to assist with it.

A. Yes.

Q. So you're unaware of -- If there was an investigative report in addition to this by National Law Enforcement Office, you're not aware of it?

A. I am not.

Q. Would they have talked to you about it before you wrote the September 19th letter --

A. Yes.

Q. -- memorandum?

A. Yes.

Q. Do you know if they did talk to you about it?

A. I believe so.

Q. Can you tell me what they told you?

A. I don't recall. My guess would be that they looked into it and found no basis.

Q. But you have no idea whom you spoke with there?

A. I do not.

Q. Okay. Are you sure you talked to Robert Schneider about this?

A. Yes, I did.

Q. And are you sure you talked to him about this before you issued the memorandum?

A. I believe Mr. Schneider contacted me about this

they were aware of it, would have wanted to see it.

Q. Okay. Now, you wrote here that there was a perceived threat from Mr. Wayson. Do you know what that threat was?

A. My understanding is that Ms. Hammond felt intimidated and threatened by Mr. Wayson's behavior.

Q. Okay. Now, how did you decide that it was a Title 18 violation?

A. Whoever I assigned to work on this memo for me would have looked that up.

Q. But you cannot recall whom you assigned to work on this memo?

A. I do not.

MR. COOPER: Objection; asked and answered. I mean, she's told you at least twice if not three times, Mr. Wayson, that she can't recall; and you're not going to get a different answer. So let's use our time wisely.

Q. (BY MR. WAYSON) Did you consult with the U.S.



Attorney at all on this?

A. I cannot recall.

Q. Could you have?

A. I beg your pardon?

Q. Could you have?

MR. COOPER: Objection; calls for speculation. Go ahead and answer.

A. I still didn't hear you. Did you say: Could I have?

Q. Could you have called the U.S. Attorney for advice about what statute was being violated?

A. I probably would have spoken to the Solicitor's Office.

Q. Do you recall who was the solicitor at that time?

A. I don't recall that I spoke to the Solicitor's Office. We had a number of solicitors that we worked with on a regular basis.

Q. Where does your -- where does this record go, your memorandum?

A. We have a filing system, central filing system, and my -- I would suppose that the law enforcement office would have kept a copy. There is a file code at -- on the top, right-hand side of the memorandums which show where they are filed.

Q. Is this the number you're referring to, 9260?



Exhibit C

Exhibit B

Page 18

A. Yes.
Q. And then in parentheses 910?
A. Yes.
Q. What does that -- Does that tell you anything?
A. The 910 is the organizational code of the state office. It means it comes from the State Director's office. The 9260 would be the central filing code, perhaps, for law enforcement.
Q. Do you know anything about this project that was being conducted up there at 98 Mile Steese Highway?
A. I do not, other than it had something to do with enhancing fisheries habitat, I believe.
Q. As the associate state director or the acting state director, how would you find out about a project like this?
A. I would not find out about a project like that unless someone made a point of telling me about it for a particular reason. Projects like that are generated and carried out at the field office level.
Q. What about the cost of it? Would you be involved in the cost of a project such as this?
A. Not unless there was a dispute over funding in that there wasn't enough funding to go around for all our projects and I needed to engage in priority setting.
Q. Would you be reviewing a budget at any time as a

Page 19

state director or associate director?
A. From a high level, and that more to ensuring that the offices were adequately funded for operations and personnel costs. Very unusual that I would look at specific project work.
Q. But if you, as the associate director of the state -- acting state director, wanted to find out what the cost was of this project, how would you do that?
A. I would probably ask the budget officer; alternatively, I might ask the program leader for wild life or engineering; or I could ask the field office manager.
Q. That would be the field office manager in Fairbanks?
A. Yes.
(Discussion off the record with the reporter.)
THE WITNESS: Field office manager.
THE REPORTER: In Fairbanks?
THE WITNESS: Fairbanks.
Q. Again, where would the budget officer be located?
A. In the state office in Anchorage.
Q. Do you remember who the budget officer was when you were the acting director?
A. Carol Moore.
Q. Carol. Do you know if she still holds that position?

Page 20

A. I believe so.
Q. If I can just ask again: Did you say you couldn't recall if you had the April 2002 complaint or not when you received the direction for the inquiry?
A. I don't recall.
Q. Okay. Have you seen it before, again, today?
A. I believe I have.
Q. Does BLM take any action about environmental violations?
A. Yes, we do.
Q. And is BLM required to follow the same rules and regulations as a private citizen?
MR. COOPER: Objection with respect to -- well, with respect to --
MR. WAYSON: Environmental.
MR. COOPER: -- environmental, correct.
With that correction or clarification, you may answer.
A. Well, I don't know what rules and regulations the private citizen would follow. If we are made aware of an environmental issue, we go out and take a look at what has happened and try to determine what the problem is and what needs to be done about it.
Q. (BY MR. WAYSON) And if you determine there was a violation, what action would you take?

Page 21

A. Well, again, it would depend on what the issue was. If there was a company that had done unauthorized work or had created a hazard or an environmental issue, we would contact the company and attempt to get them to remediate it on an administrative level. If it appeared that there were possible criminal violations, we would certainly ask law enforcement to get involved and take a look at that.
Q. Okay. Jumping back over to your letter or the memorandum of September 19, 2002, it directs me to the finding that it was justified for Mr. Schneider to send out rangers in this case; is that correct?
A. Yes.
Q. Do you think it was also justified for him to notify the state agency that I was a potential serious threat to BLM employees?
A. I don't know that he did that.
Q. Okay. Can you tell me what you were assigned to inquire into with your administrative inquiry then?
A. To the best of my recollection, which is vague, I was asked to look into Mr. Schneider's actions insofar as having called out a ranger to be on the site where Ms. Hammond was conducting her BLM activities.
Q. (BY MR. WAYSON) Do you think that this probably was assigned, though, in writing? Am I correct?



Exhibit B