NELSON P. COHEN
United States Attorney

SUSAN J. LINDQUIST
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West 7th Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
susan.lindquist@usdoj.gov

Attorney for the Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MARK N. WAYSON, | ) **Case No.  4:06-cv-00001-JWS** |
| | ) |
| Plaintiff, | ) **LINDA RUNDELL'S MOTION** |
| v. | ) **FOR SUMMARY JUDGMENT** |
| | ) **AND FOR QUALIFIED** |
| LINDA RUNDELL and UNITED | ) **IMMUNITY** |
| STATES OF AMERICA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Defendant, Linda Rundell ("Rundell"), in her individual capacity, through

counsel, moves, pursuant to Fed. R. Civ. P. 56 for summary judgment.  Mark

Wayson ("Wayson") claims that Rundell wrongly concluded that he committed a

crime and therefore harmed his reputation and deprived him of due process.

Amended Complaint ¶¶ 2, 6 & 9.   He claims she obstructed justice by terminating

the investigation against Robert Schneider ("Schneider").  Amended Complaint ¶¶ 10 & 24.  He claims she violated his freedom of speech by making the allegation in retaliation for exercising his free speech.  Amended Complaint ¶¶ 6 & 24.  He claims she deprived him of the use of his property, his ability to travel and his future employment opportunities.  Amended Complaint ¶¶ 24 & 28 (e).  Most of his allegations, such as claims that Rundell defamed him or that she obstructed justice,  are not acts which violate constitutional rights and therefore fail as a matter of law in this case based on <u>Bivens</u>.  Dkt. 21 at 5.  As a matter of law, Rundell did not violate Wayson's freedom of speech, property rights, or due process rights.

In the alternative,  Rundell is entitled to qualified immunity.

## <u>FACTS</u>

Around April 5, 2002, Wayson wrote to Earl Devaney, the Inspector General, Department of the Interior, and asked him to investigate whether BLM manager, Robert Schneider ("Schneider"), had created a dangerous situation for him.  Amended Complaint ¶ 5. Ex. B at 1.  Wayson described a September 15, 2001 encounter he had with Carol Hammond ("Hammond"), a Bureau of Land Management ("BLM") engineer, who was  directing an erosion control project on

or near Wayson's state mining claim.  Wayson asked her to halt the project and she refused.  Ex. B.  Hammond felt threatened and she telephoned the BLM ranger to come to the site.  Ex. B; Ex. H at 3, 5; Ex. I at 2, 9.  Wayson stayed off his mining site until the project was completed.  Ex. B.

Hammond wrote in a diary about the conversation she had with Wayson regarding his position that BLM was working on his state mining claims.  Ex. I at 7.  She felt uncomfortable, threatened, and intimidated " by everything from the way Wayson chose his words to the way he arrived on the scene by driving up and slamming on his brakes."  Ex. I at 9.  She had a confrontational feeling from the minute that he was on site.  *Id.*  She found the tone of his voice and his demeanor threatening.  *Id.* at 2.

In response to Wayson's letter to the Inspector General, Walter Johnson, BLM's Chief, National Law Enforcement Office, asked the State Director to conduct an administrative inquiry.  Ex. P.  Rundell, as the Acting State Director, asked Pamela Stuart, the Special Agent-in-Charge of law enforcement, to investigate Wayson's concerns.  Ex. G.  Stuart spoke with Schneider and Ranger Ed Lee before drafting the memorandum to Johnson.  *Id.*  In the memorandum, Stuart did not accuse Wayson of committing a crime as she was not investigating Wayson's conduct.  *Id.*  Stuart focused on whether BLM employee Schneider had

violated any law.

On September 19, 2002, Rundell signed the memorandum . Ex. A;

Amended Complaint ¶ 2.  The memorandum stated that "Ms. Hammond expressed

fear to both Wayson and the BLM management that there was a perceived threat

from Wayson.  It was a weekend day and the incident was in a remote location."

