```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3
    MARK N. WAYSON,
 4
              Plaintiff,
 5
       vs.                    NO. F03-0035 (JWS) Civil
 6
    ROBERT SCHNEIDER and the
 7  UNITED STATES OF AMERICA,
 8            Defendants.
 9
10     VIDEOTAPED TELEPHONIC DEPOSITION OF LINDA S.C. RUNDELL
11                     September 27, 2004
12                         9:14 a.m.
                         4010 Rodeo Road
13                     Santa Fe, New Mexico
14
15
16     The deposition of LINDA S.C. RUNDELL was taken on
17  behalf of the Plaintiff on September 27, 2004, at 9:14 a.m.
18  at the offices of Hunnicutt, Costello Reporting, Santa Fe,
19  New Mexico, before Maureen R. Costello, Certified Court
20  Reporter #220 and Notary Public in and for the County of
21  Santa Fe, State of New Mexico.
22
23
24
25                         **COPY**
```

HUNNICUTT, COSTELLO REPORTING, INC.
(505) 474-9770 - (800) 304-9770 FAX (505) 474-9771
MAUREEN R. COSTELLO, RPR, CCR 220

Case 4:06-cv-00001-JWS   Document 69-12   Filed 10/18/2007   Page 2 of 7

WAYSON vs. SCHNEIDER                                LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

2 (Pages 2 to 5)

**Page 2**

```
                APPEARANCES
FOR PLAINTIFF:   MARK N. WAYSON
                 Pro Se
VIA TELEPHONIC   Post Office Box 84570
COMMUNICATION    Fairbanks, Alaska 99708-4570
                 (407)-746-4570
                 markonwayson@yahoo.com

FOR DEFENDANTS:  DANIEL COOPER, Jr., ESQ.
                 Assistant U.S. Attorney
VIA TELEPHONIC   222 W. 7th Ave. #9, Rm. 253
COMMUNICATION    Anchorage, Alaska 99513
                 (907) 271-1408

VIDEOGRAPHER:    WILL MOIR
                 WILL VIDEO MOIR PRODUCTIONS
                 12 Monticello
                 Albuquerque, New Mexico 87123
                 (505) 292-7659 FAX (505) 298-4137
                 canyongods@comcast.net

                I N D E X
                                          PAGE
EXAMINATION OF LINDA S.C. RUNDELL
   BY MR. WAYSON                           5
                                          30
                                          36
   BY MR. COOPER                          27
                                          34

Objections By Mr. Cooper  16, 17, 20, 22, 24, 25,37

No Requests for Production of Documents

No Instructions Not to Answer

SIGNATURE/CORRECTION PAGE                 40

REPORTER'S CERTIFICATE                    41
```

**Page 3**

```
                E X H I B I T S
                Initial Reference

Deposition Exhibit

1  09/19/02 Memorandum                     23
   To: Chief, Nat'l Law Enforcement Office
   From: State Director, Linda Rundell
   Subj: DOI-OIG Case File No. 2002-I-R-612-WCA

2  10/02/02 Memorandum                     26
   To: Special Agent-in-Charge
   From: Chief Nat'l Law Enforcement Office
         Walter I. Johnson
   Subj: Investigative Referral

3  09/15/01 U.S. Dept of the Interior      26
   Bureau of Land Management
   Contract Diary by Carol Hammond

4  09/15/01 Incident/Investigation Report  27
   Officer Eddie R. Lee

5  04/05/02 Letter to Earl E. Devaney      27
   Re: 18 U.S.C. 1001 violation by Fairbanks
   From Mark N. Wayson

                   * * *
```

