LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3
    MARK N. WAYSON,
 4
                  Plaintiff,
 5
      vs.                        NO.  F03-0035 (JWS) Civil
 6
    ROBERT SCHNEIDER and the
 7   UNITED STATES OF AMERICA,
 8                Defendants.
 9
10     VIDEOTAPED TELEPHONIC DEPOSITION OF LINDA S.C. RUNDELL
11                      September 27, 2004
12                         9:14 a.m.
                        4010 Rodeo Road
13                     Santa Fe, New Mexico
14
15
16       The deposition of LINDA S.C. RUNDELL was taken on
17   behalf of the Plaintiff on September 27, 2004, at 9:14 a.m.
18   at the offices of Hunnicutt, Costello Reporting, Santa Fe,
19   New Mexico, before Maureen R. Costello, Certified Court
20   Reporter #220 and Notary Public in and for the County of
21   Santa Fe, State of New Mexico.
22
23
24
25                         COPY
```

*Attachment #3*

Case 4:06-cv-00001-JWS   Document 72-4   Filed 11/05/2007   Page 2 of 5

WAYSON vs. SCHNEIDER                    LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

4 (Pages 10 to 13)

Page 10

1  Q. Did you contact any witnesses?
2  A. I did not.
3  Q. Did you contact Ranger Lee with the law
4  enforcement in Fairbanks with BLM?
5  A. I may have, but I don't recall.
6  Q. Do you know if Henri Bisson was in any capacity at
7  -- in the Alaska administration of BLM at that time?
8  A. Henri Bisson was in the Washington office. At
9  that time he was not in the Alaska BLM organization.
10  Q. Did you talk to Michael Baffrey with the Secretary
11  of Interior's Office?
12  A. I cannot recall.
13  Q. In the second paragraph of this memorandum dated
14  September 19th, you referred to: "Upon careful review of
15  the incident in question, we have determined," and can you
16  tell me who the "we" you're referring to is?
17  A. My guess would be that I was referring to myself,
18  the State Director, and whoever from the National Law
19  Enforcement Office looked into the incident for me.
20  Q. Do you know who the chief in the National Law
21  Enforcement Office was at that time?
22  A. I'm fairly certain it was Walter Johnson.
23  Q. Okay. Did Pamela Stuart have any role in this, in
24  the inquiry?
25  A. I don't know that she was on board at that time.

Page 11

1  I can't remember the exact date that we hired her.
2  Q. Was she the chief of the law enforcement here in
3  Alaska?
4  A. She was the special agent-in-charge in Alaska.
5  Q. So she was the top-ranking law enforcement officer
6  in Alaska.
7  A. Yes.
8  Q. Okay. And where is she now?
9  A. She is now in Santa Fe.
10  Q. And when did she transfer down there, do you know?
11  A. To Santa Fe?
12  Q. Correct.
13  A. I believe it was around April of 2003. That's
14  just a guess, though.
15  Q. And I understand that you went down there in
16  December of --
17  A. 1999.
18  Q. That's correct, but I mean: You transferred from
19  Alaska in December of 2002?
20  A. Yes.
21  Q. Okay. Do you think that the finding that you made
22  may have been different had you interviewed the individuals
23  who were involved and reviewed evidence?
24  A. I don't believe so.
25  Q. Would you follow the same procedures if the

Page 12

1  complainant had been a federal employee?
2  A. Yes.
3  Q. Would you contact that employee?
4  A. Probably not. I would have asked whoever was
5  handling the inquiry for me to look at the facts and
6  contact whoever that individual felt needed to be
7  contacted.
8  Q. Did you do so in this case?
9  A. I turned it over to the National Law Enforcement
10  Office, and they conducted their investigation into the
11  matter.
12  Q. But you don't know who you assigned to do this
13  inquiry?
14  A. I don't recall.
15  Q. Would there be a record of it anyplace?
16  A. I'm -- Most likely if there is, it would be in
17  the Boise office of the National Law Enforcement Office.
18  Q. Okay. What information did you have when you
19  began this inquiry?
20  A. I had the memo from Walter Johnson, and I had
21  spoken with Mr. Schneider about the incident. At some
22  point I reviewed the statements written by Ms. Hammond,
23  Officer Lee.
24  Q. I'm sorry. I didn't hear that, ma'am.
25  A. I said: At some point I review the statements

Page 13

1  that were written by Ms. Hammond and Officer Lee.
2  Q. Okay. On the Ms. Hammond statements, you're
3  talking about the contract diary, which is, I believe,
4  Exhibit No. 2.
5  A. Yes.
6  Q. Okay. And with the -- and that Ranger Lee report,
7  you're referring to the report that's listed as No. 3; is
8  that correct?
9  A. Yes.
10  Q. Okay. And just so I keep it straight: You had a
11  memo from Walter Johnson requesting or directing you to
12  this inquiry; but you don't have that hemo, right?
