

NOV 0 5 2007

CLERK, U.S. DISTRICT COURT
FAIRBANKS, AK

Mark N. Wayson
C/o Wickwire
2775 Hanson Road
Fairbanks, AK 99709
markonwayson@yahoo.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MARK N, WAYSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| Vs. | ) |
| | ) |
| LINDA RUNDELL | ) |
| | ) |
| | ) |
| Defendant . | ) |
| | ) 4:06-Cv 1 (JWS) |

## OPPOSITION TO MOTION FOR SUMMARY JUDGEMENT AND QUALIFIED IMMUNITY

Plaintiff opposes Defendant's Motion for Summary Judgment because Plaintiff has

met the requirements to show both liability by the Defendant and damages suffered as a

result of the Defendant's violation of Plaintiff's constitutional rights.


Plaintiff opposes the Defendant's alternative request for qualified immunity because


Wayson v. Rundell, 4:06 Cv 1  JWS                                    1
Opp. To Mot. FOR Summary judgment
& qualified immunity  10-31-07

the Defendant committed her acts, using the power of her office against Plaintiff with the full knowledge that any reasonable official has, that what she was doing was in violation of Plaintiff's constitutional rights.

### History

The BLM has had Plaintiff, Mark Wayson, squarely in their sights, since he wrote a protest letter to BLM State Director, Tom Allen, August 26, 1996, protesting the constitutionality of regulations announced by Tom Allen, August 15, 1996, which claimed BLM has authority to carry out warrantless searches/inspections of buildings on mining claims, and which called for still another mandatory form to be filled out by a miner to report he was not using his buildings unlawfully, and containing only information already in BLM's files.

Plaintiff made it clear in the letter that he intended to retaliate "civilly" against BLM officials, and attached a Wall Street article which reported that a Dept. of Interior Board of Land Appeals, and not Mark Wayson, had 'warned' BLM employees that they could be held personally liable for misuse of their authority.

Attachment # 1.  8-26-96   Letter to Allen with attachments

Plaintiff's protest letter triggered a series of actions against Plaintiffs by BLM administrators, and government officials, including that committed by Defendant Rundell, and were intended to retaliate against or punish Plaintiff for speaking out in protest against unconstitutional regulations.

The first of these actions was a letter from Sally Wisely, written by Evalyn Garis (Punches), and this letter and accompanying memorandum, were sent first to State Director Tom Allen, and subsequently to Sally Wisely who signed it, and the fabrications in this letter, provides the court with a unique glimpse at the extent of the systematic and coordinated violations of Title 18, which form the backbone of the constitutional violations against Plaintiff, and how it is cooperatively accomplished by the layers of authority in the Dept, of Interior. .

Attachment # 2, 9-20-96 Wisely letter with Garis (Punches) memo

Garis' memorandum, accompanying the letter signed by BLM Alaska Associate Director Sally Wisely, is concise, and self-explanatory in chronicling how she gathered the false information, which she then put in the 9-20-96 Wisely letter.

The first intent of this Wisely response letter was to threaten Plaintiff with criminal and civil prosecution for sending a protest letter stating he would not obey her boss, Tom Allen. .Wisely wrote ;

"However, the regulations do provide that if you do not file the required notice, OMB Form #1004-0169, with the information requested, and you have an existing residence or other structures, you will be subject to immediate enforcement actions, which include civil remedies and criminal penalties."

This point is very important.  Wisely is responding with a threat to prosecute Plaintiff

if Plaintiff will not fill out the very forms which he is complaining are unconstitutional.

It is so important in this case, because it is this letter,  the only letter which Defendant

Rundell  cites in this motion containing Wisely's stated intention to retaliate against

Plaintiff for protesting, as justification for her finding, and particularly because up to

today, not a speck of evidence has been found to justify the finding Rundell made 9-19-

02.


Rundell's denials in her Motion for Summary judgment that she had any intent to

silence Plaintiff's speech, should be considered in the light of this Wisely letter,  which is

as specific as it can get that Wayson will be punished criminally and civilly, for

exercising his right to protest, and despite the efforts of Wisely, Allen, Schneider, and

AUSA Cooper, this letter has been completely debunked as any kind of illegal threat by

Plaintiff.    So the significance of Rundell trying to breath new life into that protest letter

in his Motion, exposes that indeed, her intention is to suppress Plaintiff's speech, as

Rundell basically carries out what Rundell threatened to do, and that is to prosecute

Wayson criminally, albeit Rundell had to do so out of public view where due process

might protect Plaintiff, for protesting BLM regulations. .

