TOM ALLEN
BLM
222 W. 7th Ave #13
Anchorage Alaska 99513-7599

RECEIVED Aug 26, 1996

96 AUG 28 AM 10:57

BLM AK SO 950

Dear Tom,

I got your Aug. 15 letter calling for yet another unnecessary form. This letter will constitute my 'mandatory' response, and as you can see, I'm making an extra effort as a member of the public, trying to get the servants back in line.

I read through pages thirty-seven thousand one hundred sixteen to thirty-seven thousand one hundred thirty, which erroneously claimed to contain some 'plain English', referred to a lot of sections and laws and acts not included in those fifteen pages, and on balance, made very little sense at all.

I can, however, explain the entire fifteen pages in truly plain English.

This, quite obviously, is another burdensome government infringement on personal freedoms, granted both under the constitution and the existing law, designed SOLELY to give those of you acting in the employ of, and blind obedience to, RABID BABBITT, another tool to drive Alaskans/Americans off the land. It is like the completely unnecessary, repetitious form you note in your letter, having a deadline of August 15; one in which the Interior department asked for the same information they already have, over and over and over ad nauseum, in the hopes some miner will lose his lands or claims because he has missed a deadline, or failed to fill out a form properly.

This Tom, in truly plain English, is an explanation of this form you are 'demanding', with a deadline date of October 15.

Let me take you through this Tom. "#1. The occupancy is located at:" You know the answer to this. Filed many times over, on forms and your computers is the location of the mining claims. Is that clear now?

#2 asks whether I have a 'properly' filed notice. Come on! BLM has the notices. That shouldn't be too hard to answer.

#3 Refer to number two.

#4 asks whether there is a claim to "fee simple title". If there was, you would, #1 obviously have some notice of that claim, and #2. be working feverishly and doing whatever BRUCE's boys told you to do, in order to block it.

And number 5. The final question calls for name and address. Well obviously you sent this, so you already have that.

Any questions TOM? And as far as the requested signature goes, rest assured it will be at the bottom of this letter.

Now I don't intend to lecture you on the constitutional violations of this 'war by regulation' you are participating in, to drive Americans (and especially Alaskans) off the land. And I do sympathize with you that you have to work for RABID BABBITT. But I have to remind you that there were a lot of good nazis who fell into step behind HITLER initially. Unfortunately when things got out of hand, all too many of them 'went along' with

*Attachment 1*

his madness, long after it was well out of control. And to bring you in touch with reality, this 'clean sweep' of the country by the department of the Interior, designed to drive Americans off the land, destroy cultures and ways of life, and force the population into a frame of mind where they are compelled to seek permission from various branches of this rogue government, for nearly anything they do, is out of control TOM!

I don't know how I can help you. I know you want your children to continue to respect you, and to be able to live with yourself. You are working for a maniac. You know this. He is a liar. Everyone knows this. He cannot be trusted. Anyone who deals with your department of the Interior learns this very quickly.

I think you have three choices. One, you can stand up for those Americans you serve (Oh, I know no one pays little more than lip service to this old democratic concept anymore if they work for the federal government.) and say, enough is enough. You can begin workkng to derail some of this totalitarianism. You can speak out against needless regulation of people who are not breaking the law. You can speak out against this 'Mother May I' mentality, wherein if a miner asked for all the permissions needed, and jumped through all the silly hoops set up by agencies such as youss,ttheseeason would surely be over, before he could begin. If you do this, you will be fired/retired/transferred/ etc.

Two; you could transfer to some other federal agency to fatten out your retirement. Avoid the state department if you want your integrity and self-respect to remain intact.

Three; you can go underground. You control a lot of bureacrats. You also require a lot of paperwork. Take a load off the Alaskans, and put the former in cha rge of filling out the latter. BRUCE won't be any wiser, and you could actually be doing something productive.

Finally two requests. First, the name, address, title, and phone number, home and work, for every BLM employee working in the state. A recent court decision permits the oppressed (that's us) to retaliate personally against the Oppressors (that's you guys) and I want to get my ducks lined up if you decide to take any action against any property or dwelling or structure, I have lawfully placed on my lawfully located mining claim, and am using for any portion of any part of any day, for lawful mining purposes. As you would surely do, I intend to defend with any means necessary, up to and including the use of deadly force, the taking of, or intrusion into the property and dwellings included, against anyone. And as you know, my constitution permits me, and I suppose even encourages me, to take such actions against my government when they begin running amok. Again, that's you guys I'm afraid.

In all honesty, I don't think you are aiming for me with this one, right away. First BRUCE will want it to further make lives miserable for those like the Kantishna miners. But sooner or later....

