Delmer Ackels                                                    February 6, 2007
P.O. Box 61520
Fairbanks, Alaska 99706


I, Delmer Ackels, states as follows:

1. I have been actively engaged in mining for approximately 33 years, and mined in the Birch drainage for 16 years. I have actively worked on Mark Wayson's mining claims in the past and know them to be potentially profitable claims. Mark has unworked ground in an area which has been mined for over one hundred years, and is nearly worked out, since it is now nearly completely boxed in because of the creation of established federal conservation areas and takings, which remove mineral rich ground from entry, and cut off access to other areas.

2. I have held both state and federal mining claims and have dealt with regulators at all levels from the commissioners to the field level employees.

3. I have served on the Minerals commission for 19 years, and I have worked with a team to advise the Legislature and Governor through five different administrations on mineral, mining, and land issues, and related legislation.

4. The finding by Linda Rundell that Mark Wayson committed a forcible felony against a federal employee, whether true or not, will severely complicate or prevent Mr. Wayson's ability to secure permits on State and Federal levels that will be needed to continue mining.

5. BLM's use of regulations through obsolete land orders, local procedural changes, and ever changing requirements, delay or make it difficult for anyone to mine on federal mining claims in Alaska. In conjunction with the State of Alaska, agencies such as Alaska Fish and Game often act in concert with BLM. However, the added requirement that Mark Wayson mine with a record as a federal criminal with a charge of a forcible felony against a federal employee is

1

*Attachment # 15*

unprecedented, and adds an element of difficulty and danger to his mining operations.

6. At a meeting with Mark Wayson and BLM, I was assured by BLM employees that there were no problems between BLM and Mr. Wayson. There is no basis for this finding that Mark Wayson committed a forcible felony against a Federal employee. But despite these meetings and other efforts at clarification, Mr. Wayson has been stalled now over ten years in securing the proper State permits to continue mining on his state mining claims. The false charge of being a forcible felon has not yet been expunged from BLM records.

7. I was present at Mark's request, at a meeting on September 17, 2001, with state DNR officials and BLM engineer Carol Hammond, BLM project manager Shelly Jacobsen, and BLM real estate specialist Martha Woodworth, following Mark Wayson's request on 9-15-01 for the BLM to stop a project on Mark's state mining ground.

8. At this meeting on 9-17-01, there was no reference or complaint of any threats by Mark Wayson, or of crimes committed by him on 9-15-01 or before, and I was therefore amazed later to be informed on 9-17-01 by Ben Kennedy of Alaska DNR, that BLM regional Director, Robert Schneider, had told Mr. Kennedy that Mark would be arrested if he returned to his claims. I then questioned BLM's authority to do so.

9. Also at this meeting on 9-17-01, Mark asked Carol Hammond why she said she had felt threatened on 9-15, and called out the BLM rangers, and Ms. Hammond herself replied to me that she had not felt threatened.

10. During this 9-17-01 meeting I also pointed out to BLM that their joint project with Alaska Fish and Game to change the stream of Birch Creek would divert the Birch Creek into old settling ponds which lie downstream from Mark Wayson's state claims, and I explained that these ponds were then avoided with the flow of Birch Creek remaining in the bedrock channel it had naturally chosen. BLM was informed that the diversion into the old channel which they

2

were proposing, would cause erosion of the thin rock caps on old settling ponds, and cause increased silt loads in Birch Creek, a Wild and Scenic River.

11. Nevertheless, this BLM project was eventually continued in conjunction with Alaska Fish and Game downstream from Mark's state mining claims, and it destroyed the recorded access to his claims. The diversion which was built on Mark's claims, in 2001, caused Birch Creek to breach its banks cutting new channels into the old settling ponds, exactly where I had explained and diagramed to BLM on 9-17-01, that it would breach its banks.

