1

LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ALASKA
 3
    MARK N. WAYSON,
 4
                  Plaintiff,
 5
       vs.                        NO.  F03-0035 (JWS) Civil
 6
    ROBERT SCHNEIDER and the
 7   UNITED STATES OF AMERICA,
 8              Defendants.
 9
10   VIDEOTAPED TELEPHONIC DEPOSITION OF LINDA S.C. RUNDELL
11                    September 27, 2004
12                       9:14 a.m.
                      4010 Rodeo Road
13                  Santa Fe, New Mexico
14
15
16       The deposition of LINDA S.C. RUNDELL was taken on
17   behalf of the Plaintiff on September 27, 2004, at 9:14 a.m.
18   at the offices of Hunnicutt, Costello Reporting, Santa Fe,
19   New Mexico, before Maureen R. Costello, Certified Court
20   Reporter #220 and Notary Public in and for the County of
21   Santa Fe, State of New Mexico.
22
23
24
25                       COPY
```

Attachment 20

HUNNICUTT, COSTELLO REPORTING, INC.
(505) 474-9770 - (800) 304-9770 FAX (505) 474-9771
MAUREEN R. COSTELLO, RPR, CCR 220

Case 4:06-cv-00001-JWS   Document 73-21   Filed 11/05/2007   Page 2 of 5

WAYSON vs. SCHNEIDER                     LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

10 (Pages 34 to 37)

Page 34

1  MR. COOPER: Yes, just to follow up briefly.
2        FURTHER EXAMINATION
3  BY MR. COOPER:
4      Q. Ms. Rundell, I want to get the chronology of your
5  contacts with Mr. Schneider down as best I can. First of
6  all, Mr. Schneider worked for the director's office, did he
7  not?
8      A. He was a field office manager who reported
9  directly to the state director.
10     Q. Okay. So in the normal course of the performance
11 of your duties, you would have lots of contact with
12 Mr. Schneider?
13     A. Many, yes.
14     Q. Okay. Now, focusing just on the events that took
15 place up at 98 Mile Steese and the --
16        (Discussion off the record with the reporter.)
17     MR. COOPER: Steese, S-t-e-e-s-e. That's a term
18 of art for those who live in Alaska.
19     Q. (BY MR. COOPER) Okay. So with respect to the
20 events that occurred up at 98 Mile Steese Highway and the
21 subsequent complaint and investigation -- complaint by
22 Mr. Schneider -- excuse me. Let me start over.
23        What I'm interested in is any conversations you
24 had that you can recall with Mr. Schneider about the events
25 of September 15, 2001, at 98 Mile Steese Highway concerning

Page 35

1  Mr. Wayson and Ms. Hammond.
2      A. I am reasonably certain that Mr. Schneider called
3  me to tell me about what had occurred and the fact that he
4  had asked a ranger to go out on the location because his
5  employee, Ms. Hammond, had felt intimidated and threatened
6  by Mr. Wayson.
7      Q. Okay. And after that, do you recall talking to
8  Mr. Schneider about these events and the investigation
9  until after your conclusions were reached?
10     A. It would have been a normal course of business to
11 have talked to him again as a followup.
12     Q. Okay. But not to go into -- Well, strike that.
13        Would it have been part of your investigative
14 process to talk to Mr. Schneider about what he did and why
15 he did it prior to issuing your report?
16     A. I would have been part of the process. Whether as
17 part of that inquiry, I spoke to him about it or the person
18 who was investigating spoke to him about it, I don't
19 recall.
20     Q. As you sit here today, looking back, now having
21 had your memory refreshed by all of these documents that
22 have been attached to your deposition, do you still believe
23 that Mr. Schneider did the right thing by sending a ranger
24 out there to help control the situation?
25     A. I certainly do. I think he would have been

Page 36

1  negligent in his duties if he did not respond appropriately
2  when an employee told him that he or she felt like they
3  were being threatened by a member of the public.
4      Q. Regardless of whether or not that employee's
5  perceptions accurately reflected reality?