Ex. A.  Later in the memorandum, she wrote:

> As a manger, Schneider has the right, responsibility, and legal
> obligation to ensure he is not exposing his employees to any undue
> harm.  Title 18 United States Code 111 states in pertinent part,
> 'whoever forcibly assaults, resists, opposes, *impedes, intimidates, or*
> *interferes* with any person designated in section 114 of this title (the
> BLM falls within this statute) while engaged in or on account of the
> performance of official duties shall be fined under this title or
> imprisoned not more than one year, or both.'  Ms. Hammond, while
> performing her official duties, was intimidated by Mr. Wayson.  It is
> our opinion that Mr. Schneider acted reasonably and prudently when
> he requested the rangers to stand by the site until the work was
> completed, thereby relieving Ms. Hammond of the intimidation she
> felt, whether real or perceived.

Ex. A.  Rundell believed that the focus of the investigation was "to look into Mr.

Schneider's actions insofar as having called out a ranger to be on the site where

Ms. Hammond was conducting BLM activities."  Ex. J at 21.

Rundell sent the memorandum to Johnson,  who sent it to the Special

Agent-In-Charge, Western Division, Office of Inspector General, with a note

stating that based on the memo, his office closed the case.  Ex. E.  In Johnson's

note, he recognized that the focus of the investigation was Schneider's acts and

that there was no evidence to support a finding of wrongdoing by Schneider.  *Id.*

He stated nothing about Wayson.  The documents, all coded with the number

9260, which refers to law enforcement files, were filed under Robert Schneider's

name in law enforcement files.  Ex. K & L.

In October of 2003, Wayson sued Schneider, alleging that Schneider had

violated his constitutional rights of free speech and due process.  Ex. C,

Wayson v. Schneider, F03-0035CV (JWS) ("Wayson I").  During discovery in

Wayson I, Wayson received a copy of Rundell's memorandum.  Subsequently,

Schneider moved for summary judgment and the Court granted the motion.  Ex. D.

After receiving the memorandum, Wayson gave it to Attorney Wickwire.

Ex. M at 38.  He also spoke to many people about it.  Ex. M at 38.  He warned

roughly six miners about BLM's tactic of falsifying criminal acts.  *Id.*  He's

spoken to various attorneys, his German attorney and Jutta Froehlich-Tombrink

about  the memorandum.  *Id.*

In Wayson I, Wayson deposed Rundell.  Ex. J.  Rundell acknowledged that

she was asked to do an investigation in response to Wayson's request to the

Inspector General.  She said that she typically asked someone in BLM's National Office of Law Enforcement to assist her with an investigation regarding law enforcement.  *Id.* at 9, 14-15.  Although Rundell could not remember who assisted her, Agent Stuart remembers that she investigated the case and drafted the memorandum.  Ex. G; Ex. J at 6-7.  Rundell remembered that she spoke with Schneider about the events.  Ex. J at 8, 15-16.  Rundell recalled that Hammond felt threatened by the encounter and that whoever helped her with the assignment would have looked into whether there was a violation of Title 18, a criminal statute.  Ex. J at 16.  She said that she would have called the Solicitor's office for advice about whether statutes were violated, but that she didn't recall that she had done that.  *Id.* at 17.  Moreover, in order for any criminal allegation to proceed, Rundell would have had to have presented it to the U.S. Attorney's Office, and she does not believe that this occurred.  *Id.* at 28.  She stated that the memorandum would have been filed in a central file system for law enforcement, which is indicated by a code 9260 at the top of the memorandum.  *Id.* at 17-18; see also Exs. K & L.

Wayson claims that Rundell's memorandum affected his property rights. Amended Complaint ¶¶ 24 & 28(b).   Before the September encounter with

Hammond in 2001, he used the property for about a week in both 1999 and 2000. Ex. M at 18-19. In 2001, 2002 , 2003 and 2004, he did a minimum of assessment work on the property, which was less than a week. Ex. M at 19. He bought a tractor in 2004. He got his permit from the state in 2006. He has not been physically blocked from using his property. Ex. M at 21. The access road was taken out in 2001, but that was before Rundell's memorandum. Ex. M at 21-23. Since 2001, Wayson has not had any confrontations on his property. Ex. M at 23.

As to his First Amendment rights, Wayson could not list the instances when he was prevented from speaking. Amended Complaint ¶¶ 6 & 28(b); Ex. M at 24-26. He states that he has not been able to effectively speak. Ex. M at 25. The people he claims he has been prevented from effectively speaking with are the Inspector General of the Office of the Interior, Drue Pearce, the Congressional delegation, the U.S. Attorney in Fairbanks and Anchorage, and the FBI. Ex. M at 27.