**Page 4**

```
 1  VIDEOGRAPHER: Good morning. Today is Monday, the
 2  27th of September, 2004. The time is 9:14 a.m. I am Will
 3  Moir, owner of Will Moir Video Productions located in
 4  Albuquerque, New Mexico. We're here for the deposition of
 5  Linda Rundell in the case of Mark N. Wayson versus Robert
 6  Schneider and the United States of America, filed in the
 7  United District Court for the District of Alaska, Case
 8  No. F03-0035.
 9       This deposition is being videotaped in the
10  presence Maureen Costello with the court reporting firm of
11  Hunnicutt, Costello. This deposition is being held at
12  4010 Rodeo Road in Santa Fe, New Mexico.
13       Counsel will now please state their appearance.
14       MR. WAYSON: Mark Wayson representing myself.
15       MR. COOPER: Daniel R. Cooper, Jr., Assistant
16  United States Attorney, counsel for Mr. Schneider and the
17  United States.
18       VIDEOGRAPHER: Thank you very much. The court
19  reporter will now, please, swear the witness in.
20       (The witness was first duly sworn.)
21       VIDEOGRAPHER: Thank you. We're all set. Thank
22  you.
```

**Page 5**

```
 1            LINDA S.C. RUNDELL,
 2  the Witness herein, having been first duly sworn by the
 3  Notary Public, was examined and testified as follows:
 4                    EXAMINATION
 5  BY MR. WAYSON:
 6       Q  Ms. Rundell, I will begin the questioning. I'm
 7  Mark Wayson. I would first like to ask you how long you've
 8  been with BLM.
 9       A  A little over 25 years.
10       Q  And in what capacity are you working now?
11       A  I am currently the BLM State Director for the
12  states of New Mexico, Oklahoma, Texas and Kansas.
13       Q  And how many -- how many state directors are
14  there?
15       A  Oh, about eleven, ten or eleven, something like
16  that.
17       Q  Okay. And were you a state director in Alaska?
18       A  I was the associate state director in Alaska.
19       Q  And for how long?
20       A  For three years.
21       Q  Can you tell me from when to when, please?
22       A  December 1999 through December of 2002.
23       Q  And as an associate director, whom did you -- who
24  was the director then?
25       A  Fran Cherry.
```

HUNNICUTT, COSTELLO REPORTING, INC.
(505) 474-9770 - FAX (505) 474-9771

Case 4:06-cv-00001-JWS   Document 69-12   Filed 10/18/2007   Page 3 of 7

WAYSON vs. SCHNEIDER                    LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

3 (Pages 6 to 9)

Page 6

1  Q. Did you say Kerry?
2  A. Cherry, C-h-e-r-r-y.
3  Q. Okay. As an associate director, were you at times
4  the acting director?
5  A. Yes, I was.
6  Q. Okay. Well, I want to draw your attention to this
7  -- a letter that we have here which is -- it's
8  Exhibit No. 5 --
9  A. Yes.
10 Q. -- in that packet. It's the September 19th
11 memorandum, excuse me, from the State Director to the
12 Chief, National Law Enforcement Office.
13 A. (Witness perused document.)
14 Q. Did you find it?
15 A. Yes, I have it.
16 Q. Okay. And did you write this letter, write this
17 memorandum?
18 A. I signed it. It may have been drafted by one of
19 my employees.
20 Q. Do you know who would be drafting something like
21 that?
22 A. I do not recall.
23 Q. Did you read it, review it?
24 A. Yes, I did.
25 Q. Did you sign it, agreeing with it?

Page 7

1  A. Yes, I did.
2  Q. Okay. Now, this in your first paragraph, you
3  refer to an inquiry. I understand this was an
4  administrative inquiry.
5  A. I believe so.
6  Q. Okay. And who assigned it to you?
7  A. As I recall, from going through this packet of
8  information because my memory is vague on this, it was
9  someone from the National Law Enforcement Office of BLM.
10 Q. In other words, they would have the authority to
11 assign you an inquiry like this?
12 A. Most likely I received a call; and I have a copy
13 of a written memo signed by Walter Johnson, who was the
14 acting agent-in-charge at that time, about the incident and
15 asking that I look into it.
16 Q. What's the date of this memo, please?
17 A. Oh, let's see. (Witness perused documents.) I
18 believe I'm referring to the memo signed by -- well, Dennis
19 McLane. It's actually from Walter Johnson to the IG's
20 office.
21 Q. I'm sorry. I didn't understand.
22 A. The October 2, 2002, memo from Walter Johnson to
23 the special agent-in-charge, Office of Inspector General.
24 You have it marked as No. 7.
25 Q. That's correct, but my inquiry is: Who assigned