13  A. The memo, again, is from Walter Johnson to the IG
14  that I'm referring to.
15  Q. Yes. And do you have that memo?
16  A. I do. We've already spoken about it. It's No. 7.
17  Q. Well, I would ask if you have another one because
18  that's dated October 2nd, and your memorandum is dated
19  September 19, 2002.
20  A. Yes.
21  Q. Well, did you have a memo accompanying this report
22  from Ms. Hammond and the report from Ranger Lee?
23  A. Oh, I don't know. It's not part of the materials,
24  I don't believe, that were sent to me.
25  Q. No, I think that's correct. But did you have one?

Case 4:06-cv-00001-JWS   Document 72-4   Filed 11/05/2007   Page 3 of 5

WAYSON vs. SCHNEIDER                    LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

5 (Pages 14 to 17)

Page 14

1  A. I do not recall.
2  Q. Okay. Did you also have the complaint, April 5,
3  2002, complaint, to Earl E. Devaney from me?
4  A. If it's in this packet, I have it. If not, I do
5  not have it.
6  Q. No. I'm asking if you had it. It's No. 1, if
7  that can be of help.
8  A. I have this in front of me that was sent to me.
9  If you're asking whether I had it at the time, I do not
10 know.
11 Q. But you do recall having the report from Ranger
12 Lee and the report from Ms. Hammond?
13 A. Yes.
14 Q. Did you have the e-mail from Mr. Schneider, which
15 is No. 4?
16 A. (Witness perused document.) Probably. I don't
17 recall.
18 Q. When you say that there are different procedures
19 for different administrative inquiries, did you follow the
20 procedure for this administrative inquiry involving a law
21 enforcement matter?
22 A. Yes. I contacted the National Office of Law
23 Enforcement.
24 Q. But didn't they actually contact you?
25 A. I asked them to assist with this.

Page 15

1  Q. So I understand that they assigned it to you, and
2  then you asked them to assist with it.
3  A. Yes.
4  Q. So you're unaware of -- If there was an
5  investigative report in addition to this by National Law
6  Enforcement Office, you're not aware of it?
7  A. I am not.
8  Q. Would they have talked to you about it before you
9  wrote the September 19th letter --
10 A. Yes.
11 Q. -- memorandum?
12 A. Yes.
13 Q. Do you know if they did talk to you about it?
14 A. I believe so.
15 Q. Can you tell me what they told you?
16 A. I don't recall. My guess would be that they
17 looked into it and found no basis.
18 Q. But you have no idea whom you spoke with there?
19 A. I do not.
20 Q. Okay. Are you sure you talked to Robert Schneider
21 about this?
22 A. Yes, I did.
23 Q. And are you sure you talked to him about this
24 before you issued the memorandum?
25 A. I believe Mr. Schneider contacted me about this

Page 16

1  incident after it happened. He gave me a briefing on the
2  phone.
3  Q. Did he report to you that there was a videotape?
4  A. No. I don't know. He may have. I don't recall.
5  Q. If there were videotape, you would have included
6  it in your inquiry?
7  A. My guess is whoever investigated it would have, if
8  they were aware of it, would have wanted to see it.
9  Q. Okay. Now, you wrote here that there was a
10 perceived threat from Mr. Wayson. Do you know what that
11 threat was?
12 A. My understanding is that Ms. Hammond felt
13 intimidated and threatened by Mr. Wayson's behavior.
14 Q. Okay. Now, how did you decide that it was a Title
15 18 violation?
16 A. Whoever I assigned to work on this memo for me
17 would have looked that up.
18 Q. But you cannot recall whom you assigned to work on
19 this memo?
20 A. I do not.
21    MR. COOPER: Objection; asked and answered. I
22 mean, she's told you at least twice if not three times,
23 Mr. Wayson, that she can't recall; and you're not going to
24 get a different answer. So let's use our time wisely.
25 Q. (BY MR. WAYSON) Did you consult with the U.S.

Page 17

1  Attorney at all on this?
2  A. I cannot recall.
3  Q. Could you have?
4  A. I beg your pardon?
5  Q. Could you have?
6    MR. COOPER: Objection; calls for speculation.
7    Go ahead and answer.
8  A. I still didn't hear you. Did you say: Could I
9  have?
10 Q. Could you have called the U.S. Attorney for advice
11 about what statute was being violated?
12 A. I probably would have spoken to the Solicitor's
13 Office.
14 Q. Do you recall who was the solicitor at that time?
15 A. I don't recall that I spoke to the Solicitor's
16 Office. We had a number of solicitors that we worked with
17 on a regular basis.
18 Q. Where does your -- where does this record go, your
19 memorandum?