Wisely then accused Plaintiff of threatening BLM employees by writing,

"Personnel information will not be released when there are known threats of harm or
endangerment to our employees." Due to the hostile nature of your letter, your request
for this information is denied,"


When Ms. Garis (Punches ) prepared this memorandum and letter 9-17-96, she

violated U.S. Title 18, 1001 (a) which reads,

Except as otherwise provided in this section, whoever, in any matter within the
jurisdiction of the executive, legislative, or judicial branch of the government of the
United States, knowingly and willfully-

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact:
(2) makes any materially false, fictitious, or fraudulent statement or representation: or
(3) makes or uses any false writing or document knowing the same to contain any
materially false, fictitious, or fraudulent statement or entry:

Shall be fined under this title, imprisoned not more than 5 years or, if the offense involves
international or domestic terrorism (as defined in section 2331) imprisoned not more than
8 years, or both.

Since her 9-17-96 Memorandum states clearly that false information has been relayed

to her from Washington D.C., and false language appears in the letter nearly verbatim,

both Tom Allen and Sally Wisely also knew that the letter was false, albeit, Wisely was

the one who signed it. So Wisely anyway, committed the same violation as Garis.


However, such violations are so routine at BLM, that on 9-20-07, in deposition, Ms.

Garis showed no concern about admitting to committing this crime under oath. She

apparently had nothing to worry about, since she made the admission under the watchful protection of both Ms. Lindquist of the U.S. Attorney's office, and Joe Darnell, Solicitor for BLM, both of who said not a word, showed no surprise that the violation had taken place, and have done nothing subsequently to report or investigate the crime they learned of in the Garis deposition.

Attachment #3, 9-20-07  Garis deposition page 15, lines 8-21

Defendant argues that Plaintiff has no standing to bring federal criminal charges, and she is 100 % correct. This requires a U.S. Attorney with integrity and courage, and a commitment to enforce the criminal statutes fairly, rather than pursuant to some political agenda.

Despite having his access to a grand jury blocked by the U.S. Attorney, because of a refusal to investigate high-ranking federal suspects, Plaintiff can nevertheless, present to a trial jury the evidence of the Obstruction of Justice committed by Defendant, as well as other offenses committed by those working with her. so as to permit a jury to evaluate the validity of government testimony and documents, in a civil trial, regarding factual matters in dispute.

The government won't dare bring the signer of this letter, Sally Wisely, before a civil trial jury.    Not only would it become obvious that she had signed her 9-20-96 letter

Wayson v. Rundell, 4:06 Cv 1  JWS                                             6
Opp. To Mot. FOR Summary judgment
& qualified immunity  10-31-07

knowing it was false, but Wisely would be forced to explain why she calmly testified in **Wayson v. Schneider** that she, as a BLM administrator, would violate someone's constitutional rights if ordered to do so.

Ms. Garis may have felt some pressures to violate the Title 18 false document statute in conjunction with her boss, but all BLM employees did not succumb to such pressures.

From 1980 until 1999, Heather Coats was a BLM employee of the Anchorage office, who sometimes worked directly with Evalyn Garis. She will testify, that she was asked to violate the law in order to illegally transfer lands to individuals who had political connections, but that she refused to do so.

Heather Coats will testify at trial that Sally Wisely was present and agreed with BLM State Director Tom Allen, at a graduation ceremony for Equal Employment Opportunity Counselors, when he instructed Ms. Coats and the other graduates not to follow the regulations their job required to protect grievants from he and others, but to bring all complaints directly to him.

Heather coats will testify that she did not follow Allen's instructions, but instead followed the rules which she was mandated to follow as an EEO counselor.

Heather Coats will testify that she successfully filed a complaint against her popular male BLM supervisor, and subsequently was subjected to intolerable harassment until she left BLM, and that her health and job success both suffered at a federal position she took in Seattle after leaving the Anchorage BLM office, as a result of retaliation against her by the Anchorage BLM office for speaking out, and that she learned of the retaliation against her during hearings to get her job back at EEO.

Heather Coats will testify that in the 19 years she was employed by BLM in Anchorage she observed a culture as described in paragraph 8 of her attached affidavit.

"While at BLM I also observed wholesale waste., I saw many employees assigned to busy work or no work at all, I observed records falsification, as well as violations of the law regarding illegal transfers of federal land, based upon political interference, but there was never an environment available where I could successfully stop such violations while at BLM."

Attachment # 4  10-22-07 Heather Coats Affidavit

The Garis memorandum suggests that the 'threats' from Plaintiff which the Wisely letter were actually fabricated as a tactic to shut Wayson up, but Plaintiff and Executive Director of the Citizens Advisory Commission on Federal Areas, Stan Leaphart, were both concerned that such reports of threats could precipitate dangerous confrontations in the field between Plaintiff and other miners and regulators.