Second request; about a year and a half ago, your office 'promised' me a response from public servant, TOM GOREY, of BLM.
What kind of progress is there?
If you remember, its been now nearly two years since he was sent a letter with a simple form to fill out, which related directly to his public duties. An SASE was even included. He didn't answer. A second one was sent to this servant. Still no answer.
Again, I'm relying on that long-abandoned-by-BLM concept that public servants should work for me as a member of the public, and still want an answer.
Now your office said it would happen. Has it?
I'll warn you Tom, this TOM GOREY has sucked his way pretty far up the chain, and that could be why he won't answer even your inquiries.
Nevertheless, I want you to get back to me on this one Tom. And do drop by anytime.

MARK N. WATSON
P.O. Box 84570
Fairbanks Alaska
99708-4570

xc  Senator MURKOWSKI

Case 4:06-cv-00001-JWS   Document 73-2   Filed 11/05/2007   Page 4 of 6

THE WALL STREET JOURNAL WEDNESDAY, JULY 31, 1996                                                                A15

# A Man, a Mine and a 29-Year Battle With Interior

## Rule of Law

### By Samuel Western

Eugene Simons, a 75-year-old geological engineer in Casper, Wyo., is savoring a sweet victory following a 29-year legal fight with the Bureau of Land Management. After one of the longest lease battles in Interior Department history, Mr. Simons finally has in his possession two leases to mine trona in Sweetwater County, Wyoming. Trona is a mineral that provides the raw material for soda ash, and Mr. Simons's leases include some of the premier deposits on earth. After approving his leases on paper almost three decades ago, BLM refused to actually give him the leases and for the next 29 years kept stalling, appealing and fabricating regulations. Then last spring, in a flurry of paperwork, it finally issued the leases. The change of heart came about because the Board of Land Appeals, the legal arm of the Interior Department, obliquely warned BLM employees that if they did not issue the leases they could be held personally responsible. Mr. Simons and his attorney, Tom Sansonetti, may be on the cusp of a trend: holding federal land managers personally responsible for their inaction.

The battle started in 1967, when Mr. Simons applied for leases to mine 275 million tons of trona from 5,000 acres of BLM land. The problems began in October 1968, when Congress created the Flaming Gorge National Recreation Area. Mining is usually prohibited in national recreation areas, and this new creation of Congress surrounded all but 320 acres of the land in Mr. Simons's leases. Yet the Mineral Leasing Act of 1920 was clear: Mr. Simons had "proven 'the reasonable prospect of developing a paying mine'" and so the "permittee shall be entitled to a lease." Since Mr. Simons had staked out his claim first, the government couldn't throw him out. The command "shall" has been the bane of federal land managers. It says Congress has considered the matter and made law. In a similar case involving a coal lease, the court found "the language 'shall' has flattened bureaucratic and environmental groups in at least a half dozen cases involving coal and mineral leases."

In Mr. Simons's case, the law initially worked as intended. The BLM approved his leases in April 1971 but declined to issue them. Suspecting trouble, Mr. Simons began efforts to exchange his leases for another BLM property outside a national recreation area. Swapping property is often a satisfactory way for both parties to get what they want, and while the government showed interest, it never followed through.

In 1976 Mr. Simons was still without his leases when Interior changed the rules and informed him that he was now required to prepare a new evaluation of potential reserves. He did. BLM rejected his estimates. Mr. Simons appealed and won. Then the government said he must prove the mine economically viable. He obliged. The BLM disapproved. Mr. Simons appealed again and won again. The BLM still insisted that he had insufficient reserves. Mr. Simons called BLM's bluff by asking for an administrative hearing. BLM cancelled the hearing, agreeing the reserves were sufficient—then, three years later, changed its mind. Mr. Simons once more asked for an administrative hearing.

After that 1986 hearing, the Board of Land Appeals took four years to reach a decision. Finally, in 1990, it unanimously decided in Mr. Simon's favor and ruled that the matter was settled. Even before the ruling, some BLM employees had refused to partake further in the stall. "I cannot see how we can legally and ethically change the rules in the middle of the game," wrote one district supervisor. "Inaction by the BLM is entirely responsible for this flasco. I will not participate in a bastard project."

But others, specifically those in the BLM regional solicitor's office in Denver, ignored the ruling and concocted new reasons to appeal. They got an en banc hearing of the Board of Land Appeals; to their dismay, all 10 judges found for Mr. Simons.



*Mr. Simons won because he persisted. The majority of litigants give up, which is just what the government wants.*

Next BLM suddenly decided the leases required Forest Service approval and the Forest Service asked for a six-month analysis.

At this juncture Mr. Simons filed a motion to compel BLM to issue the lease. In March 1996 the appeals board denied the motion, saying it had no supervisory authority over employees. But it stressed that its decision was final and that disregarding it would be serious. In a footnote, it added that a BLM employee who did not follow the court ruling might find himself in a position of personal liability. When Mr. Sansonetti asked for the home addresses of BLM employees so that complaints could be served, within a week Mr. Simons found himself, finally, with his leases in hand.