12. The restoration of Mr. Wayson's access would involve considerable costs to him. The restoration of his claims by removing the diversion dam which had been placed on top of Mr. Wayson's State mining Claims would also require changes be made to the project which has already cost hundreds of thousands of dollars of taxpayer money to place this land fill on his claims, in addition to the environmental damage it has caused by not being engineered properly. Knocking this river diversion dam down by BLM in Aug. 2003, and spreading this material around on Mr. Wayson's State mining claims will force Mr. Wayson to spend large amounts of money to dig up and truck away these hundreds of yards of material to a proper dump site before he can even start mining his claims. BLM/Alaska Fish and Game failed river diversion project that was placed on Mark's claims has made these mining claims of Mr. Wayson's worthless to mine in their present state.

13  I served on the Citizen's Advisory Commission for Federal Areas (CACFA) for 15 years, and therefore have knowledge of the history of BLM retaliation against Mr. Wayson.

14. Along with published calls by Senator Ted Stevens in the summer of 1996, for citizens not to obey controversial Department of the Interior regulations, Mark Wayson sent written objections of new proposed regulations by BLM, to then state BLM director, Tom Allen, and I reviewed these letters copied to our commission.

15. Acting BLM Director Sally Wisely, responded to Mark Wayson's objections with threats of criminal prosecution, and she portrayed Mark's objections as '<u>threats</u>' to BLM, ignoring the attached report of a Board of Land Appeals decision.
(Attachment 1. BLM Acting State Director's 9-20-96 letter to Mark Wayson)

16. Mark requested that our commission (CACFA) intervene, and a series of meetings were conducted by Commission Executive Director, Mr. Stan Leaphart, with Mark Wayson, State Director Tom Allen, and other BLM personnel.

17. Mark wrote BLM State Director Tom Allen in October 1996, requesting an investigation into Ms. Wisely's conduct, and explaining his position, the fact that he meant to <u>'retaliate' civilly</u> and Mark again included a copy of the article reporting that the Board of Land Appeals had ruled that BLM personnel could be held personally liable if they (BLM personnel) violated courts' directions.
(Attachment 2. Mark's letter of 10-4-96, to Tom Allen with article attached.)

18. On December 10, 1996, a video-taped meeting, which I have reviewed, was held by Stan Leaphart, of CACFA, with BLM employees. BLM declared they felt no threat of any kind existed between them and Mr Wayson, and the misunderstanding was put to rest.

19. Nevertheless, subsequent to these reconciliation / clarification efforts by the commission, I was alarmed to be copied with a letter by BLM state Director, Tom Allen, dated January 9, 1997, accusing Mark Wayson of making "explicit threats to harm and endanger the lives of BLM personnel," and Director Allen even cited the video-taped meeting as grounds for his statement.
(Attachment 3. Director Tom Allen's 1-9-97, letter to Mark Wayson.)

20. Again I monitored Stan Leaphart's efforts to intervene, and he even enlisted the aid of Senator Frank Murkowski, but even the Senator's intervention, and further subsequent meeting

and correspondence between Stan Leaphart of our commission and BLM Director Tom Allen, failed to produce a corrected record.
(Attachment 4, Stan Leaphart's 1-28-97 letter to Senator Murkowski )
(Attachment 5, Senator Murkowski's 2-13-97 letter to Mark Wayson)
(Attachment 6, Stan Leaphart's 2-5-97 letter to BLM Director Tom Allen)

21. What began as a free speech objection by Mark, quoting a Board of Land Appeals decision in 1996, to what he felt to be unreasonable regulations by BLM, became "known threats of harm or endangerment," according to BLM Deputy State Director, Sally Wisely, and subsequently, in the written words of BLM State Director, Tom Allen, Mark's objections progressed into, "explicit threats to harm BLM employees." Despite extensive good faith efforts by Mark Wayson, the Citizens' Advisory Commission of Federal areas, and Senator Frank Murkowski, to resolve this issue, and Carol Hammond's reassurance to us that she did not feel threatened 9-15-01, as well as BLM's claim that no record of threats by Mr Wayson against BLM are in BLM files, the continuation of these false claims by BLM personnel has virtually stopped Mr. Wayson from mining his claims for the past ten years.