6      A. A person's feelings are what they are. They're
7  very personal; and in a situation that one employee might
8  take as being threatening behavior, another might not; but
9  you have to pay attention to what that employee is telling
10 you and take action based on that employee's feelings.
11     Q. In other words, you have to provide a safe work
12 place for and a safe work environment for an employee based
13 upon their perception?
14     A. Yes.
15     Q. Okay.
16        MR. COOPER: Thank you. I don't have anything
17 further.
18        FURTHER EXAMINATION
19 BY MR. WAYSON:
20     Q. Ms. Rundell, to try and track down who may have
21 taken part of this inquiry for you here in Alaska, do you
22 remember if it was an -- the person you requested was an
23 Alaskan officer or if it was somebody from the national
24 bureau?
25     A. The typical policy is if we are conducting an

Page 37

1  inquiry or investigation about someone within our state, is
2  that someone from out of state would conduct that inquiry
3  or investigation.
4      Q. Okay. Do you remember how many rangers you had at
5  that time in Alaska?
6      A. I believe there were three or four.
7      Q. And would that be in addition to Special Agent
8  Stuart?
9      A. Yes. She's not considered a ranger.
10     Q. Was there a Special Agent Pete Johnson involved in
11 this also who was an Alaskan agent?
12     A. Pete Johnson was the special agent-in-charge prior
13 to when Ms. Stuart was hired. He retired. I can't recall
14 the date he retired or the date Ms. Stuart came on board.
15     Q. Is it normal in the course of BLM business not to
16 maintain records of an inquiry like this?
17        (Discussion off the record with the reporter.)
18     MR. WAYSON: Of an inquiry like this,
19 administrative inquiry.
20     MR. COOPER: I'm going to object. It misstates
21 the record. There's been no evidence that there hasn't
22 been records kept.
23        (Discussion off the record with the reporter.)
24     MR. COOPER: Never mind. Withdraw my objection.
25 Go ahead. Let's get this over with.

Case 4:06-cv-00001-JWS   Document 73-21   Filed 11/05/2007   Page 3 of 5

WAYSON vs. SCHNEIDER                                LINDA S.C. RUNDELL - SEPTEMBER 27, 2004
                                                                     4 (Pages 10 to 13)

WORD INDEX EXHIBITS

Page 10
1   Q. Did you contact any witnesses?
2   A. I did not.
3   Q. Did you contact Ranger Lee with the law
4   enforcement in Fairbanks with BLM?
5   A. I may have, but I don't recall.
6   Q. Do you know if Henri Bisson was in any capacity at
7   -- in the Alaska administration of BLM at that time?
8   A. Henri Bisson was in the Washington office. At
9   that time he was not in the Alaska BLM organization.
10  Q. Did you talk to Michael Baffrey with the Secretary
11  of Interior's Office?
12  A. I cannot recall.
13  Q. In the second paragraph of this memorandum dated
14  September 19th, you referred to: "Upon careful review of
15  the incident in question, we have determined," and can you
16  tell me who the "we" you're referring to is?
17  A. My guess would be that I was referring to myself,
18  the State Director, and whoever from the National Law
19  Enforcement Office looked into the incident for me.
20  Q. Do you know who the chief in the National Law
21  Enforcement Office was at that time?
22  A. I'm fairly certain it was Walter Johnson.
23  Q. Okay. Did Pamela Stuart have any role in this, in
24  the inquiry?
25  A. I don't know that she was on board at that time.

Page 11
1   I can't remember the exact date that we hired her.
2   Q. Was she the chief of the law enforcement here in
3   Alaska?
4   A. She was the special agent-in-charge in Alaska.
5   Q. So she was the top-ranking law enforcement officer
6   in Alaska.
7   A. Yes.
8   Q. Okay. And where is she now?
9   A. She is now in Santa Fe.
10  Q. And when did she transfer down there, do you know?
11  A. To Santa Fe?
12  Q. Correct.
13  A. I believe it was around April of 2003. That's
14  just a guess, though.