The only person who tried to stop Wayson from speaking was Froehlich-Tombrink, whom Wayson wishes to call as his own expert witness. Ex. M at 26. Dkt. 67. Wayson believes Rundell's memorandum affected his speech because she effectively closed down his ability to litigate against Schneider. Ex. M at 26.

He admits that he was not prevented from doing his own investigation within the litigation with Schneider. Ex. M at 27.

Wayson also claims that his due process rights were violated. Amended Complaint ¶¶ 9 & 13. He testified that before Rundell could make a finding that Wayson had committed a crime, she has to go through court and allow him to be confronted with the charges against him and to defend himself. Ex. M at 33.

Wayson also complains that the memorandum negatively affected his access rights to his daughter in Germany. Amended Complaint ¶ 1, 28(f); Dkts. 66 & 67. He stated that the United States Consulate in Germany was told that he was threatening and gave this information to the German court. Dkts. 66 & 67. He believes that Rundell's memorandum is at the beginning of the chain of this false allegation. Ex. M at 35. But another possible source of the idea that Wayson is threatening is his own 1996 letter to BLM director Tom Allen in which he requested the names and addresses of BLM employees so that he could "retaliate personally against them." Ex. O at 17 & Ex. 1 thereto. Thereafter, in Wayson I, Wayson raised the issue about his threatening nature by alleging that Schneider spread false rumors that he was a threat to BLM employees. Ex. C. Even the court could be a possible source of the information that was conveyed to Germany,

its order discussed the allegation that Wayson was a threat in its order.  Ex. D.

Moreover, it is highly unlikely that the internal memorandum had any affect on the

litigation because before Rundell issued her memorandum, Wayson had received

an unusual and unfavorable reversal of a lower German court order.  Dkt. 68 at 2.

## STANDARD OF REVIEW

Summary judgment is appropriate when there "is no genuine issue as to any

material fact" and "the moving party is entitled to a judgment as a matter of law,"

Fed. R. Civ. P. 56 (c); *Celotex Corp. V. Catrett*, 477 U.S. 317, 322 (1986).  The

moving party has the burden of showing that there is no genuine dispute as to

material fact.  *Celotex*, 477 U.S. at 323-35.  To withstand summary judgment, the

non-moving party must establish that there are genuine factual issues that may be

reasonably resolved in favor of either party.  *California Architectural Building

Products v. Franciscan Ceramics, Inc.*, 818 F.2d 1466 (9th Cir. 1987).  There is no

genuine issue of material fact when the relevant evidence in the record, taken as a

whole, indicates that a reasonable fact finder could not return a verdict for the non-

moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The

mere existence of a scintilla of evidence in support of the plaintiff's position will

be insufficient to withstand summary judgment.  The opposing party must present

evidence on which the jury could reasonably find the plaintiff. *Id.* at 252.

## ANALYSIS

### I.  WAYSON FAILED TO STATE A CLAIM FOR THE VIOLATION OF A CONSTITUTIONAL RIGHT

A.    Wayson Has No Constitutionally Protected Interest Not
      to Be Accused of a Crime.

Wayson alleges that in the September 19, 2002 memorandum, Rundell made an official finding that he committed a crime against BLM employee Hammond. Amended Complaint ¶ 2.  He alleges that there was no factual basis for Rundell's finding and that she did this to conceal the wrongdoing of her subordinate Schneider.  Amended Complaint ¶¶ 3 & 6.  Wayson alleges that she made this false finding "for the purpose of compromising Plaintiff's reputation and credibility with others, including the state of Alaska . . . ."  Amended Complaint ¶ 6.

Falsely accusing someone of a crime is defamation.[1]  "A communication is defamatory if it tends to harm the reputation of another so as to lower him [or her] in the estimation of the community or to deter third persons from associating or dealing with him [or her]."  <u>Green v. Northern Publishing Co., Inc.</u>, 655 P.2d 736,

_____

[1]  Blacks Law Dictionary (8th Ed.) defamation**, *n.* 1.** The act of harming the reputation of another by making a false statement to a third person.

739 (Alaska 1982), *cert. denied,* 463 U.S. 1208 (1983) (citing Restatement

(Second) of Torts § 559 (1977)).

There is no constitutional right to be free of defamation unless it is

accompanied by the loss of something substantial, like federal employment.