Page 8

1  you the administrative inquiry?
2  A. I do not recall. As I mentioned, it was probably
3  as a result of a phone call from the national office, law
4  enforcement.
5  Q. But you don't know who called you?
6  A. I do not recall.
7  Q. Okay. Did you -- Do you know when you were
8  assigned this inquiry?
9  A. I do not.
10 Q. Okay. What -- Is there a procedure for an
11 administrative inquiry?
12 A. The procedures vary according to what the inquiry
13 is about. In this case I would have made some calls
14 myself, particularly to the manager in question,
15 Mr. Schneider; and most likely I asked that someone from
16 the National Office of Law Enforcement look into it as well
17 since it involved a law enforcement activity.
18 Q. Did you contact Mr. Schneider then?
19 A. I did.
20 Q. Did you talk to him before you wrote this or
21 signed this memorandum?
22 A. I did.
23 Q. Okay. Do you recall who was the national law
24 enforcement officer you spoke with?
25 A. I do not.

Page 9

1  Q. Okay. Do you remember if you talked to anybody
2  else in conducting this administrative inquiry?
3  A. I do not recall. It's likely that I may have.
4  Q. But would you have followed a procedure for an
5  inquiry such as this?
6  A. As I mentioned already, the procedures varied,
7  depending on the type of inquiry you're looking at.
8  Q. What kind of inquiry was this?
9  A. Well, this one involved law enforcement. So
10 typically we would ask someone from the National Law
11 Enforcement Office to help with the review.
12 Q. Did you make any notes when you were preparing,
13 doing this administrative inquiry?
14 A. I don't know that I did. I don't have them if I
15 did.
16 Q. Okay. Can you recall anyone else that you spoke
17 with making various inquiries?
18 A. As I mentioned already, I'm sure that I talked to
19 someone from the National Office of Law Enforcement; but
20 who that was, I cannot recall.
21 Q. Did you talk to Carol Hammond?
22 A. I don't know that I did talk to Carol.
23 Q. Do you know her?
24 A. I probably met her in Fairbanks at an
25 all-employees meeting or some other meeting.

Case 4:06-cv-00001-JWS   Document 69-12   Filed 10/18/2007   Page 4 of 7

WAYSON vs. SCHNEIDER                     LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

4 (Pages 10 to 13)

Page 10

1  Q. Did you contact any witnesses?
2  A. I did not.
3  Q. Did you contact Ranger Lee with the law
4  enforcement in Fairbanks with BLM?
5  A. I may have, but I don't recall.
6  Q. Do you know if Henri Bisson was in any capacity at
7  -- in the Alaska administration of BLM at that time?
8  A. Henri Bisson was in the Washington office. At
9  that time he was not in the Alaska BLM organization.
10 Q. Did you talk to Michael Baffrey with the Secretary
11 of Interior's Office?
12 A. I cannot recall.
13 Q. In the second paragraph of this memorandum dated
14 September 19th, you referred to: "Upon careful review of
15 the incident in question, we have determined," and can you
16 tell me who the "we" you're referring to is?
17 A. My guess would be that I was referring to myself,
18 the State Director, and whoever from the National Law
19 Enforcement Office looked into the incident for me.
20 Q. Do you know who the chief in the National Law
21 Enforcement Office was at that time?
22 A. I'm fairly certain it was Walter Johnson.
23 Q. Okay. Did Pamela Stuart have any role in this, in
24 the inquiry?
25 A. I don't know that she was on board at that time.