20 A. We have a filing system, central filing system,
21 and my -- I would suppose that the law enforcement office
22 would have kept a copy. There is a file code at -- on the
23 top, right-hand side of the memorandums which show where
24 they are filed.
25 Q. Is this the number you're referring to, 9260?

Case 4:06-cv-00001-JWS   Document 72-4   Filed 11/05/2007   Page 4 of 5

WAYSON vs. SCHNEIDER                                    LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

9 (Pages 30 to 33)

Page 30

1    FURTHER EXAMINATION
2    BY MR. WAYSON:
3    Q.  Ms. Rundell, I would like to continue just a
4    minute.  Would it be -- would you be concerned personally
5    if there was an official finding that you'd committed a
6    criminal act?
7    A.  I beg your pardon?  That I committed a criminal
8    at?
9    Q.  Exactly.
10   A.  Would I be concerned personally?
11   Q.  Yes.
12   A.  I would assume so.
13   Q.  If it was made part of the official record?
14   A.  You know, you're asking for speculation, but I
15   would assume I'd be concerned.
16   Q.  And if you were -- had been accused by an employee
17   of something, would you expect to be contacted before such
18   a finding was made?
19   A.  Perhaps.  It would depend on what the -- what the
20   allegation was.
21   Q.  Well, let's say it's the allegation that's in
22   paragraph 5 of your memorandum.
23   A.  That I don't believe is an allegation.  It seems
24   to be a conclusion from the review.
25   Q.  And if this conclusion had been made about you and

Page 31

1    placed in the official record, would you find this
2    troubling?
3    A.  Well, again, you're asking for speculation, and I
4    just -- I don't know.
5    Q.  And there are a number -- in Exhibit No. 3, which
6    is the Carol Hammond report, there are a number of other
7    allegations in there.  Do you remember those?
8    A.  My recollection is that Ms. Hammond was not
9    pleased that a video camera had been thrust in her face.
10   She felt intimidated.  She felt threatened.
11   Q.  Did Ms. Hammond indicate that the video camera was
12   thrust in her face?
13   A.  I believe that is in her report, but I'd have to
14   go over it again.
15   Q.  Could it have been in Mr. Schneider's report
16   instead?
17   A.  It could have been.  It could have been.
18   Q.  Do you recall an allegation from Ms. Hammond that
19   there had been some comment made by me that it was just
20   like a woman to call someone for help?
21   A.  I don't recall that.
22   Q.  Do you recall an allegation in there -- or a
23   suggestion or allegation by Ms. Hammond in her report that
24   I had intended that the 9/11 attackers target federal
25   buildings?

Page 32

1    A.  I don't recall that either.  It may be in the
2    report, but I'd have to read it to refresh my memory.
3    Q.  Do you recall, from your memory today or back then
4    when you were reviewing it, an allegation that I had
5    improperly touched another BLM employee?
6    A.  I don't recall.
7    Q.  Did you arrive at a conclusion what was done or
8    what I did to threaten, intimidate, or interfere with
9    Ms. Hammond?
10   A.  I'm sorry.  Can you repeat that?
11   Q.  Yes.  Did you arrive at a conclusion at any time
12   what it was I did which was threatening to Ms. Hammond?
13   A.  Ms. Hammond's report and what was reported to me
14   by Mr. Schneider is that your verbal language and your
15   presence was intimidating to her, and she felt threatened.
16   Q.  Okay.  Was there any suggestion of force?
17   A.  Not that I can recall.
18   Q.  Okay.  Is it possible that you spoke with
19   Mr. Schneider after your inquiry was completed?
20   A.  Well, certainly.  He worked for me.
21   Q.  Right, but what I'm asking is that:  Do you recall
22   for sure that you spoke to him before you wrote the
23   memorandum?
24   A.  Yes, I'm sure I did.
25   Q.  About this matter?

Page 33

1    A.  Yes.
2    Q.  Okay.
3    A.  I'm fairly certain he called me after the incident
4    occurred on the -- probably the next business day.
5    Q.  Did you -- That was long before the inquiry was
6    assigned to you, correct?
7    A.  Yes.
8    Q.  So did you talk to him after the inquiry was
9    assigned to you?
10   A.  I don't recall, but I may have called him just to
11   refresh my memory on what he had said.
12   Q.  Well, you're not certain when, but was it -- can
13   you tell me approximately how long before you wrote the
14   September 19, 2002, memorandum that the inquiry was
15   assigned to you?
16   A.  I do not recall.
17   Q.  Is there something procedurally that would require
18   you answer within a certain period of time?
19   A.  I don't know.
20   Q.  Well, you referred to that, indeed, there are some
21   procedures.  Is there any place I can obtain these
22   procedures?