Efforts made by Plaintiff to resolve the situation are described in the attached affidavit from Stan Leaphart, and the description includes a videotaped meeting on 12-10-96, with two BLM officials to try and resolve the situation created by Wisely's 9-20-96 letter. Attachment # 5, August 2007 Stan Leaphart Affidavit

Stan Leaphart also felt that because of the sharing of information between branches of the Department of the Interior, BLM's accusations against Plaintiff would have an adverse effect upon Plaintiff's access to his town, Diamond, Alaska, which is located inside Denali National Park and Reserve, and to which the Dept. of Interior has illegally blocked Plaintiff's access for over a quarter of a century now.

Significant in the Leaphart affidavit is the fact that shortly after Plaintiff wrote to protest unconstitutional regulations by BLM, Senator Ted Stevens publicly called for civil disobedience against Dept. of the Interior regulations, and for a 'revolt' by the people against this governing agency. To date BLM has not made same or similar accusations against Senator Stevens, or accused him of a crime, nor has AUSA Cooper filed a motion in court with the false claim that Senator Stevens had asserted that the Senator could use deadly force against anyone who even came onto the Senator's claims, as Cooper has falsely asserted against Plaintiff, using the same 8-26-96 letter as justification for such a statement.

The concerns which Plaintiff has regarding the dangerous possible effects in the field, resulting from false reports are not contrived.

Kathy Villenueuve (Charlie) was the state DNR regulator, who inspected and regulated Plaintiff's state mining claims when they were converted to state claims in 1998.

In 1999, Ms. Villenueuve contacted Plaintiff regarding reports from BLM of threats made by miners against regulators. BLM personnel had warned Ms. Villenueuve that miners on several drainages, including Butte Creek where Plaintiff has claims had threatened persons with firearms, and that the State of Alaska was unable to provide security for her. Ms. Villenueuve began carrying a firearm for her own protection because of these threats, and was relieved when Plaintiff agreed to accompany her on her inspections made at the mine on Butte Creek where those making the threats allegedly mined.

Attachment # 6   3-13-07 Kathy Villenueuve Affidavit

Ms. Villenueuve notes in her affidavit that even in 2007, she still considers such reports of threats to be a risk to regulators.

Carol Hammond, in 2004, more than three years after her brief contact with Plaintiff

still expressed fear.  She wasn't even a regulator at BLM, and her comment that she

would not want to have anything to do with Plaintiff or meet him on the street

somewhere, actually expands considerably the danger zone for a confrontation which

both Leaphart and Villenueuve agree results from putting out  information that the

Plaintiff has made 'explicit threats to harm BLM employees' and the Defendant has

expanded on this report,  to create a law enforcement record available to any government

that Plaintiff had forcibly committed a crime against a BLM employee.

Attachment # 7,    9-21-04  Carol Hammond deposition, page 103, lines 19-22


## FACTS


Why didn't Linda Rundell determine why Carol Hammond was frightened 9-15-01.

Could it have been right expressed  because she had gotten caught trespassing on a state

claim?  Was it an effect of her brain cancer which had confused her by then?


While she states she was still 'scared' of Wayson in 2003, she admits at page 29, lines

22-23, of Attachment 7, that she knew I had mining claims in the area, she acknowledged

on page 90, lines 18-25, page 90. line 1, that she too would have been angry if she

discovered the government doing a project with heavy equipment on mining claims

which she owned, but that Plaintiff had not threatened her on that day.

It is important in this context to first remember that on 9-15-01, Plaintiff didn't threaten anyone, and it was BLM, in violation of their own policy, who decided to settle a claim dispute with armed personnel. It wasn't the Plaintiff who appeared with a gun telling BLM to get off his State claims. It was BLM soliciting an armed agent to force Plaintiff off his claims.

It is also extremely unlikely that BLM was on Plaintiff's claims by accident. Records show this Battest claims 98 mile project underway since 1992 at least, with the project manager assigned there since 1995 reportedly. Will a jury believe that hundreds of thousands of dollars were spent over many years on an established project started in 1992, on the Steese Highway, named the '98 Mile Steese Project' and this project suddenly and accidentally jumped upstream off of the Battest claims and onto Mark Wayson's state mining claims, which never were any part of the Battest claims or contiguous to them? Or will a jury believe that this project jumped onto Mark Wayson's claims in retaliation by BLM for long-standing differences they have maintained since 1996 when he informed them that their regulations were unconstitutional ?

A review of the facts reveals there is false link after false link in the chain of deceit forged by Linda Rundell, the Dept. of the Interior, the Dept. of justice, and the Dept. of State, to silence Plaintiff through a false record, which a jury must be given a chance to evaluate in order to determine the extent of damages, and the intent behind the

Wayson v. Rundell, 4:06 Cv 1 JWS
Opp. To Mot. FOR Summary judgment
& qualified immunity 10-31-07

12

memorandum by Linda Rundell to silence Mark Wayson for daring to speak out against the BLM.