Holding employees personally responsible may provide a solution to a long-standing problem in federal land management when to give federal employees more say. Environmental groups want to give land managers greater discretion in making decisions rather than having them bound to one broad legislative fiat. The differences between recreational users and commodity users of the West cry out for a flexible federal land management policy in which the observations and recommendations of scientists in the field are considered of equal merit with the pronouncements of desk-bound policy wonks.

Clearly, BLM's treatment of Mr. Simons does not encourage such flexibility. The implied message is that land managers and government lawyers will use the almost unlimited litigation funds of Interior or Justice to grind their opposition in the dirt. This poisons the actions of every conscientious federal land manager trying to balance the needs of the general public vs. the needs of the community and, simultaneously, carry out the wishes of Congress.

Mr. Simons won because he persisted. The majority of litigants give up, which is just what the government wants. "I saw it a hundred times when I was at BLM," says Mr. Sansonetti, who used to be the top lawyer at the Interior Department. "Cases like Gene Simons's are just not that unusual. There are dozens of people spread all throughout New Mexico, Utah, Idaho and Montana in similar situations." Mr. Sansonetti says the Board of Land Appeals' footnote in the Simons case had "an immediate effect on other similar cases I'm working on."

On July 1, Mr. Simons's leases became valid. But his case isn't over yet. Once again, he must appear before the Board of Land Appeals. Now BLM wants to tax him at 8% of production. The original amount, way back in 1967, was 5%.

---

*Mr. Western is a writer in Big Horn, Wyo.*



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
ALASKA STATE OFFICE
222 W. 7th Avenue, #13
ANCHORAGE, ALASKA 99513-7599

August 15, 1996

Dear Mining Claimant:

The Final Rule for Use and Occupancy Under the Mining Laws was published on July 16, 1996 in the Federal Register, Volume 61, Page 37116, and became effective on August 15, 1996. You may be affected by this rule if you use and occupy a mining claim located on BLM administered land.

If you have an existing full or part-time occupancy on your mining claim, you must file a notice of use and occupancy with the BLM District Office where you file your Notice or Plan of Operations **no later than October 15, 1996**. Provided on the reverse side of this letter is the Notification of Existing Occupancy form, OMB Form #1004-0169, for your use.

The regulations define *occupancy* to mean full or part-time residence on the public lands. It also means temporary or permanent structures for use of a watchman or caretaker. Residence or structures may include barriers to access, fences, motor homes, trailers, cabins, houses, buildings, and storage of equipment or supplies.

For a copy of the Use and Occupancy Rules and Regulations, 43 CFR 3715, contact your local BLM office. A copy of the Federal Register may also be accessed on the Internet at WWW.ACCESS.GPO.GOV.

And a reminder--the August 31st deadline for payment of the $100 maintenance fee or filing the waiver for the upcoming assessment year is right around the corner.

For additional information or assistance with completion of the form, contact the nearest BLM office. Thank you for your cooperation.

Sincerely,

Tom Allen

State Director

OMB Control #1004-0169
Expires: June 13, 1999

## UNITED STATES DEPARTMENT OF THE INTERIOR
## BUREAU OF LAND MANAGEMENT
## MANAGEMENT OF USE AND OCCUPANCY
## EXISTING OCCUPANCY NOTIFICATION
## 43 CFR 3715.4

This notification records the presence of a reasonably incidental occupancy of the Public Lands under the authority of the mining laws and pursuant to 43 CFR Subpart 3715. This recordation serves only to provide notice to BLM. BLM will use this information and information gathered in follow-up inspections to determination if occupancy is reasonably incident as described in 43 CFR 3715. The submission of this notice is mandatory if an existing occupancy is to be granted the grace period described in 43 CFR 3715.4. Information submitted on this form or during follow up- inspections as approved by this collection will be subject to the provisions of the Freedom Of Information Act. No person is required to provide the information on this form if a currently valid OMB control number is not displayed in the upper right-hand corner.

1) The Occupancy is located at:

_____ Quarter Section, Section _____
Township _____, Range _____
_____ Meridian, _____ County,
State of _____.

2) Do you have a properly filed Notice or an approved Plan of Operations. Please fill in the appropriate blanks:

Notice Number _____ Plan of Operation Number _____
Date Filed _____ Date Approved _____

3) Is your Occupancy part of a reasonably incidental activity that does not require a Notice or a Plan

_____ (Y/N)

4) Do you claim fee simple title to the lands on which your occupancy is located?

_____ (Y/N)

5) Please give us your address and telephone number(s) so that we may contact you:

Mailing Address                               Telephone Number(s)
_____                  _____ ext _____
_____                  _____ ext _____
_____

Signature _____ Date _____

Public reporting burden for this collection of information, including the information submitted on this form and gathered in follow-up inspections is estimate to average 2 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed,, and completing and reviewing the collection of information. Send comments on this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: BLM Collection Clearance Officer (DW-110), Building 50, Denver Federal Center, Denver, CO 80225-0047.

*[Handwritten across form: ALL INFORMATION ALREADY AVAILABLE AT BLM OFFICE.]*