22. In 2001, BLM was caught by Mark who tried to stop a BLM project on state lands, where he had a recorded state mining claim, and this BLM project was neither on nor adjacent to the Battest claims where the project had been funded, (downstream from Mr. Wayson's) but was on Mr. Wayson's claims. Mark's objections this time not only led to a threat of arrest by the BLM regional director Robert Schneider, but subsequent notification to the state regulators, that Mark represented a "serious potential threat to BLM employees."

23. I believe that the finding September 19, 2002, by BLM state Director, Linda Rundell, that Mark Wayson forcibly committed a crime against Carol Hammond nearly a year after the meeting I attended where Carol Hammond admitted she did not feel 'threatened' by Mr. Wayson, reflects BLM's true agenda to get Mark off his claims. Linda's Rundell's finding, following the BLM progressive fabrications over the past ten years, presents a pretty accurate

blueprint of what Mark can expect in the future if he tries to mine.

24. With Mr. Wayson's increased costs to remove additional <u>non-gold bearing material</u> that BLM has placed at great cost, on Mr. Wayson's mining claims, and then BLM returning to Mr. Wayson's State mining claims and <u>spreading</u> this fill out over a larger area of his claims because of the BLM's/State of Alaska's Fish and Game failed project, this fill has become even more expensive for Mr. Wayson to remove. Along with the direct attack on Mr. Wayson's character as a violent person without provocation and added cost of removing this fill and restoring access, it would be an economic disaster for Mr. Wayson to mine his claims at this time or in the future.

_____
Delmer Ackels

Signed and sworn before me on the ___7th___ day of February 2007.

_____ notary public for the State of Alaska

STATE OF ALASKA
NOTARY PUBLIC
Lugena Lescault
My Commission Expires: August 2, 2010

# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
ALASKA STATE OFFICE
222 W. 7th Avenue, #13
ANCHORAGE, ALASKA 99513-7599

FF-26889 through
FF-26895 (3842)
(931)

Mr. Mark N. Wayson
P.O. Box 84570
Fairbanks, Alaska 99708-4570

20 SEP 1996

Dear Mr. Wayson:

This is in reply to your letter of August 26, 1996, regarding the final rule and regulations for Use and Occupancy Under the Mining Laws and the requirement to provide notification of existing uses and occupancies to the Bureau of Land Management (BLM). You express your annoyance with filling out "yet another unnecessary form". You also request information concerning all BLM employees in Alaska and you reference correspondence with Tom Gorey.

In response to the first issue, the BLM is entrusted with the management of the public lands of the United States and is held accountable for the prevention of abuse of those lands while recognizing the valid rights and uses under the Mining Laws. The BLM is required by law to take appropriate action to eliminate invalid uses, including unauthorized occupancy of the public lands.

The new regulations address the unlawful use and occupancy of unpatented mining claims for nonmining purposes. The rule explains the restrictions in order to ensure that the uses and occupancies are limited to those involving prospecting or exploration, mining, or processing operations. The rule makes clear that using a mining claim for purposes that are not reasonably incident to mining is not authorized by the mining laws and should not be occurring on the public lands. It has long been an established principle of the mining laws and numerous judicial interpretations that surface uses of a claim can only be for purposes connected with or incident to exploration and recovery of minerals.

The regulations allow for certain structures on your claims that will enable you to carry out the exploration, mining, or processing of minerals. The regulations do not adversely affect the miner who is involved in bona-fide mining operations. However, the regulations do provide that if you do not file the required notice, OMB Form #1004-0169, with the information requested, and you have an existing residence or other structures, you will be subject to immediate enforcement actions, which include civil remedies and criminal penalties.