15  Q. And I understand that you went down there in
16  December of --
17  A. 1999.
18  Q. That's correct, but I mean: You transferred from
19  Alaska in December of 2002?
20  A. Yes.
21  Q. Okay. Do you think that the finding that you made
22  may have been different had you interviewed the individuals
23  who were involved and reviewed evidence?
24  A. I don't believe so.
25  Q. Would you follow the same procedures if the

Page 12
1   complainant had been a federal employee?
2   A. Yes.
3   Q. Would you contact that employee?
4   A. Probably not. I would have asked whoever was
5   handling the inquiry for me to look at the facts and
6   contact whoever that individual felt needed to be
7   contacted.
8   Q. Did you do so in this case?
9   A. I turned it over to the National Law Enforcement
10  Office, and they conducted their investigation into the
11  matter.
12  Q. But you don't know who you assigned to do this
13  inquiry?
14  A. I don't recall.
15  Q. Would there be a record of it anyplace?
16  A. I'm -- Most likely if there is, it would be in
17  the Boise office of the National Law Enforcement Office.
18  Q. Okay. What information did you have when you
19  began this inquiry?
20  A. I had the memo from Walter Johnson, and I had
21  spoken with Mr. Schneider about the incident. At some
22  point I reviewed the statements written by Ms. Hammond,
23  Officer Lee.
24  Q. I'm sorry. I didn't hear that, ma'am.
25  A. I said: At some point I review the statements

Page 13
1   that were written by Ms. Hammond and Officer Lee.
2   Q. Okay. On the Ms. Hammond statements, you're
3   talking about the contract diary, which is, I believe,
4   Exhibit No. 2.
5   A. Yes.
6   Q. Okay. And with the -- and that Ranger Lee report,
7   you're referring to the report that's listed as No. 3; is
8   that correct?
9   A. Yes.
10  Q. Okay. And just so I keep it straight: You had a
11  memo from Walter Johnson requesting or directing you to
12  this inquiry; but you don't have that memo, right?
13  A. The memo, again, is from Walter Johnson to the IG
14  that I'm referring to.
15  Q. Yes. And do you have that memo?
16  A. I do. We've already spoken about it. It's No. 7.
17  Q. Well, I would ask if you have another one because
18  that's dated October 2nd, and your memorandum is dated
19  September 19, 2002.
20  A. Yes.
21  Q. Well, did you have a memo accompanying this report
22  from Ms. Hammond and the report from Ranger Lee?
23  A. Oh, I don't know. It's not part of the materials,
24  I don't believe, that were sent to me.
25  Q. No, I think that's correct. But did you have one?



Case 4:06-cv-00001-JWS   Document 73-21   Filed 11/05/2007   Page 4 of 5

WAYSON vs. SCHNEIDER                                    LINDA S.C. RUNDELL - SEPTEMBER 27, 2004

7 (Pages 22 to 25)

Page 22
1   (Discussion off the record with the reporter.)
2   Q.  Was this assigned in writing, to the best of your
3   recollection, Ms. Rundell?
4   A.  I cannot recall.
5   Q.  Do you think that a finding such as this would
6   have a detrimental effect to a BLM employee if it was in
7   their file?
8   A.  What finding is that?
9   Q.  The finding that you noted here in the September
10  19th memorandum.
11  A.  I don't know -- I can't conceive that it would
12  have a detrimental effect, no.
13  Q.  But if it was the -- if you made a finding that a
14  BLM employee had committed a Title 18 violation, do you
15  think that would be detrimental to their career?
16  A.  I can't speculate on that.
17  Q.  Do you think your inquiry was fair?
18  A.  I do.
19  Q.  Do you think it was fair in that you did not speak
20  with me, the accused?
21      MR. COOPER:  Well, objection; vague.  You're
22  referring to yourself as "the accused," and your
23  Exhibit No. 1 makes you the accuser, so ...
24      MR. WAYSON:  I'm speaking in reference to the
25  accusation here -- or the finding, rather, that I committed

Page 23
1   a crime against Ms. Hammond.  That's my question.
2       MR. COOPER:  There's no finding that you committed
3   a crime against Mrs. Hammond -- or Ms. Hammond.  If you
4   want me to submit it to the grand jury, I will, Mr. Wayson;
5   but I don't think that's what you want.