Paul v. Davis, 424 U.S. 693, 706 (1976).  In Paul, state officials identified the

Plaintiff to local businesses as a known shoplifter.  The shoplifting charge against

the Plaintiff had been dismissed.  The Plaintiff sued, "seeking redress for the

alleged violation of rights guaranteed to him by the Constitution of the United

States."  *Id.* at 696.  The Court found that such an allegation "would appear to

state a classical claim for defamation actionable in the courts of virtually every

State.  Imputing criminal behavior to an individual is generally considered

defamatory Per se . . . ."  *Id.* at 697.   The court found  "that the interest in

reputation asserted in this case is neither 'liberty' nor 'property' guaranteed

against state deprivation without due process of law."  *Id.* at 712.

Wayson stated that he has not asserted any constitutional right to be free of

defamation.  Dkt.32 at 2.  Therefore, even if the court assumed Rundell falsely

accused Wayson of a crime, that action would not violate a constitutional right.

Wayson, like the plaintiff in Paul, alleged an ordinary defamation claim, and not a

claim of constitutional magnitude.  In a *Bivens* case, Wayson can only proceed

against Rundell for violations of constitutional rights.

      B.      Wayson Has No Standing to Claim That Rundell Violated the Law
              and He Has No Constitutional Right to an Investigation.

Wayson alleges that in finding that Wayson had committed a crime, Rundell

violated the law clearly established in 18 U.S.C. §1519,[2] Obstruction of Justice.

Amended Complaint ¶ 10.  He concluded that Rundell's false statements about

him in her report satisfy the elements of the crime.  He concludes that because

Rundell violated the law, she could not have been acting within the scope of her

employment.

Wayson has no private right of action to assert a violation of the criminal

statute.  Forsyth v. Humana,114 F.3d 1467, 1482 (9th Cir. 1997) ("The obstruction

of justice claim under 18 U.S.C. § 1503 is also futile because 18 U.S.C. § 1503 is a

criminal statute that does not provide for a private cause of action.");

Scherer v. United States, et. al., 241 F. Supp. 2d 1270, (Kansas 2003) (listing

_____

    [2]  Destruction, alteration, or falsification of records in Federal investigations
and bankruptcy. Whoever knowingly alters, destroys, mutilates, conceals, covers
up, falsifies, or makes a false entry in any record, document, or tangible object
with the intent to impede, obstruct, or influence the investigation or proper
administration of any matter within the jurisdiction of any department or agency of
the United States or any case filed under title 11, or in relation to or contemplation
of any such matter or case, shall be fined under this title, imprisoned not more than
20 years, or both.

cases).  Therefore, his allegation that Rundell violated the law is not actionable.

Within the context of the allegation that Rundell obstructed justice, Wayson alleges that her obstruction of justice deprived him of his due process right to have an investigation into whether Schneider violated his rights.  Amended Complaint ¶¶ 13 & 28(c).  Subsequently, Wayson  stated in a pleading that he "has not asserted any right to have the government investigate anything at his request." Dkt. 32 at 2.  Therefore, even if Rundell blocked an investigation, which she did not, she did not violate any right.  Moreover, "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." The Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972).  By Wayson's own admission, he had no rights to have an investigation , therefore, he had no due process that was violated.

Wayson also claims that Rundell violated his constitutional due process rights when she made a finding that he committed a crime without going through the courts, and thus, she deprived him of his right to be confronted with the charges and to defend himself.  Amended Complaint ¶¶ 2& 9; Ex. M at  33.   To ensure a fair and accurate trial, the Sixth Amendment's Confrontation Clause protects a defendant's ability to effectively cross-examine prosecution witnesses

testifying against him.  Hovey v. Ayers, 458 F.3d 892, 903 (9th Cir. 2006) (citations omitted).  "The confrontation right attaches when an individual testifies against a defendant in an adversary proceeding before the trier of fact, see Craig, 497 U.S. at 845, 110 S.Ct. 3157, not merely when an individual's testimony is potentially adverse to a defendant."[3]  Id.  Rundell did not charge Wayson with a crime, there was no adversary proceeding, and no right to confrontation arose. Ex. N;  See Ex A.