Page 11

1  I can't remember the exact date that we hired her.
2  Q. Was she the chief of the law enforcement here in
3  Alaska?
4  A. She was the special agent-in-charge in Alaska.
5  Q. So she was the top-ranking law enforcement officer
6  in Alaska.
7  A. Yes.
8  Q. Okay. And where is she now?
9  A. She is now in Santa Fe.
10 Q. And when did she transfer down there, do you know?
11 A. To Santa Fe?
12 Q. Correct.
13 A. I believe it was around April of 2003. That's
14 just a guess, though.
15 Q. And I understand that you went down there in
16 December of --
17 A. 1999.
18 Q. That's correct, but I mean: You transferred from
19 Alaska in December of 2002?
20 A. Yes.
21 Q. Okay. Do you think that the finding that you made
22 may have been different had you interviewed the individuals
23 who were involved and reviewed evidence?
24 A. I don't believe so.
25 Q. Would you follow the same procedures if the

Page 12

1  complainant had been a federal employee?
2  A. Yes.
3  Q. Would you contact that employee?
4  A. Probably not. I would have asked whoever was
5  handling the inquiry for me to look at the facts and
6  contact whoever that individual felt needed to be
7  contacted.
8  Q. Did you do so in this case?
9  A. I turned it over to the National Law Enforcement
10 Office, and they conducted their investigation into the
11 matter.
12 Q. But you don't know who you assigned to do this
13 inquiry?
14 A. I don't recall.
15 Q. Would there be a record of it anyplace?
16 A. I'm -- Most likely if there is, it would be in
17 the Boise office of the National Law Enforcement Office.
18 Q. Okay. What information did you have when you
19 began this inquiry?
20 A. I had the memo from Walter Johnson, and I had
21 spoken with Mr. Schneider about the incident. At some
22 point I reviewed the statements written by Ms. Hammond,
23 Officer Lee.
24 Q. I'm sorry. I didn't hear that, ma'am.
25 A. I said: At some point I review the statements

Page 13

1  that were written by Ms. Hammond and Officer Lee.
2  Q. Okay. On the Ms. Hammond statements, you're
3  talking about the contract diary, which is, I believe,
4  Exhibit No. 2.
5  A. Yes.
6  Q. Okay. And with the -- and that Ranger Lee report,
7  you're referring to the report that's listed as No. 3; is
8  that correct?
9  A. Yes.
10 Q. Okay. And just so I keep it straight: You had a
11 memo from Walter Johnson requesting or directing you to
12 this inquiry; but you don't have that memo, right?
13 A. The memo, again, is from Walter Johnson to the IG
14 that I'm referring to.
15 Q. Yes. And do you have that memo?
16 A. I do. We've already spoken about it. It's No. 7.
17 Q. Well, I would ask if you have another one because
18 that's dated October 2nd, and your memorandum is dated
19 September 19, 2002.
20 A. Yes.
21 Q. Well, did you have a memo accompanying this report
22 from Ms. Hammond and the report from Ranger Lee?
23 A. Oh, I don't know. It's not part of the materials,
24 I don't believe, that were sent to me.
25 Q. No, I think that's correct. But did you have one?

Case 4:06-cv-00001-JWS   Document 69-12   Filed 10/18/2007   Page 5 of 7

WAYSON vs. SCHNEIDER                    LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

5 (Pages 14 to 17)

Page 14

1  A. I do not recall.
2  Q. Okay. Did you also have the complaint, April 5,
3  2002, complaint, to Earl E. Devaney from me?
4  A. If it's in this packet, I have it. If not, I do
5  not have it.
6  Q. No. I'm asking if you had it. It's No. 1, if
7  that can be of help.
8  A. I have this in front of me that was sent to me.
9  If you're asking whether I had it at the time, I do not
10 know.
11 Q. But you do recall having the report from Ranger
12 Lee and the report from Ms. Hammond?
13 A. Yes.
14 Q. Did you have the e-mail from Mr. Schneider, which
15 is No. 4?
16 A. (Witness perused document.) Probably. I don't
17 recall.
18 Q. When you say that there are different procedures
19 for different administrative inquiries, did you follow the
20 procedure for this administrative inquiry involving a law
21 enforcement matter?
22 A. Yes. I contacted the National Office of Law
23 Enforcement.
24 Q. But didn't they actually contact you?
25 A. I asked them to assist with this.