23   A.  I would suggest that you put your request to the
24   National Law Enforcement Office.
25       MR. WAYSON:  Mr. Cooper, anything further?

Case 4:06-cv-00001-JWS   Document 72-4   Filed 11/05/2007   Page 5 of 5

WAYSON vs. SCHNEIDER                     LINDA S.C. RUNDELL - SEPTEMBER 27, 2004
                                                       10 (Pages 34 to 37)

Page 34

1    MR. COOPER: Yes, just to follow up briefly.
2           FURTHER EXAMINATION
3   BY MR. COOPER:
4    Q.  Ms. Rundell, I want to get the chronology of your
5   contacts with Mr. Schneider down as best I can. First of
6   all, Mr. Schneider worked for the director's office, did he
7   not?
8    A.  He was a field office manager who reported
9   directly to the state director.
10   Q.  Okay. So in the normal course of the performance
11  of your duties, you would have lots of contact with
12  Mr. Schneider?
13   A.  Many, yes.
14   Q.  Okay. Now, focusing just on the events that took
15  place up at 98 Mile Steese and the --
16        (Discussion off the record with the reporter.)
17       MR. COOPER: Steese, S-t-e-e-s-e. That's a term
18  of art for those who live in Alaska.
19   Q.  (BY MR. COOPER) Okay. So with respect to the
20  events that occurred up at 98 Mile Steese Highway and the
21  subsequent complaint and investigation -- complaint by
22  Mr. Schneider -- excuse me. Let me start over.
23        What I'm interested in is any conversations you
24  had that you can recall with Mr. Schneider about the events
25  of September 15, 2001, at 98 Mile Steese Highway concerning

Page 35

1   Mr. Wayson and Ms. Hammond.
2    A.  I am reasonably certain that Mr. Schneider called
3   me to tell me about what had occurred and the fact that he
4   had asked a ranger to go out on the location because his
5   employee, Ms. Hammond, had felt intimidated and threatened
6   by Mr. Wayson.
7    Q.  Okay. And after that, do you recall talking to
8   Mr. Schneider about these events and the investigation
9   until after your conclusions were reached?
10   A.  It would have been a normal course of business to
11  have talked to him again as a followup.
12   Q.  Okay. But not to go into -- Well, strike that.
13        Would it have been part of your investigative
14  process to talk to Mr. Schneider about what he did and why
15  he did it prior to issuing your report?
16   A.  I would have been part of the process. Whether as
17  part of that inquiry, I spoke to him about it or the person
18  who was investigating spoke to him about it, I don't
19  recall.
20   Q.  As you sit here today, looking back, now having
21  had your memory refreshed by all of these documents that
22  have been attached to your deposition, do you still believe
23  that Mr. Schneider did the right thing by sending a ranger
24  out there to help control the situation?
25   A.  I certainly do. I think he would have been

Page 36

1   negligent in his duties if he did not respond appropriately
2   when an employee told him that he or she felt like they
3   were being threatened by a member of the public.
4    Q.  Regardless of whether or not that employee's
5   perceptions accurately reflected reality?
6    A.  A person's feelings are what they are. They're
7   very personal; and in a situation that one employee might
8   take as being threatening behavior, another might not; but
9   you have to pay attention to what that employee is telling
10  you and take action based on that employee's feelings.
11   Q.  In other words, you have to provide a safe work
12  place for and a safe work environment for an employee based
13  upon their perception?
14   A.  Yes.
15   Q.  Okay.
16       MR. COOPER: Thank you. I don't have anything
17  further.
18            FURTHER EXAMINATION
19  BY MR. WAYSON:
20   Q.  Ms. Rundell, to try and track down who may have
21  taken part of this inquiry for you here in Alaska, do you
22  remember if it was an -- the person you requested was an
23  Alaskan officer or if it was somebody from the national
24  bureau?
25   A.  The typical policy is if we are conducting an

Page 37

1   inquiry or investigation about someone within our state, is
2   that someone from out of state would conduct that inquiry
3   or investigation.
4    Q.  Okay. Do you remember how many rangers you had at
5   that time in Alaska?
6    A.  I believe there were three or four.
7    Q.  And would that be in addition to Special Agent
8   Stuart?
9    A.  Yes. She's not considered a ranger.
10   Q.  Was there a Special Agent Pete Johnson involved in
11  this also who was an Alaskan agent?
12   A.  Pete Johnson was the special agent-in-charge prior
13  to when Ms. Stuart was hired. He retired. I can't recall
14  the date he retired or the date Ms. Stuart came on board.
15   Q.  Is it normal in the course of BLM business not to
16  maintain records of an inquiry like this?
17        (Discussion off the record with the reporter.)
18       MR. WAYSON: Of an inquiry like this,
19  administrative inquiry.
20       MR. COOPER: I'm going to object. It misstates
21  the record. There's been no evidence that there hasn't
22  been records kept.
23        (Discussion off the record with the reporter.)
24       MR. COOPER: Never mind. Withdraw my objection.
25  Go ahead. Let's get this over with.