In deciding this motion for Summary Judgment the court should review this chain of deceit which the Defendant has indicated in her Motion for summary Judgment, began in 1996. Ms. Rundell had virtually unlimited resources available to her to conduct an investigation of Robert Schneider's conduct, and specifically she was offered law enforcement assistance if it were needed.

Instead she decided to retaliate against Plaintiff by incorporating and relying upon the chain of lies which had its first link hammered out back in 1996.

Any reasonable official who was assigned to investigate Plaintiff's complaint against Schneider, would have established this as an important fact to resolve. Any non-federal reasonable official would have found the federal government had trespassed, and subsequently wasted more public money on a huge project which was/is illegally constructed since it was not permitted, and is one which channeled a stream back into settling ponds which BLM knew existed and caused environmental damage they were warned would occur, and perhaps would have determined instead that Schneider was doing all he could to run Wayson out of the district which BLM 'owns.'

But not the Defendant. Instead the Defendant relied upon the layers of deception already stacked up against Plaintiff by her colleagues. Rundell raised the stakes and made a record that Plaintiff is a criminal, sent this off to BLM Law Enforcement, who are the same people who violated BLM policy 9-15-01. So now Plaintiff has even greater concerns.

Ranger Lee's patrol Log which was sent to Plaintiff in early October 2007, again offers the court a glimpse at the lengths to which those in this agency will go to in order to vilify Plaintiff, and the lengths which BLM will go to in order to shut up Plaintiff and retaliate against Plaintiff for his protests of their unconstitutional and/or criminal activity.

On 9-15-01, Plaintiff arrived on his claims where Hammond was working in what could be agreed is an easily recognizable vehicle. Carol Hammond saw this vehicle, and rode in this vehicle 9-15-01 according to her report which is Defendant's exhibit 'H.' Ranger Lee saw the truck according to his report.

Attachment 8, Photo of Plaintiff's 1961 Dodge pickup mining truck

In her Motion, AUSA Lindquist makes a point of stressing that in 2001 Plaintiff did not return to his mining claims until the project was complete, because she is trying to

stress that Plaintiff was not prevented from using his property by Defendant Rundell. But

by 9-17-01 BLM had acknowledged that Plaintiff had caught them trespassing on his

claims with their 98 mile project. However, Ranger Lee's patrol notes clearly indicate

that Wayson is BLM's target, and that regional Director Schneider had a direct role in

this targeting of Wayson, which should have been investigated by Rundell if she too

wasn't targeting Wayson. One of the charades in Rundell's 9-19-02 is that she was to

investigate whether Schneider acted properly in sending out rangers. Ranger Lee's patrol

log indicates otherwise.       For 9-17-01, the day the 'patrol to protect Hammond' was set

up, Ranger Lee's patrol log notes say,

"Coordinate Wayson Fiasco."

"meet with BS (Bob Schneider) regarding Wayson !!"

"Coordinate with Mike Bilbee (another ranger) re: who gets to go to Waysons!!!"

"Mike won!!!"

Attachment # 9  Ranger Lee patrol Log


It doesn't say, 'coordinate security for Hammond,' and it doesn't say that because that

was not the mission. Get Wayson was the stated mission.


Lindquist didn't make these patrol notes available to Plaintiff until after Ranger lee

had been deposed, but it appears as though Schneider dispatched the entire northern

region law enforcement contingent to guard Hammond because although Ranger Billbee

apparently 'won' the assignment to monitor Wayson personally, Ranger Lee also spent

several days on the same assignment, and apparently felt compelled to provide some

'evidence' that Wayson was somehow in the area, since he could have never anticipated

that Lindquist might want to prove otherwise since no suit was filed then.

Plaintiff believes a jury should decide if this 'law enforcement' had the intent of

protecting Hammond, or provoking/harassing Wayson in the hope he would return to his

property, when dispatched to 98 mile Steese after 9-15-01..

Despite the fact Hammond had ridden in Plaintiff's truck a few days earlier, and Lee

had observed the truck for some hours, on 9-21-01, Lee wrote in his patrol log,,

"observed P/U green w/red hoist in bed at 98 mile Steese turnoff. P/U gone when I drove
from Ptarmigan creek. Confirmed was same P/U observed by Carol on 09/20/01."

This is a remote area. There is no record to be found of a pickup truck even remotely

similar to Plaintiff's and Lee's 'green pickup with red hoist' at 98 mile turnoff entry, is

intended to create a false 'record' that Wayson was lurking in the area. on 9-20-01 and 9-

21-01.