Attachment #1

BLM cannot fill out the Existing Occupancy Notification form for you. The regulations provide that if you are occupying the public lands under the mining laws on August 15, 1996, you may continue your occupancy for one year after that date, if you notify BLM on the approved form by October 15, 1996, of the existence of the occupancy, and BLM has no pending trespass action against you concerning this occupancy. Such use or occupancy cannot be a threat to health, safety, or the environment. So, if you have an existing residence or structures, such as cabins, buildings, or storage sheds for equipment or supplies, either temporary or permanent, on your claims, you should complete the form, sign it, and send it to the BLM office in Fairbanks before October 15, 1996.

The second part of your letter requests information concerning addresses and phone numbers, both work and home, for all BLM personnel in the State. The release of home addresses and phone numbers is prohibited, in accordance with the Privacy Act, 5 U.S.C. (552a) (1974). Disclosure of this information would constitute a clearly unwarranted invasion of personal privacy. Further, your request for names, addresses, and phone numbers of BLM personnel in order "to retaliate personally against" them may constitute a Federal crime under 18 U.S.C. 111 or a State crime under AS 11.41.230. Personnel information will not be released when there are known threats of harm or endangerment to our employees. Due to the hostile nature of your letter, your request for this information is denied.

According to the External Affairs Office in Washington, there is no record of your correspondence with Tom Gorey.

Enclosed for your information is a copy of the Final Rule for Use and Occupancy Under the Mining Law as published in the Federal Register, Vol. 61, No. 137, on July 16, 1996, along with an Existing Occupancy Notification form for your use should you decide to file.

Sincerely,

Tally Wise
Associate State Director

Enclosures
   1-Final Rule for Use and
     Occupancy under the
     Mining Laws
   2-Existing Occupancy
     Notification Form

TOM ALLEN
BLM
222 W. 7th Ave. #13
Anchorage Alaska 99513-7599

Dear Tom,

 I want you to open an immediate investigation of Associate State director SALLY WISELY for violation of 18 U.S.C. 1001, which has placed me in physical danger, and endangers BLM employees of the Fairbanks region, indirectly as well. I also want you to immediately notify any and all persons she has copied with her 9-20-96 letter, that it is 100% untrue with respect to the misrepresentations she attempts to make regarding violations under both federal and state law. She has lied and fabricated, to intimidate and threaten me.

 She arrogantly, and probably ignorantly, included my letter with hers. Any relatively competent individual who reads them both can see that she is quoting out of context, in order to create a false threat to BLM employees, with myself as the alleged source of such a threat. But there is no assurance both will be read together.

 At best it is another typical Dept. of Interior bit of deception, to use as a basis for asking congress for more weaponry, bullets, and bureacrats to tote guns to be used to control the citizenry. At worst, it is a rather dangerous act of a not so secret agent provacateur, of the government, creating a false record, in order to justify a pre-emptive strike against me, and I must consider the worst.

 In either case, it is a clear violation of the stated duties of the office she holds, and a violation of the statute I have included for your review.

 Regarding the latest form you folks invented to harass those using public lands, WISELY again demonstrates the standard Dept. of Interior arrogance when she opines, "The regulations do not adversely affect the miner who is involved in bona-fide mining operations."

 Yet she threatens me with 'immediate enforcement actions, which include civil remedies and criminal penalties', in the next sentence.

 Does anyone there use their head? Or is it simply a matter of bowing toward BRUCE and his boys, who run the Dept of Interior for an elitist minority?

 Mining inherently involves the use of equipment. We are mining as authorized under the law. Therefore it is burdensome, unnnecessary, and violates my right to be secure in my effects. Surely you are not going to threaten me with criminal and civil prosecution, if I fail to join you in participating in a process which is not constitutina are you? By insisting I provide such a form, which not only contains information BLM already has, merely as a declaration or reassurance to BLM that I am not breaking some law, and threatening me with prosecutions if I do not, makes my very resistance to the constitutional violation, a crime.