6       MR. WAYSON:  Oh, I would be very pleased if you do
7   that, Mr. Cooper.
8   Q.  (BY MR. WAYSON)  My question is the -- has to do
9   with the finding that you made in the fifth paragraph.
10      MR. COOPER:  Well, first of all, I really think
11  you really need to mark this as an exhibit if you're going
12  to keep on referring to it.  Your No. 5, is that what
13  you're referring to?
14      MR. WAYSON:  That's what I'm referring to, No. 5,
15  which is the -- I don't know the order we started off in.
16  If you want to make that Exhibit No. 1, that's fine with
17  me.
18      MR. COOPER:  Let's make it Exhibit No. 1 and
19  attach it to the deposition, Madam Court Reporter.
20      (Discussion off the record with the reporter.)
21          (Deposition Exhibit No. 1)
22              Was marked for identification)
23      MR. COOPER:  Thank you.
24  Q.  (BY MR. WAYSON)  Ms. Rundell, referring to
25  Exhibit No. 1, I'm referring to specifically to the fifth

Page 24
1   paragraph wherein it states:
2           "Title 18 United States Code 111
3       states in pertinent part, 'whoever forcibly
4       assaults, resists, opposes, impedes,
5       intimidates, or interferes with any person
6       designated in section 1114 of this title
7       (the BLM falls within this statue) while
8       engaged in or on account of the performance
9       of official duties shall be fined under this
10      title or imprisoned not more than one year,
11      or both."
12      Next sentence:
13          "Ms. Hammond, while performing her
14      official duties, was intimidated by
15      Mr. Wayson."
16      MR. COOPER:  Now what's your question?
17  Q.  (BY MR. WAYSON)  My question is:  Can we
18  reasonably assume that's a finding that a criminal act
19  occurred?
20      THE REPORTER:  That what?
21      MR. WAYSON:  Is that a reasonable -- a person -- a
22  reasonable person reading this could assume that a criminal
23  act had occurred.
24      MR. COOPER:  Well, I just object to the form of
25  the question.

Page 25
1   Q.  (BY MR. WAYSON)  Did you make a finding that I
2   committed a crime -- this crime against Ms. Hammond?
3       MR. COOPER:  Well, once again, I'm going to
4   object, Mr. Wayson.  It's not a crime against Ms. Hammond.
5   It would be a crime against the peace and dignity of the
6   United States of America.
7       (Discussion off the record with the reporter.)
8       MR. COOPER:  Okay.  It would be a crime against
9   the peace and dignity of the United States of America.
10  Q.  (BY MR. WAYSON)  Okay.  Ms. Rundell, did you make
11  this finding?
12      MR. COOPER:  Objection to the characterization of
13  the statement as a "finding."
14      Go ahead and answer, if you can, Ms. Rundell.
15  A.  Yes, I did.
16  Q.  (BY MR. WAYSON)  You did make this finding?
17  A.  Yes.
18  Q.  And are you saying it was based upon the people
19  you spoke with and who you can't recall?
20  A.  I'm sorry.  I'm not getting what you're saying.
21  Q.  Well, I mean, other than what you've noted here
22  today of the persons you spoke with, is there any other
23  evidence that led you to the finding?
24  A.  I don't recall.
25  Q.  Ms. Rundell, you stated you can't recall who you

HUNNICUTT, COSTELLO REPORTING, INC.
(505) 474-9770 - FAX (505) 474-9771

Case 4:06-cv-00001-JWS   Document 73-21   Filed 11/05/2007   Page 5 of 5

WAYSON vs. SCHNEIDER                                    LINDA S.C. RUNDELL - SEPTEMBER 27, 2004
9 (Pages 30 to 33)

Page 30

1    FURTHER EXAMINATION
2 BY MR. WAYSON:
3   Q.  Ms. Rundell, I would like to continue just a
4 minute.  Would it be -- would you be concerned personally
5 if there was an official finding that you'd committed a
6 criminal act?
7   A.  I beg your pardon?  That I committed a criminal
8 at?