    C.    The Memorandum Did Not Deprive Wayson of His Property or Liberty Rights.

Wayson claims that Rundell's memorandum caused him to be deprived of the use of his property.  Amended Complaint ¶ 24.  He did not identify a single instance when he was deprived of the use of his property because of her memorandum.  Ex. M at 20.  Wayson claims that he could be on the property, but in 2001 BLM deprived him of working on his claims.  Ex. M at 21.  Wayson did not list Rundell as a person who prevented him from working his claims.  Id. Wayson stated that the road was destroyed when the BLM moved the stream in 2001, but Rundell did not sign the memorandum in 2002.  Ex. M at 21-22.  In the

_____

[3] Maryland v. Craig, 497 U.S. 836, 845-46, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)

ensuing years he always used his property less than a week to do his minimal

assessment.  He was never physically blocked from his property.  Ex. M at 21.

Rundell did not physically block his access and her memorandum did not interfere

with his property rights.  There is no evidence to sustain Wayson's claim.

Wayson alleges that he has been damaged by restrictions on his right and

ability to travel.  Amended Complaint ¶ 28(e).  Since 2001, he has not encountered

any problem traveling to Germany.  Ex. M at 24.

Wayson claims that the memorandum negatively affected his litigation in

Germany to obtain visitation rights.  Amended Complaint ¶¶ 1, 28(f).  He claims

that the Consulate was told he was threatening and dangerous and it, in turn,

conveyed this information to the court.  This allegation sounds like a defamation

claim and it should be dismissed.  Moreover, there is no causal connection

between the Rundell memorandum and Wayson's damages.  There are many

sources which publicly revealed that BLM employees felt that Wayson was

threatening.  The sources include a 1996 BLM letter, Wayson himself, and

pleadings filed in Wayson I.  Rundell is not connected with those sources, except

to the extent that she testified at a deposition in Wayson I.  Wayson does not know

who conveyed the information to the Consulate.  Moreover, it is unrealistic to

blame Rundell for the unexpected, untoward decisions issued by the German court

because many factors contribute to a judicial decision.  Moreover, a German court

issued at least one unfavorable and unexpected reversal of a decision before

Rundell signed the memorandum.

Wayson claims the memorandum has had or will have an affect on his future

employment.  Amended Complaint at par 28(e).   Since 2001, he has not applied

for any employment.  Ex. M at 24.   His allegation is highly speculative and not

actionable because he has not applied for employment.

> D.    Wayson's Free Speech Was Not Affected by an Internal
>        Memorandum Which Was Not Intended for Him.

Wayson claims that the memorandum was written in retaliation for the

exercise of his first amendment rights.  Amended Complaint ¶¶ 6 & 24.  An

individual may bring a constitutional tort action for violations of the freedom of

speech clause of the first amendment.  Gibson v. United States, 781 F.2d 1334,

1342 (9th Cir.1986), cert. denied, 479 U.S. 1054(1987).  The elements of such a

claim are (1) a governmental action, (2) designed to retaliate against and chill

political expression, and (3) damages.  Allen v. Scribner, 812 F.2d 426, 437 (9th

Cir. 1987) (Noonan, J., dissenting.   The courts have held that "[a] plaintiff 'may

not recover merely on the basis of a speculative 'chill' due to generalized and

legitimate law enforcement initiatives' . . . .  However, where a plaintiff

'allege[s] discrete acts of police surveillance and intimidation directed solely at silencing' her or him, a civil rights claim will lie. . . .  The defendant's intent is an element of the claim."  <u>Mendocino Environmental Center v. Mendocino County</u>, 14 F.3d 457, 464 (9th Cir. 1994) (internal citations omitted).

Rundell's action was to respond to Wayson's request for an investigation into Schneider's actions, and it was not a law enforcement initiative.  Rundell did not intend  to retaliate against Wayson or chill his speech.  Ex. N.  The internal memorandum was sent to Johnson and then into law enforcement files under Schneider's name.  Ex. N, K, & L.  Wayson, himself, only received it in the course of litigation of Wayson I.  Wayson, by contrast, spoke to lawyers, friends and miners about the memorandum and BLM's tactic of falsifying criminal charges.

In Wayson I, the court found that "absent evidence that Schneider expected what he told Kennedy to be forwarded to Wayson, a communication from Schneider to *Kennedy* . . . is at most a 'scintilla' of evidence supporting the critical position that Schneider acted with the intent to silence Wayson."  Ex. D at 4.  The same rationale applies to Rundell's memorandum.  There is no evidence that Rundell expected that the memorandum she sent to Johnson would be forwarded to Wayson.  Therefore, just as in Wayson I, where "the communication alleged to have chilled Wayson's speech rights was not directed to Wayson himself, but to

state employee Ben Kennedy," Rundell's communication alleged to have chilled Wayson's speech was not directed to him.