Page 15

1  Q. So I understand that they assigned it to you, and
2  then you asked them to assist with it.
3  A. Yes.
4  Q. So you're unaware of -- If there was an
5  investigative report in addition to this by National Law
6  Enforcement Office, you're not aware of it?
7  A. I am not.
8  Q. Would they have talked to you about it before you
9  wrote the September 19th letter --
10 A. Yes.
11 Q. -- memorandum?
12 A. Yes.
13 Q. Do you know if they did talk to you about it?
14 A. I believe so.
15 Q. Can you tell me what they told you?
16 A. I don't recall. My guess would be that they
17 looked into it and found no basis.
18 Q. But you have no idea whom you spoke with there?
19 A. I do not.
20 Q. Okay. Are you sure you talked to Robert Schneider
21 about this?
22 A. Yes, I did.
23 Q. And are you sure you talked to him about this
24 before you issued the memorandum?
25 A. I believe Mr. Schneider contacted me about this

Page 16

1  incident after it happened. He gave me a briefing on the
2  phone.
3  Q. Did he report to you that there was a videotape?
4  A. No. I don't know. He may have. I don't recall.
5  Q. If there were videotape, you would have included
6  it in your inquiry?
7  A. My guess is whoever investigated it would have, if
8  they were aware of it, would have wanted to see it.
9  Q. Okay. Now, you wrote here that there was a
10 perceived threat from Mr. Wayson. Do you know what that
11 threat was?
12 A. My understanding is that Ms. Hammond felt
13 intimidated and threatened by Mr. Wayson's behavior.
14 Q. Okay. Now, how did you decide that it was a Title
15 18 violation?
16 A. Whoever I assigned to work on this memo for me
17 would have looked that up.
18 Q. But you cannot recall whom you assigned to work on
19 this memo?
20 A. I do not.
21    MR. COOPER: Objection; asked and answered. I
22 mean, she's told you at least twice if not three times,
23 Mr. Wayson, that she can't recall; and you're not going to
24 get a different answer. So let's use our time wisely.
25 Q. (BY MR. WAYSON) Did you consult with the U.S.

Page 17

1  Attorney at all on this?
2  A. I cannot recall.
3  Q. Could you have?
4  A. I beg your pardon?
5  Q. Could you have?
6    MR. COOPER: Objection; calls for speculation.
7    Go ahead and answer.
8  A. I still didn't hear you. Did you say: Could I
9  have?
10 Q. Could you have called the U.S. Attorney for advice
11 about what statute was being violated?
12 A. I probably would have spoken to the Solicitor's
13 Office.
14 Q. Do you recall who was the solicitor at that time?
15 A. I don't recall that I spoke to the Solicitor's
16 Office. We had a number of solicitors that we worked with
17 on a regular basis.
18 Q. Where does your -- where does this record go, your
19 memorandum?
20 A. We have a filing system, central filing system,
21 and my -- I would suppose that the law enforcement office
22 would have kept a copy. There is a file code at -- on the
23 top, right-hand side of the memorandums which show where
24 they are filed.
25 Q. Is this the number you're referring to, 9260?

Case 4:06-cv-00001-JWS   Document 69-12   Filed 10/18/2007   Page 6 of 7

WAYSON vs. SCHNEIDER                                  LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

6 (Pages 18 to 21)

Page 18

1  A. Yes.
2  Q. And then in parentheses 910?
3  A. Yes.
4  Q. What does that -- Does that tell you anything?
5  A. The 910 is the organizational code of the state
6  office. It means it comes from the State Director's
7  office. The 9260 would be the central filing code,
8  perhaps, for law enforcement.
9  Q. Do you know anything about this project that was
10 being conducted up there at 98 Mile Steese Highway?
11 A. I do not, other than it had something to do with
12 enhancing fisheries habitat, I believe.
13 Q. As the associate state director or the acting
14 state director, how would you find out about a project like
15 this?
16 A. I would not find out about a project like that
17 unless someone made a point of telling me about it for a
18 particular reason. Projects like that are generated and
19 carried out at the field office level.
20 Q. What about the cost of it? Would you be involved
21 in the cost of a project such as this?
22 A. Not unless there was a dispute over funding in
23 that there wasn't enough funding to go around for all our
24 projects and I needed to engage in priority setting.
25 Q. Would you be reviewing a budget at any time as a