Wayson v. Rundell, 4:06 Cv 1_JWS                                                16
Opp. To Mot. FOR Summary judgment
& qualified immunity 10-31-07

What is appropriate is for a jury to decide whether this is just is another fabricated report to try to create an impression that Plaintiff was lurking in the area near a BLM project, justifying that he is a criminal targeting BLMers' forcibly.

Had Defendant done an investigation like any reasonable official could be expected, to do, she could, as the state director access this information and establish its credibility before making any finding, and she would have determined then and now, that this truck is an off-road mining truck, and cannot go very fast, or skid to a stop by slamming on the brakes, and that it couldn't have been parked at the 98 mile turnoff when Ranger Lee's notes imply that it was on 9-20 and 9-21-01.

Ms. Lindquist attaches a Declaration from retired SAIC Pamela Stuart claiming that she did the investigation and spoken with Ranger Lee and Robert Schneider. Defendant's exhibit 'G.'

No true apparently, as both Robert Schneider in **Wayson v. Schneider** and Ranger lee in deposition on this case state they did not talk to her.

Attachment # 10,   9-11-07 Ranger Lee Deposition, page 81, lines 16-25, page 82, line 1

A Declaration (Defendant's exhibit B) is attached from Greg Assmus who claims to be "custodian of the internal Affairs Investigation files." and he writes that in paragraph 5, "My file does not have a FOIA request in it."


Not true. Writing 'my file' is a trick to make the court believe there have been no FOIA requests for the file, and to believe that the finding which Defendant made is locked away and couldn't have been distributed to anyone else in Germany or otherwise. There was at least another FOIA request, because John Livornese of the Washington D.C. BLM office forwarded an FOIA request from Plaintiff to Greg Assmus's agency. In his letter, he cites the same case number as Assmus cites.

Attachment # 11,  7-16-04 Livornese letter. Page 2


Plaintiff faxed a request to Greg Assmus' supervisor requesting that a corrected Declaration be provided for the court. A response from Assmus is unlikely since he, like Sandra Evans, Pamela Stuart, Evalyn Garis, and others are immune from prosecution by the Department of Justice for filing false reports in cases such as these.

Attachment 12, 10-28-07 Wayson-Director Woody Fax w/ corrected Assmus Declaration


Defendant attaches a Declaration dated 5-16-07,  (Defendant's Exhibit L) From Department of Interior Office of Inspector General 'Information Disclosure Specialist,

Sandra Evans. Ms. Evans' Declaration is false in many respects, but is primarily misleading because it is incomplete. Ms Evans flat falsifies her Declaration when she writes, "Lastly, Mr. Wayson's may 9, 2004, e-mail suggested that records might be filed under another number based on correspondence authored by BLM."

Not true. Plaintiff received notice from Sandra Evans, that Plaintiff's Appeal # 2004-179, was received 6-3-04, and that according to law, had to be answered within 20 days. It never has been answered, and Evans has little to fear that the Department of Justice would ever bring her to task for such a violation of the law, which serves to conceal wrongdoing by Defendant Rundell Dept. of the Interior officials. 10-04-04 Wayson inquired why appeal had not been answered, but no reply has ever come. Attachment #13, Notice of receipt, &10-04-04, Wayson-Evans letter,

Plaintiff faxed a corrected Sandra Evans Declaration to Inspector General Devaney for her to sign, but no response is expected, since following Rundell's finding, Plaintiff's ability to successfully petition anyone in the Interior Dept. has effectively disappeared. Attachment # 14, 10-28-07 Faxes to Evans and I.G. Devaney requesting correct Declaration from Evans for the court. To paraphrase Chief Justice Marshall, the right to petition carries with it the expectation that the petition will have some effect.

## DAMAGES

This Motion by Defendant may provide the best evidence of the damages of her 9-19-02 finding, for she relies on a long debunked BLM document of 8-26-96, which is more than eleven years old, to argue(on page 15) that it represents one of 'many' which 'publicly revealed' that Wayson was a source of threats. The question for a jury is then how long will Rundell's finding survive, and how many more times will it be used against Plaintiff or his family?

Lindquist has waited until the last possible moment to disclose these 'witnesses' and has not abided by discovery rules in disclosing information which she obtained from them. She has no intention of bringing any of them to trial, but is trying to use their sworn Declarations to convince the court that there has been no dissemination of the finding which Defendant made in her 9-19-02, and therefore neither Plaintiff nor his daughter were damaged by Defendant's finding.