 In plain English, Wisely's letter threatens me with "immediate enforcement action", using the full power of the federal government, if I dare even to assert constitutional protection against an arbitrary requirement invented by BLM.

Attachment # 2

The description of 'Occupancy' in the federal register, a vague, arbitrary definition, and by declaration, is not even limited to what it says. Additionally, this portion of the register, contains several pages of BLM 'Mother-May-I's' which forecast further interference by BLM into lawful activities on public lands, which are authorized by law.

The fact that the form demanded by BLM for October 15, requests only information which BLM already has, is clear indication that BLM's actual concerns and intent, lie far from the BLN reasons printed in the register, for the form. Language which follows, spells out that BLM is poised to descend upon the miners during the following year in an inspection process, armed with the BLM definition of 'occupancy', and an appeal process which BLM admits will have absolutely no effect whatsoever, against adverse effects to a miner, from any 'BLM decision, order, or determination.'

Viewed alone, this October 15 form demand, may seem innocent enough. However, it triggers a process by BLM, devoid of even any shreds of due process, common sense, or respect for the citizen. It is poised to interfere with a miner's business, his way of life, personal actions of a lawful nature he/she might perform at a mine, and threatens the fabric of liberty.

The federal register also threatens years and years in jail, and hundreds of thousands of dollars in fines to a miner who runs afoul of definitions and regulations which, by BLM declaration, have no clear boundaries. Your Ms. WISELY has already promised in writing that my criminal and civil prosecution will begin immediately, if I fail by October 15 to 'sign up' for the ordeal which such an October 15 'occupancy notification' will trigger.

I would ask that you move quickly in your investigation of Ms. WISELY for violation of 18 U.S.C. 1001. Not only would it remove the very real danger of physical harm to me which she has created, but it might be enlightening to the public if she and I could be tried together before a jury.

In the meantime, my request for addresses of BLMer's continues. (They all have access to mine.) I've enclosed a brief outline of the case which led to those of us being oppressed by BLM, being given the green light to retaliate personally against BLMer's. It chronicles the 29 years of evil Mr. SIMONS had to contend with, and it isn't over yet for him. You might pass it around the office, for it may inspire some within BLM that they don't have to blindly participate in lawless immoral acts against the public.

Again Tom, you can fill out the occupancy form for me if you like. It is simply too vaguely framed and supported, with too much potential for self-incrimination and harm, which can follow if I do so. And again, please feel free to drop by. However, until you act swiftly and decisively to remove the physical danger to me which WISELY has created, I would suggest you drop by cautiously, and after you give me advance notice. Safer for all concerned.

MARK N. WAYSON
P.O. Box 84570
Fairbanks Alaska
99708-4570

THE WALL STREET JOURNAL WEDNESDAY, JULY 31, 1996.

# A Man, a Mine and a 29-Year Battle With Interior

## Rule of Law

### By Samuel Western

Eugene Simons, a 75-year-old geological engineer in Casper, Wyo., is savoring a sweet victory following a 29-year legal fight with the Bureau of Land Management. After one of the longest lease battles in Interior Department history, Mr. Simons finally has in his possession two leases to mine trona, in Sweetwater County, Wyoming. Trona is a mineral that provides the raw material for soda ash; and Mr. Simons's leases include some of the premier deposits on earth. After approving his leases on paper almost three decades ago, BLM refused to actually give him the leases and for the next 29 years kept stalling, appealing and fabricating regulations. Then last spring, in a flurry of pettiness, it finally issued the leases. The change of heart came about because the Board of Land Appeals, the legal arm of the Interior Department, obliquely warned BLM employees that if they did not issue the leases they could be held personally responsible. Mr. Simons and his attorney, Tom Sansonetti, may be on the cusp of a trend: holding federal land managers personally responsible for their inaction.