9   Q.  Exactly.
10  A.  Would I be concerned personally?
11  Q.  Yes.
12  A.  I would assume so.
13  Q.  If it was made part of the official record?
14  A.  You know, you're asking for speculation, but I
15 would assume I'd be concerned.
16  Q.  And if you were -- had been accused by an employee
17 of something, would you expect to be contacted before such
18 a finding was made?
19  A.  Perhaps.  It would depend on what the -- what the
20 allegation was.
21  Q.  Well, let's say it's the allegation that's in
22 paragraph 5 of your memorandum.
23  A.  That I don't believe is an allegation.  It seems
24 to be a conclusion from the review.
25  Q.  And if this conclusion had been made about you and

Page 31

1 placed in the official record, would you find this
2 troubling?
3   A.  Well, again, you're asking for speculation, and I
4 just -- I don't know.
5   Q.  And there are a number -- in Exhibit No. 3, which
6 is the Carol Hammond report, there are a number of other
7 allegations in there.  Do you remember those?
8   A.  My recollection is that Ms. Hammond was not
9 pleased that a video camera had been thrust in her face.
10 She felt intimidated.  She felt threatened.
11  Q.  Did Ms. Hammond indicate that the video camera was
12 thrust in her face?
13  A.  I believe that is in her report, but I'd have to
14 go over it again.
15  Q.  Could it have been in Mr. Schneider's report
16 instead?
17  A.  It could have been.  It could have been.
18  Q.  Do you recall an allegation from Ms. Hammond that
19 there had been some comment made by me that it was just
20 like a woman to call someone for help?
21  A.  I don't recall that.
22  Q.  Do you recall an allegation in there -- or a
23 suggestion or allegation by Ms. Hammond in her report that
24 I had intended that the 9/11 attackers target federal
25 buildings?

Page 32

1   A.  I don't recall that either.  It may be in the
2 report, but I'd have to read it to refresh my memory.
3   Q.  Do you recall, from your memory today or back then
4 when you were reviewing it, an allegation that I had
5 improperly touched another BLM employee?
6   A.  I don't recall.
7   Q.  Did you arrive at a conclusion what was done or
8 what I did to threaten, intimidate, or interfere with
9 Ms. Hammond?
10  A.  I'm sorry.  Can you repeat that?
11  Q.  Yes.  Did you arrive at a conclusion at any time
12 what it was I did which was threatening to Ms. Hammond?
13  A.  Ms. Hammond's report and what was reported to me
14 by Mr. Schneider is that your verbal language and your
15 presence was intimidating to her, and she felt threatened.
16  Q.  Okay.  Was there any suggestion of force?
17  A.  Not that I can recall.
18  Q.  Okay.  Is it possible that you spoke with
19 Mr. Schneider after your inquiry was completed?
20  A.  Well, certainly.  He worked for me.
21  Q.  Right, but what I'm asking is that:  Do you recall
22 for sure that you spoke to him before you wrote the
23 memorandum?
24  A.  Yes, I'm sure I did.
25  Q.  About this matter?

Page 33

1   A.  Yes.
2   Q.  Okay.
3   A.  I'm fairly certain he called me after the incident
4 occurred on the -- probably the next business day.
5   Q.  Did you -- That was long before the inquiry was
6 assigned to you, correct?
7   A.  Yes.
8   Q.  So did you talk to him after the inquiry was
9 assigned to you?
10  A.  I don't recall, but I may have called him just to
11 refresh my memory on what he had said.
12  Q.  Well, you're not certain when, but was it -- can
13 you tell me approximately how long before you wrote the
14 September 19, 2002, memorandum that the inquiry was
15 assigned to you?
16  A.  I do not recall.
17  Q.  Is there something procedurally that would require
18 you answer within a certain period of time?
19  A.  I don't know.
20  Q.  Well, you referred to that, indeed, there are some
21 procedures.  Is there any place I can obtain these
22 procedures?
23  A.  I would suggest that you put your request to the
24 National Law Enforcement Office.
25      MR. WAYSON:  Mr. Cooper, anything further?