Moreover, there is no evidence that Wayson's speech was ever chilled. Wayson could not list any instances when he was silenced, except when his friend and expert Froehlich-Tombrink warned him not to speak.  Ex. M at 24-28. Although he stated to the court that he "has not asserted any claim that the right to free speech includes the right to a responsive listener[,]" he continues to claim that his speech is  not effective.  Dkt. 32 at 2; Ex. M at 25.  He still states that his ability to speak is infringed if the response is one that is unanticipated or is less than you would anticipate for speaking.  Ex. M at 25.  He argues that he has not been able to effectively speak, because the actions of the Bureau of Land Management has prejudiced those to whom he is speaking.  Ex. M at 25.

In his Amended Complaint, Wayson lists numerous communications he made about Schneider and the incident he wanted investigated.  Amended Complaint ¶¶ 14, 15, 16, 18, 19, 21.  Wayson contacted his local Assistant U.S. Attorney, the U.S. Attorney, and the Attorney General about the issue.  He listed some of these same entities in his deposition.  Ex. M at 27-28.  He is not prevented from speaking, he just attributes the agencies' failure to do what he wants to the internal memorandum.   In Wayson I, the court ruled that Wayson "confuses his

right to speak freely with an assumed right to speak without contradiction. . . . The right to speak carries no corresponding power to silence others." Ex. D at 4. Rundell had the freedom to voice her analysis of the situation to her supervisor and comment about Wayson's role in the interaction.

The right to speak also carries no corresponding power to require others to respond. The agencies do not have to respond to Wayson's requests. Wayson has been able to speak freely since the memorandum issued. There is simply no constitutional violation because Rundell did not intend to chill Wayson's free to speech. The court should grant her summary judgment on the merits.

## II. RUNDELL HAS QUALIFIED IMMUNITY UNLESS THE ACT COMPLAINED OF IS APPARENTLY LAWLESS.

In the alternative, should the court decline to grant her motion for summary judgment, Rundell is entitled to qualified immunity. Federal officials are protected by qualified immunity as to constitutional claims or violation of federal law. Qualified immunity is intended to provide government officials with the ability reasonably to anticipate when their conduct may give rise to liability for damages and to terminate unjustified lawsuits quickly. Anderson v. Creighton, 483 U.S. 635, 646 (1987); Davis v. Scherer, 468 U.S. 183, 195 (1984). The qualified immunity enunciated in Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982),

protects "government officials performing discretionary functions."  The Supreme

Court noted that "such officials as police officers or prison wardens, to say nothing

of higher level executives who enjoy only qualified immunity, routinely make

close decisions in the exercise of the broad authority that is necessarily delegated

to them."  Davis, 468 U.S. at 196.  The court intends for qualified immunity to

protect "all but the plainly incompetent or those who knowingly violate the law."

Malley v. Briggs, 475 U.S. at 341.

The proper inquiry to determine whether a federal official has qualified

immunity for a constitutional violation is: "Taken in the light most favorable to the

party asserting the injury, do the facts alleged show the officer's conduct violated a

constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001)  "If no

constitutional right would have been violated were the allegations established,

there is no necessity for further inquiries concerning qualified immunity.  On the

other hand, if a violation could be made out on a favorable view of the parties'

submissions, the next, sequential step is to ask whether the right was clearly

established.  This inquiry, it is vital to note, must be undertaken in light of the

specific context of the case, not as a broad general proposition; and it too serves to

advance understanding of the law and to allow officers to avoid the burden of trial

if qualified immunity is applicable."  Id.  "The relevant, dispositive inquiry in

determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*; Valdez v. Rosenbaum, 302 F.2d 1039, 1043 (9th Cir. 2002).