Page 19

1  state director or associate director?
2  A. From a high level, and that more to ensuring that
3  the offices were adequately funded for operations and
4  personnel costs. Very unusual that I would look at
5  specific project work.
6  Q. But if you, as the associate director of the state
7  -- acting state director, wanted to find out what the cost
8  was of this project, how would you do that?
9  A. I would probably ask the budget officer;
10 alternatively, I might ask the program leader for wild life
11 or engineering; or I could ask the field office manager.
12 Q. That would be the field office manager in
13 Fairbanks?
14 A. Yes.
15    (Discussion off the record with the reporter.)
16    THE WITNESS: Field office manager.
17    THE REPORTER: In Fairbanks?
18    THE WITNESS: Fairbanks.
19 Q. Again, where would the budget officer be located?
20 A. In the state office in Anchorage.
21 Q. Do you remember who the budget officer was when
22 you were the acting director?
23 A. Carol Moore.
24 Q. Carol. Do you know if she still holds that
25 position?

Page 20

1  A. I believe so.
2  Q. If I can just ask again: Did you say you couldn't
3  recall if you had the April 2002 complaint or not when you
4  received the direction for the inquiry?
5  A. I don't recall.
6  Q. Okay. Have you seen it before, again, today?
7  A. I believe I have.
8  Q. Does BLM take any action about environmental
9  violations?
10 A. Yes, we do.
11 Q. And is BLM required to follow the same rules and
12 regulations as a private citizen?
13    MR. COOPER: Objection with respect to -- well,
14 with respect to --
15    MR. WAYSON: Environmental.
16    MR. COOPER: -- environmental, correct.
17    With that correction or clarification, you may
18 answer.
19 A. Well, I don't know what rules and regulations the
20 private citizen would follow. If we are made aware of an
21 environmental issue, we go out and take a look at what has
22 happened and try to determine what the problem is and what
23 needs to be done about it.
24 Q. (BY MR. WAYSON) And if you determine there was a
25 violation, what action would you take?

Page 21

1  A. Well, again, it would depend on what the issue
2  was. If there was a company that had done unauthorized
3  work or had created a hazard or an environmental issue, we
4  would contact the company and attempt to get them to
5  remediate it on an administrative level. If it appeared
6  that there were possible criminal violations, we would
7  certainly ask law enforcement to get involved and take a
8  look at that.
9  Q. Okay. Jumping back over to your letter or the
10 memorandum of September 19, 2002, it directs me to the
11 finding that it was justified for Mr. Schneider to send out
12 rangers in this case; is that correct?
13 A. Yes.
14 Q. Do you think it was also justified for him to
15 notify the state agency that I was a potential serious
16 threat to BLM employees?
17 A. I don't know that he did that.
18 Q. Okay. Can you tell me what you were assigned to
19 inquire into with your administrative inquiry then?
20 A. To the best of my recollection, which is vague, I
21 was asked to look into Mr. Schneider's actions insofar as
22 having called out a ranger to be on the site where
23 Ms. Hammond was conducting her BLM activities.
24 Q. (BY MR. WAYSON) Do you think that this probably
25 was assigned, though, in writing? Am I correct?

Case 4:06-cv-00001-JWS   Document 69-12   Filed 10/18/2007   Page 7 of 7

WAYSON vs. SCHNEIDER                     LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

8 (Pages 26 to 29)