Proof that there is actually no control of the official record which Defendant can rely on, 9-20-07, Lindquist produced 331 pages, all bate stamped from Ranger Lee, which he said came from the Wayson file, although in deposition 9-11-07, he said when asked that there was no longer a Wayson file. In the 331 pages, there was nothing of a criminal

nature, although it included Plaintiff's 2003 voting record, a letter to the editor in 1999

from Plaintiff, fishing license application, a bumper sticker denigrating BLM with a

swastika produced by Plaintiff, copies of deeds for property owned by Plaintiff, deeds for

property purchased by Plaintiff's former wife, a cartoon by Plaintiff lampooning BLM,

and many pages dealing with civil cases, but not one single page dealing with any

criminal matter. Lindquist affirms that she did not intend for Plaintiff to have the memo,

and therefore could not intend to chill his speech. The reverse is true. Rundell did not

intend that Plaintiff see the memo so he could, respond within due process guidelines,

and she could more effectively chill Plaintiff's speech by making other authorities

unwilling to even respond to a criminal, this interfering with Plaintiff's ability to petition

his government.

Attachment # 15, Bates page number Lee 000052, lst page of 331 pages produced 9-20-

07 by Lindquist, and with a sticky note saying "from his office"


   Not coincidently, these files are virtually all representative of protests, and private

court petitions exercised by Plaintiff. They are illegally retained by law enforcement

officials under the 1974 privacy act, but useful to BLM since they have campaigned for

so long to shut up Plaintiff.

Ms. Rundell was very clear in her deposition of 9-27-04, that she intended her memorandum to be a finding of criminal actions by Plaintiff against Carol Hammond. She admitted she fired the shot at the Plaintiff, and she admitted how she intended the 'shot' should strike Plaintiff, but now in her Declaration, she is claiming that she had no intent that the shot she fired would hit Plaintiff, and is arguing also that she is not responsible if this shot ricocheted and also smashed through Plaintiff's daughter as well, since she didn't' intend to have it do so, and didn't call Germany.   The argument seems to be that someone else 'could have' fired the shot which has wounded Rosana Joy Sug Wayson so terribly in Germany, but the timing of the events, as well as the similarity of the false BLM statements on record, to those expressed by the Consulate in Germany seem to reveal more than a casual connection between Rundell's finding and Rosana's destruction, when viewed with Frau Froehlich-Tumbrink's observations of what occurred in Germany.

The German guardian ad litem, Jutta Froehlich-Tumbrink, is better trained and experienced to explain how Defendant's finding made its way into the German court System, and the effects it has had upon Plaintiff and daughter.

Attachment 16, 1-22-07   Jutta Froehlich-Tumbrink affidavit

The U.S. Attorney is no stranger to defending Rundell for infringing upon the free

speech of others.  In New Mexico Alliance et al v. Norton et al., N.M.D.C. Case #04-02,

Defendant Rundell was accused of establishing an ad hoc 'working group' to formulate

recommendations to BLM on future issuances of private oil and gas leases within the

105,000 acre chihuahuan desert grassland on Otero Mesa, and Rundell's group excluded

input by members of the public, and did not announce their meetings.   Suit was

dismissed only because Rundell agreed to disband the group she had formed which

excluded the public.

Attachment 17, 6-3-04,   Mike Harris – U.S. Attorney Mitchell Fax


Before this was even settled, Rundell was caught again, violating the law, and

interfering with free speech from the public by limiting public input to mail only, on the

same project for which she had to abandon her illegal ad hoc committee.  Under threat of

another suit, Defendant Rundell re-opened public comment on the Otero Mesa project

following her receipt of the attached.

Attachment 18, 6-9-04 Harris – Rundell letter.


Lindquist has no intention of producing Assmus, Evans, Stuart, or apparently anyone

else at a trial, but instead is relying upon last minute Declarations to convince the court to

dismiss the case, and citing law which is intended to defend Defendant under a fact

scenario which is not correct. There are so many factual disputes, and so much

falsification of records and perjury involved in this case which bear directly upon the

intent and extent of Defendant's actions, that Plaintiff urges the court to allow a jury to

resolve matters at issue.

In contrast to the government, all affiants noted on this Opposition have been

available to the government and will testify at trial.

Ms. Lindquist's argument that Plaintiff did not spend time on my mining ground from

2001, through 2005, ignores the fact that Plaintiff was tied up with overseas litigation to

restore his child's basic rights, and Plaintiff not been overseas so had the Dept. of State

not seized upon false defamatory statements made by BLM officials, which would not

have been used as a basis for their statements had Defendant not impeded the

investigation which she was assigned.

Del Ackels, who was closely involved in the attempted resolution of this and previous

BLM situations involving Plaintiff did, as an experienced miner, provide an affidavit as

to the real property loss damages to Plaintiff's future mining prospects, as they have been

directly affected by Defendant's finding, and he asserts that both mining on plaintiff's

claims, and contacts with agencies which are essential in mining, will be substantially

more difficult for Plaintiff, as a result of Rundell's finding..