The battle started in 1967, when Mr. Simons applied for leases to mine 275 million tons of trona from 5,000 acres of BLM land. The problems began in October 1968, when Congress created the Flaming Gorge National Recreation Area. Mining is usually prohibited in national recreation areas and this new creation of Congress surrounded all but 120 acres of the land in Mr. Simons's leases. Yet the Mineral Leasing Act of 1920 was clear: Mr. Simons had proven "the reasonable prospect of developing a paying mine" and so the "permittee shall be entitled to a lease." Since Mr. Simons had staked out his claim first, the change the rules in the middle of the game, government couldn't throw him out.

The command "shall" has been the bane of federal land managers. It says Congress has considered the matter and made law. In a similar case involving a coal lease, the court found "the language *shall be entitled* could not be clearer." "Shall" has flattened bureaucratic and environmental groups in at least a half dozen cases involving coal and mineral leases.

In Mr. Simons's case, the law initially worked as intended. The BLM approved his leases in April 1971 but declined to issue them. Suspecting trouble, Mr. Simons began efforts to exchange his leases for another BLM property outside a national recreation area. Swapping property is often a satisfactory way for both parties to get what they want, and while the government showed interest it never followed through.

In 1976 Mr. Simons was still without his leases when Interior changed the rules and informed him that he was now required to prepare a new evaluation of potential reserves. He did. BLM rejected his estimates. Mr. Simons appealed and won. Then the government said he must prove the mine economically viable. He obliged. The BLM disapproved. Mr. Simons appealed again and won again. The BLM still insisted that he had insufficient reserves. Mr. Simons called BLM's bluff by asking for an administrative hearing. BLM canceled the hearing, agreeing that the reserves were sufficient—then, three years later, changed its mind. Mr. Simons once more asked for an administrative hearing. After that 1988 hearing, the Board of Land Appeals took four years to reach a decision. Finally, in 1990, it unanimously decided in Mr. Simons's favor and ruled that the matter was settled. Even before the ruling, some BLM employees had refused to partake further in the stall. "I cannot see how we can legally and ethically change the rules in the middle of the game," wrote one district supervisor. "In action by the BLM is entirely responsible for this fiasco. I will not participate in a bastard project."

But others, specifically those in the BLM regional solicitor's office in Denver, ignored the ruling and concocted new reasons to appeal. They got an en banc hearing of the Board of Land Appeals; to their dismay, all 10 judges found for Mr. Si-



mons. Next BLM suddenly decided the leases required Forest Service approval and the Forest Service asked for a sixmonth analysis.

At this juncture Mr. Simons filed a motion to compel BLM to issue the lease. In March 1996 the appeals board denied the motion, saying it had no supervisory authority over employees. But it stressed that its decision was final and that disregarding it would be serious. In a footnote, it added that a BLM employee who did not follow the court ruling might find himself in a position of personal liability. When Mr. Sansonetti asked for the home addresses of BLM employees so that complaints could be served, within a week Mr. Simons found himself, finally, with his leases in hand.

Holding employees personally responsible may provide a solution to a long-standing problem in federal land management: when to give federal employees more say. Environmental groups want to give land managers greater discretion in making decisions rather than having them bound to one broad legislative fiat. The differences between recreational users and commodity users of the West cry out for a flexible federal land management policy in which the observations and recommendations of scientists in the field are considered of equal merit with the pronouncements of desk-bound policy wonks.

Clearly, BLM's treatment of Mr. Simons does not encourage such flexibility. The implied message is that land managers and government lawyers will use the almost unlimited litigation funds of Interior or Justice to grind their opposition in the dirt. This poisons the actions of every conscientious federal land manager trying to balance the needs of the general public vs. the needs of the community and, simultaneously, carry out the wishes of Congress.

Mr. Simons won because he persisted. The majority of litigants give up, which is just what the government wants. "I saw it a hundred times when I was at BLM," says Mr. Sansonetti, who used to be the top lawyer at the Interior Department. "Cases like Gene Simons's are just not that unusual. There are dozens of people spread all throughout New Mexico, Utah, Idaho and Montana in similar situations." Mr. Sansonetti says the Board of Land Appeals' footnote in the Simons case had "an immediate effect on other similar cases I'm working on."