Looking at the event in the light most favorable to Wayson, the question presented is, do the facts alleged show that Rundell violated a constitutional right? They do not.  Rundell  received a request for an investigation of the acts of Schneider by he agency's chief law enforcement officer.  As the acting BLM Acting State Director, Rundell could respond to an internal inquiry in an internal memorandum and expect that the memorandum would not violate anyone's constitutional right of free speech.  She could also look at the facts available to her and conclude that Schneider acted to protect an employee who was threatened by Wayson.  As it is a crime to oppose, interfere with, or impede certain officers in the performance of their official duties, Rundell could conclude that Wayson committed a crime.  See Ex. A at 1.  Rundell had read Hammond's diary, in which she stated that she felt threatened and that she had asked Wayson to leave the job site more than once.  Ex. H at 4 & 8; Ex. J at 32.  The memorandum concluded that Schneider was justified in what he did because the employee felt threatened.

Rundell made a conclusion about Schneider's actions.  She did not charge Wayson with a crime and Wayson did not have the constitutional right to have an

administrative inquiry.  The case was closed against Schneider.  Therefore, there

was no reason for her to imagine that she could be violating Wayson's due process

rights.  As nothing happened to him, there were no due process rights at issue.

Rundell, as Acting State Director, oversaw law enforcement.  One function

of BLM was to provide "law enforcement services for the protection of users of

public land in co-operation with other Federal, state, and local authorities. . . ."

Ex. F.  Law enforcement and cooperating with authorities were part of  Rundell's

job.    Rundell acted reasonably and should not have known that her response to

that Chief's request for an administrative inquiry would be produced.  She did not

intend for Wayson to receive the memorandum so she could not intend to chill his

speech.  Even taking the facts in the light most favorable to Wayson, and

concluding that Rundell falsely accused Wayson of committing a crime and that

she blocked further investigation of Schneider, there is no constitutional violation.

Even if she were wrong in her conclusions, she never formally charged Wayson

with a crime and Wayson has no constitutional right not to be accused of crime or

to have an investigation into Schneider's conduct.  See supra at 7.  Wayson

acknowledges that he has no right to an investigation and he has no constitutional

right to not be defamed.  Dkt. 32 at 2.  When a court finds that "no constitutional

right would have been violated were the allegations established, there is no

necessity for further inquiries concerning qualified immunity." <u>See</u> <u>supra</u> at 18.

The court can stop its analysis after the first step because Wayson did not allege a legitimate violation of a right guaranteed by the constitution.  But if the court finds that there was a possible constitutional violation, it should grant Rundell qualified immunity.  If the court considered whether the constitutional right that was allegedly violated, was clearly established, it would have to conclude that under <u>Paul v. Davis</u>, it was not clearly established that wrongly accusing someone of crime in an internal memorandum would result in the violation of a constitutional right.  Nor was it clearly established that a citizen has a constitutional right to an investigation about the decisions made by a BLM manager.  Rundell could not predict that producing an internal memorandum would possibly violate someone's constitutional rights.

### <u>CONCLUSION</u>

Wayson does not have a constitutional right to be free of defamation.  He lacks standing to accuse Rundell of committing a crime and to claim a constitutional right to an investigation.  The  memorandum did not silence him or prevent him from using his property.  Rundell did not intend the internal memorandum  to go to Wayson, and therefore, she could not have intended to chill his speech.  He has not lost any use of his property.   Therefore the court should

grant Rundell's motion for summary judgment and find that as a matter of law,
Wayson failed to allege any violation of his constitutional rights.

In the alternative, if the court finds that Rundell violated a constitutional
right, then she is entitled to qualified immunity.  As the Acting State Director, she
was in charge of law enforcement for the BLM and it was not apparently lawless
for her to conclude in an internal memorandum that Wayson's conduct satisfied
the elements of a criminal statute.  Rundell could not reasonably expect that her
internal memorandum would be disseminated and violate constitutional rights.
Rundell is entitled to qualified immunity.

Rundell asks the Court to grant her  Motion for Summary Judgment .

Respectfully submitted October 18, 2007, in Anchorage, Alaska.

NELSON P. COHEN
United States Attorney
s/ Susan J. Lindquist
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3378
Fax: (907) 271-2344
E-mail: susan.lindquist@usdoj.gov
AK #9008053

**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2007
a copy of the foregoing **LINDA RUNDELL'S
MOTION FOR SUMMARY JUDGMENT AND
FOR QUALIFIED IMMUNITY** was served on:

Mark N. Wayson
c/o Wickwire
2775 Hanson Road
Fairbanks, AK 99709

by regular U. S. mail.

s/ Susan J. Lindquist