**Page 26**

1 assigned to help you on this law enforcement, but did you
2 give specific instructions?
3    A. I'm certain I asked someone to look into it for
4 me.
5    Q. Did you ask them to make a report to you?
6    A. I don't know that I asked for a written report.
7 It may have just been verbal.
8    MR. WAYSON: You can talk to her.
9    MR. COOPER: Okay. Madam Court Reporter, first of
10 all, for the purpose of this deposition, I would like to
11 have Ms. Rundell hand you what's been marked -- she has a
12 document marked the number 7 with a circle around it. I
13 would like that marked as No. 2.
14    The one that she has circled with --
15    (Discussion off the record with the reporter.)
16    (Deposition Exhibit No. 2
17    Was marked for identification)
18    MR. COOPER: Okay. She also has a document with a
19 circled No. 2 at the top. If she would mark that, please.
20 That's the Carol Hammond report as No. 3.
21    (Deposition Exhibit No. 3
22    Was marked for identification.)
23    MR. COOPER: Okay. And the Ranger Lee report,
24 which has the circled No. 3 at the top would be Deposition
25 Exhibit No. 4.

**Page 27**

1    (Deposition Exhibit No. 4
2    Was marked for identification)
3    EXAMINATION
4 BY MR. COOPER:
5    Q. And, Ms. Rundell, do you have this letter from the
6 Mark Wayson dated April 5, 2002? That's No. 1. I'd like
7 to mark that as Deposition Exhibit No. 5.
8    A. With the attachments?
9    Q. Yes, go ahead and mark it the way it was submitted
10 with all those attachments.
11    A. Okay.
12    (Deposition Exhibit No. 5
13    Was marked for identification)
14    MR. COOPER: Okay. Thank you.
15    Q. (BY MR. COOPER) Starting now back with Deposition
16 Exhibit No. 1, which is your memo dated September 19, 2002,
17 Ms. Rundell, at the bottom of the first page, do you have
18 what has been referred to by Mr. Wayson as a finding where
19 you make a conclusion that there was an intimidation in the
20 performance of official duties? Do you find that?
21    A. Yes, I do, huh-huh.
22    Q. Okay. Now, the finding -- and I'm going to use
23 that word because that's how Mr. Wayson has used it -- is
24 not the same as a conviction, is it?
25    A. A conviction, no.

**Page 28**

1    Q. Okay. In fact, in order for this case to proceed
2 even criminally, would you have had to present the factual
3 issues to the United States Attorney's Office so that they
4 could proceed criminally?
5    A. Yes.
6    Q. Did you ever do so?
7    A. I do not believe that occurred.
8    Q. Okay. With respect to the incident back in
9 September of 2001 which, prior to Mr. Wayson's complaint on
10 Exhibit No. 5 that Mr. Schneider did something wrong, do
11 you have any firm recollection of either the incident in
12 September 2001 or the subsequent investigation called for
13 by Mr. Wayson?
14    A. Very, very vague. It was not of sufficient
15 standing, I guess. That's not quite the right word, but it
16 just didn't stay with me because it didn't seem to be that
17 big of an incident.
18    Q. Okay. When you where conducting this
19 investigation or supervising this investigation, did you
20 maintain a file at any time, do you recall?
21    A. I do not recall, but I don't believe I did.
22    Q. Okay. If you had retained a file, where would it
23 be located now if it still exists?
24    A. It would have been put together with the
25 investigative materials.

**Page 29**

1    Q. Would it have been somewhere in the state
2 director's office?
3    A. It would have been, I would assume, filed under
4 the Law Enforcement Code. I may have -- if I had kept
5 written notes of anything, would have given them to the
6 investigator.
7    Q. Okay. And you would have worked with the
8 Solicitor General's Office on this, if at all, in terms of
9 legal advice?
10    A. Right.
11    Q. Was Joe Darnell at the solicitor's office at that
12 time?
13    A. Yes, he was.
14    Q. Okay. Now, turning your attention to Exhibits
15 No. 3 and No. 4, do you believe as you sit here today that
16 you did review those two, those two items?
17    A. I believe so.
18    Q. Okay. But you don't know if you ever saw this the
19 letter from Mr. Wayson to Mr. Devaney marked Exhibit No. 5?
20    A. I don't recall it. I may have seen it. I just
21 don't really recall.
22    MR. COOPER: Okay. Thank you. I don't have
23 anything further.

HUNNICUTT, COSTELLO REPORTING, INC.
(505) 474-9770 - FAX (505) 474-9771