Attachment 19,  2-6-07 Ackels affidavit with his attachments

Defendant's claims of qualified immunity hinge upon whether or not what she did was something which a reasonable official would have known was unlawful.  Ms. Rundell, acting as a BLM State director had and has unlimited resources at her disposal when assigned to investigate Plaintiff's complaint against her subordinate, Robert Schneider.  She didn't use them and the result was her finding, which she is now recanting in her 10-15-07 Declaration, long after the damage has been done, and which raises the point that she must have know it was wrong since she is recanting it now..

Any reasonable official, before making a finding and an official record of a crime committed by a citizen, would know that due process must first be followed before any finding of criminal activity could be made.

Any reasonable official would first read at least the very first sentence of Plaintiff's 4-5-02 complaint (Defendant's exhibit B) and recognize that it was a criminal complaint against her subordinate which she was assigned to investigate, and would reasonably proceed with an investigation incorporating due process before closing the investigation with a finding of criminal activity against Plaintiff, or against anyone for that matter.

The very first line of exhibit B, calls for an investigation of Robert Schneider for a violation of title 18. Missing from Defendant's exhibit B, is the attachment referred to in paragraph 5 of exhibit, B, the Kennedy e-mail in which Robert Schneider is reported to have advised State of Alaska mining regulators, that Plaintiff is a "serious potential threat" to BLM employees. There is no complaint in Exhibit B, that Plaintiff was filing a criminal complaint against Robert Schneider for sending rangers to 98 mile Steese Highway on 9-15-01 or after that time.

Regarding Defendant's Exhibit A, the finding signed by Ms. Rundell makes no reference to the actual events involved in the Title 18 violation which Plaintiff complained of, namely spreading false statements which he knew to be false. Instead in Defendant's exhibit A, Linda Rundell clears her subordinate, Schneider.

Plaintiff's 4-2-02 complaint also had attached correspondence relating to the 'August 1996' letter, and a report of a videotape which clearly established that BLM felt there were no threat. The 4-2-02 complaint from Plaintiff, refers to correspondence from Plaintiff outlining his constitutional objections to BLM . Any reasonable official would have reviewed this material and requested to view the videotape from 1996.

This was not a situation like one where the police mistakenly search the wrong house upon executing a search warrant for contraband, which they had just learned of earlier the

same day. These mistakes can happen. But in this case, Rundell had plenty of time to

review the tape she knew of and examine witnesses and evidence.


   A reasonable official would follow policy in conducting such an investigation. Ms.

Rundell didn't. In her 9-27-04 deposition, in response to Plaintiff's query as to how

Plaintiff could track down who had taken part in the inquiry, Rundell testified,


"The typical policy is if we are conducting an inquiry or investigation about someone
within our state is that someone from out of state would conduct that inquiry or
investigation ."

   Then why didn't she follow the policy? Rundell testified repeatedly in her 9-27-04

deposition that she had followed the policy because she was trying to lead Plaintiff away

from his queries about Pamela Stuart's involvement in the investigation. She testified 9-

27-04,

"I turned it over to the National Law Enforcement Office and they conducted their
investigation into the matter."

Attachment # 20, l 9-27-04 Rundell deposition P. 12, lines 9-11


   Ms. Rundell was asked ,

"When you say that there are different procedures for different administrative inquiries,
did you follow the procedure fore this administrative inquiry involving a law enforcement
matter?"

   Rundell responded,

"Yes, I contacted the National Office of Law enforcement."

Wayson v. Rundell, 4:06 Cv 1  JWS                                    27
Opp. To Mot. FOR Summary judgment
& qualified immunity  10-31-07

.    If Stuart is the one who Rundell now claims did the investigation, then she is admitting that she did not follow the policy which she described as "typical" when investigating Schneider, because Rundell was the special Agent for Alaska, and not some one from out of state as called for by the policy.  A reasonable official would follow known policies she was aware of when conducting an investigation, and since Rundell admits she did not, then this too would not qualify her for qualified immunity as a defense of her actions

The other test of whether Rundell qualifies for qualified immunity is whether she knew what she did was breaking the law.

Too many of the cases cited by Defendant to justify qualified immunity, do not apply in this case, because Rundell was not operating in any gray area, and because they apply to a fact scenario which did not occur.  . She had plenty of time, for her assignment.  In fact Rundell prepared her memo several weeks ahead of the due date given on the 8-5-02 assignment memo, (Defendant's exhibit P) and no reasonable official would ignore the offer from the BLM National Law Enforcement Office to provide resources for a criminal investigation if necessary, and then make a finding of criminal activity.  But Rundell did.