On July 1, Mr. Simons's leases became valid. But his case isn't over yet. Once again, he must appear before the Board of Land Appeals. Now BLM wants to tax him at 8% of production. The original amount, way back in 1967, was 5%.

*Mr. Western is a writer in Big Horn, Wyo.*



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
ALASKA STATE OFFICE
222 W. 7th Avenue, #13
ANCHORAGE, ALASKA 99513-7599

```
                                              FF-26889 through
                                              FF-26895 (3842)
                                                       (931)
```

Mr. Mark N. Wayson                            JAN -9 1997
P.O. Box 84570
Fairbanks, Alaska 99708-4570

Dear Mr. Wayson:

This is in response to your recent letters to this office and your meeting of December 10, 1996, with staff members from the Bureau of Land Management (BLM) Northern District Office (NDO).

The BLM letter to you dated September 20, 1996, was signed by Associate State Director Sally Wisely acting under the delegation of authority on behalf of the State Director. The views expressed in this letter are not the opinions of Ms. Wisely. They represent the policies, position, and concerns of the BLM. In discussing your allegations with our Special Agent over Law Enforcement, we have determined there has been no violation of 18 U.S.C. 1001, which relates to knowingly and willfully falsifying a material fact or making any false, fictitious or fraudulent statements or representations. This is clearly not the case in our correspondence with you. Therefore, an investigation is not warranted and will not be undertaken.

You have asked for a list of people who have read your letters because you are concerned they may get the wrong impression of you. Because we perceive your numerous statements to be explicit threats to harm and endanger the lives of BLM personnel, this information will not be released to you. The BLM has a legal responsibility to protect its employees and provide a safe work environment.

I have addressed the various issues identified and believe this letter will bring closure to your concerns. Any issues regarding your mining claim will be handled through the Northern District Office.

                                              Sincerely,

                                              /s/ Tom Allen

                                              State Director

Attachment #3

## CITIZENS' ADVISORY COMMISSION
## ON FEDERAL AREAS
3700 Airport Way
Fairbanks, AK 99709
(907) 451-2775
FAX 452-2761

**TO:** Senator Frank Murkowski

**FROM:** Stan Leaphart- Executive Director

**DATE:** January 28, 1997

**SUBJECT:** Mark Wayson- Tom Allen BLM Complaint

Attached please find a series of correspondence between Mr. Mark Wayson and the BLM Alaska State Office. This correspondence reflects Mr. Wayson's serious concerns about his safety brought about by repeated misperceptions on the part of BLM. The BLM has wrongly concluded that Mr. Wayson has made threats against BLM employees, despite efforts by Mr. Wayson and myself to assure the agency that no such threats were made, or intended. In fact, Mr. Wayson and I met with BLM staff from the Fairbanks office on December 10, 1996 to discuss this situation. Although the staff we met with did not have the authority to address Mr. Wayson's complaint of misconduct on the part of Sally Wisely, we made the effort to clarify Mr. Wayson's concerns about his personal safety. It was made clear at the December meeting that no threats were intended and the BLM staff confirmed that they felt no threat by Mr. Wayson.

In spite of this and their assurances that they would convey this understanding to the State office, Mr. Allen's January 9, 1997 letter still alleges that statements made in Mr. Wayson's letters constitute "explicit threats to harm and endanger lives of BLM personnel." I share Mr. Wayson's concerns that this erroneous statement can have the undesired effect of elevating the potential for confrontation in any future contacts with BLM personnel if those personnel believe they are dealing with someone who intends them harm.

I would like to request that your office review the attached correspondence and move appropriately to eliminate any potential danger to both Mr. Wayson and BLM employees. Please feel free to contact our office if you have questions or need to clarify anything.