In her 9-27-04 deposition, (omitted from Defendant's exhibit J which is Rundell's 9-27-04 deposition)  Rundell confirms and reiterates that her memorandum made a finding that Plaintiff committed a crime against Carol Hammond.  She testified to this finding over strenuous and improper objections and testimony by AUSA Cooper.
See Attachment 20 page 25, lines 1-17)

She confirmed the intent of her finding in this same deposition by correcting Plaintiff that her finding was a "conclusion" when the Plaintiff referred to it as an "allegation."
See Attachment 20 Page. 30, lines 21-24

Rundell knew what the policy was, stated it in deposition, tried to make the world believe in her 9-27-04 deposition that she followed it, but her intent to shut up Plaintiff is reflected in her then not following the correct policy.  She knew she was doing something wrong then, because she lied about it in deposition.
See Attachment 20, page 36, line 25, page 37, lines 1-3

The certification by Judge Timothy Burgess, 1-18-06, that Linda Rundell was acting within the scope of her employment, thereby removing this case from State court into federal court, does more than just blur the lines between branches of government. It eliminated a basic protection for Plaintiff which the founders intended when they

separated the executive, judicial and legislative branches of government and the removal

resulting from an illegal Certification compromised the fairness of this process.


In a State court recently, prosecutor Michael Nifong of North Carolina lost his job,

was disbarred, fined, and even jailed for contempt of court for misrepresenting evidence

in the criminal prosecution of the three Duke University Lacrosse players which gained

so much national attention. Like the Plaintiff, these three Lacrosse players were never

formally convicted. But the advantage they have is that they have been publicly

exonerated of the accusations. Plaintiff doesn't have that advantage.


AUSA Cooper's Motion for Summary Judgment in **Wayson v. Schneider** the

Schneider case is relevant to damages in **Wayson v. Rundell** . Was Cooper influenced

so much by Rundell's finding in her 9-19-02 memorandum that her wrote the in his 3-7-

05 Summary Judgment Motion that Plaintiff had asserted that he could use deadly force

at any time against anyone on his mining claims? And was he so influenced by her

finding that he, like Rundell, also used the same 8-26-96 letter as a basis for such a claim

in his Summary Judgment Motion, even though the court effectively dismissed its

relevance earlier in the case? Was Cooper so influenced by Rundell's finding that he

ratcheted Wayson's threat level to include thart Wayson had the right to use deadly force

upon 'anyone' who came on his claims?

(Attachment 21, 3-7-05 Cooper Motion for Summary Judgment  pages 19-21


Wayson v. Rundell, 4:06 Cv 1  JWS                                    30
Opp. To Mot. FOR Summary judgment
& qualified immunity  10-31-07

The result was another public record. This is a record which is collected and stored on a regular basis by BLM law enforcement. This is a record which is available without any record of a request to at least 16 federal intelligence agencies, some of which service the State department, which has in the past spontaneously contacted German Appeals courts to provide such damaging false information, in a bid to punish Plaintiff by separating him from his daughter.

Recently prosecutor Nifong in a North Carolina court was disbarred, fined, and jailed for contempt of court for misrepresenting evidence to put a criminal charge on three lacrosse players, who fortunately were publicly exonerated because due process eventually worked for them. .

To paraphrase AUSA Cooper, what really matters here is that AUSA Cooper committed criminal contempt of court, since he was trying to validate false claims and a permanent record of criminal acts by Plaintiff, which he knew were false, and that he created another false public record in doing so, which, while undoubtedly delighting his federal colleagues, serves to further damage Plaintiff.

In a state court, Plaintiff could expect the same sanctions for such misconduct by AUSA Cooper, as were suffered by Prosecutor Nifong in north Carolina, loss of job,

disbarment, fine, and jail time.  However, despite the fact he was informed of the Cooper

misconduct, U.S. Attorney Cohen has done nothing.


Had Judge Burgess not also returned to assume a power he no longer had, the case

might well still be in state court.  Since there wasn't/isn't any due process involved in

Rundell recording Plaintiff as a criminal in police records, Plaintiff could never hope for

the exoneration which the three Duke lacrosse player achieved, but at least in a state

court, Plaintiff could have expected sanction against Cooper's absolute contempt for the

court, the truth, due process, and complete disregard for what his lies have done to

Plaintiff and family.


October 31, 2007


Mark N. Wayson, pro se

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies
that on this $5$ day of $\cancel{\text{Nov}}$,
2007, a copy of the foregoing was
served by mail on: AUSA Susan Lindquist

Office of U.S. Attorney
222 W. 7th Ave., #9, Rm. 253
Anchorage, Alaska 99513

Mark N. Wayson

Wayson v. Rundell, 4:06 Cv 1  JWS
Opp. To Mot. FOR Summary judgment
& qualified immunity  10-31-07

32