**FRANK H. MURKOWSKI**
ALASKA

COMMITTEES:

CHAIRMAN
ENERGY AND NATURAL RESOURCES
FINANCE
VETERANS' AFFAIRS
INDIAN AFFAIRS

# United States Senate

WASHINGTON, DC 20510-0202
(202) 224-6665

222 WEST 7TH AVENUE, BOX 1
ANCHORAGE, AK 99513-7570
(907) 271-3735

101 12TH AVENUE, BOX 7
FAIRBANKS, AK 99701-6278
(907) 456-0233

P.O. BOX 21647
JUNEAU, AK 99802-1647
(907) 586-7400

130 TRADING BAY ROAD, SUITE 350
KENAI, AK 99611-7716
(907) 283-5808

109 MAIN STREET
KETCHIKAN, AK 99901-6489
(907) 225-6880

February 13, 1997

Mr. Mark Wayson
P.O. Box 84570
Fairbanks, AK 99708-4570

Dear Mark:

Thank you for your letter informing me of your situation with the Bureau of Land Management (BLM). A member of my staff has spoken with Mr. Tom Allen and has received assurances that you are not in any danger from BLM employees. In addition, they have no complaints with your use of your claim and are purely interested in working with you in a positive, professional manner.

I hope you can now put this matter to rest and wish you every success with your claim. Thank you for the opportunity to be of assistance.

Sincerely,

Frank H. Murkowski
United States Senator

cc: Stan Leaphart
    Executive Director
    Citizen's Advisory Commission
       on Federal Areas
    3700 Airport Way
    Fairbanks, AK 99709

Attachment # 5

## Citizens' Advisory Commission
## on Federal Areas

3700 Airport W
Fairbanks, Alaska 99
(907) 451-277
Fax: 451-276

February 5, 1997

Mr. Tom Allen
State Director
Bureau of Land Management
222 W. 7th Avenue, #13
Anchorage, Alaska 99513-7599

Dear Mr. Allen:

I appreciated the opportunity to speak with you in Juneau last week about Mr. Mark Wayson and the misunderstanding that currently exists between him and your agency. I particularly appreciated your assurances that neither you nor your staff felt personally threatened by Mr. Wayson and that any and all future contacts with him will be handled in an absolutely fair and open manner. I have relayed those assurances to Mr. Wayson.

However, in spite of your verbal assurances, Mr. Wayson remains concerned that the statement in your January 9, 1997 letter that "...we perceive your numerous statements to be explicit threats to harm and endanger the lives of BLM personnel...," will have the undesired effect of elevating the potential for confrontation in any future contacts with BLM personnel if those personnel believe they are dealing with someone who intends them harm. As you and I discussed in Juneau, Mr. Wayson had hoped that the December 10, 1996 meeting with Nichelle Jacobson and Woody Woodworth from the BLM's Northern District Office had served to clarify that no threats against BLM staff were made nor intended. I have asked Mr. Wayson to reiterate this, in writing.

You made it clear in the January 9 letter and in our discussion in Juneau, that you feel strongly that you have addressed the various issues identified and that the letter brought closure to Mr. Wayson's concerns. Mr. Wayson feels there are still unresolved issues. I would ask you to continue to work with Mr. Wayson in an effort to resolve this undesirable misunderstanding.

As I have told Mr. Wayson and as I told you, I am not in complete agreement with his assessment of this situation. At the same time, I can appreciate his frustration in having to wait weeks or months for a response to his letters, regardless of how the content and

Attachment #6

Mr. Tom Allen                                                                 2
February 5, 1997

tone of those letters are viewed." However, my opinion on this matter is not at issue. As a representative of the Citizens' Advisory Commission on Federal Areas, my goal is to try to find a positive solution that is acceptable to all concerned. If I can provide any assistance toward this end, or if you have any questions, please contact me at 451-2775. Thank you.

                                           Sincerely,

                                           Stan Leaphart
                                           Executive Director

cc:    Mark Wayson
       Sen. Frank Murkowski